# In the United States Court of Appeals
# For the Fifth Circuit

---

## SARAH PALMQUIST, INDIVIDUALLY AND AS NEXT FRIEND OF E.P., A MINOR; GRANT PALMQUIST,

*Plaintiffs – Appellants*

v.

## THE HAIN CELESTIAL GROUP, INCORPORATED,

*Defendant – Appellee*

---

Appeal from the United States District Court for the
Southern District of Texas, Galveston Division; No. 3:21-CV-90

---

# BRIEF OF APPELLANTS

---

**YETTER COLEMAN LLP**
Constance H. Pfeiffer
Jason R. LaFond
Austin Brumbaugh
811 Main Street, Suite 4100
Houston, TX 77002
(713) 632-8000
(713) 632-8022 (Fax)

**BECK REDDEN LLP**
Russell S. Post
Owen J. McGovern
Bennett J. Ostdiek
1221 McKinney Street, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

*Counsel for Appellants, Sarah Palmquist, Individually and as
Next Friend of E.P., a minor; Grant Palmquist*

## In the United States Court of Appeals
## For the Fifth Circuit

### SARAH PALMQUIST, INDIVIDUALLY AND AS NEXT FRIEND OF E.P., A MINOR; GRANT PALMQUIST,

*Plaintiffs – Appellants*

**v.**

### THE HAIN CELESTIAL GROUP, INCORPORATED,

*Defendant – Appellee*

Appeal from the United States District Court for the
Southern District of Texas, Galveston Division; No. 3:21-CV-90

### CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. **Plaintiffs-Appellants:**

   Sarah Palmquist, Individually and as Next Friend of E.P., a minor; Grant Palmquist

**2.      Counsel for Plaintiffs-Appellants:**

BECK REDDEN LLP
Russell S. Post
Owen J. McGovern
Bennett J. Ostdiek
1221 McKinney, Suite 4500
Houston, TX 77010-2010
Tel: 713.951.3700

YETTER COLEMAN LLP
Constance H. Pfeiffer
Jason R. LaFond
Austin Brumbaugh
811 Main Street, Suite 4100
Houston, TX 77002
Tel: 713.632.8000

ARNOLD & ITKIN LLP
Kurt Arnold
Caj Boatright
Roland Christensen
Andrew Gould
Brittany Clark
Alec Paradowski
6009 Memorial Drive
Houston, TX 77007
Tel: 713.222.3800

PARKER & SANCHEZ PLLC
Charles R. Parker
Anderson Parker
700 Louisiana St., Suite 2700
Houston, TX 77002
Tel: 713.659.7200

**4.  Defendant-Appellee:**

The Hain Celestial Group, Incorporated

**5.  Counsel for Defendant-Appellee:**

COVINGTON & BURLING LLP
Michael X. Imbroscio
Phyllis A. Jones
David N. Sneed
Kathleen E. Paley
Elizabeth T. Fouhey
Nicole Antoine
Clayton Bailey
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: 202.662.6000

FEE, SMITH & SHARP, L.L.P.
Brian G. Cano
2777 Allen Parkway, Suite 800
Houston, TX 77019
Tel: 713.362.8300

**6.  Defendants-Appellees:**

Whole Foods Market, Inc.
Whole Foods Market Rocky Mountain/Southwest, L.P.

**7.  Counsel for Defendants-Appellees:**

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
Bradley E. Chambers
1301 McKinney Street, Suite 3700
Houston, TX 77010
Tel: 713.650.9700

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
Samuel Lanier Felker
1600 West End Avenue, Suite 2000
Nashville, TN 37203
Tel: 615.726.5558

*/s/ Russell S. Post*
Russell S. Post
*Attorney of Record for Appellant*

**STATEMENT REGARDING ORAL ARGUMENT**

The Palmquists believe that oral argument will aid the decisional process. This appeal involves important, unresolved questions regarding improper joinder and causation in toxic tort cases. In both respects, the appeal presents questions of first impression for this Court.

Additionally, this cutting-edge toxic tort case is one of the first of many cases percolating around the country in which tainted baby food products allegedly caused heavy metal toxicity in a small child—and the injuries in this case are more acute than most, if not all, of the other cases. If the Court determines that it has jurisdiction to reach the merits, its opinion will provide guidance to courts around the country that will soon be addressing similar issues.

**Page**

Certificate of Interested Persons .................................................................. i

Statement Regarding Oral Argument ........................................................ v

Table of Contents .................................................................................... vi

Index of Authorities ................................................................................. x

Statement of Jurisdiction ...................................................................... xvii

Issues Presented .................................................................................. xviii

Introduction ............................................................................................. 1

Statement of the Case .............................................................................. 2

Summary of Argument ........................................................................... 10

Argument ............................................................................................... 11

    I.     The district court erred by denying the Palmquists' motion to remand. ........................................................................................ 11

        A.     The district court erred by concluding that it could not consider the allegations raised in the Palmquists' amended complaint. ........................................................... 12

               1.     In this circuit, improper joinder is determined by application of the federal pleading standard .................. 13

               2.     Plaintiffs who filed suit in state court are entitled to amend after removal to comply with the federal pleading standard, and courts are not free to ignore such amended complaints when conducting improper joinder analysis. ........................................... 15

               3.     The Fifth Circuit already announced the core principles that control this question in the Rule 12 context ............................................................................. 18

4. Longstanding Fifth Circuit precedent holds that plaintiffs may "clarify" and "amplify" their jurisdictional allegations after removal for purposes of improper joinder analysis. ..........................................19

5. The district court wrongly ruled that Fifth Circuit precedent prevents courts from considering amended complaints when conducting an improper joinder analysis. ............................................21

B. The Palmquists' amended complaint alleged viable claims against Whole Foods, defeating diversity jurisdiction. ...............................................................23

1. The Palmquists' amended complaint plausibly alleged an express factual misrepresentation. ...............24

2. The district court erred by concluding that the express factual misrepresentation exception does not apply. ......................................................27

a. The district court misread the Palmquists' complaint. ..........................................28

b. The district court misinterpreted Texas law. ........28

c. Federal district court orders do not support dismissal. ..........................................33

C. The jurisdictional nature of this error demands correction. ...............................................................35

II. Even if the district court did have jurisdiction over this case, it erred by granting judgment as a matter of law on the issue of causation. ...........................................................36

A. The Palmquists introduced sufficient evidence of general causation. .......................................................38

1. Even though the threshold of harmful exposure is unknown, reliable expert testimony proved a scientific consensus that heavy metal poisoning can cause neurocognitive injuries. .........................39

2.      The Palmquists' experts eliminated all potential causes of Ethan's injuries other than heavy metal poisoning............................................................................42

3.      The combination of a scientific consensus that exposure to a toxic substance can generally cause injury and a reliable differential diagnosis ruling out other causes is sufficient to prove general causation. ....................................................44

4.      The district court incorrectly ruled that Fifth Circuit precedent forecloses the argument that the Palmquists introduced sufficient evidence of general causation. ..........................................46

      a.    The *Curtis* line of cases is distinguishable. ..........47

      b.    *Johnson* is distinguishable.....................................49

B.    The Palmquists introduced sufficient evidence of specific causation. ....................................................50

C.    The Palmquists introduced sufficient evidence that Hain's baby food contained harmful levels of heavy metals and that Ethan suffered from heavy metal toxicity. ....................................................53

III.    The Palmquists introduced sufficient evidence to establish liability..............................................................................56

A.    There is sufficient evidence of a marketing defect. .................56

1.      The Palmquists proved a marketing defect. ...................56

2.      The nonliability presumption does not apply. ................59

B.    There is sufficient evidence of a manufacturing defect. ............60

C.    There is sufficient evidence of negligence. ..............................62

D.    The district court erred in granting summary judgment on the Palmquists' design defect claim......................................63

Conclusion ...........................................................................................65

Certificate of Service ...........................................................................67

Certificate of Compliance .....................................................................67

# INDEX OF AUTHORITIES

CASES                                                                 PAGE(S)

*African Methodist Episcopal Church v. Lucien*,
   756 F.3d 788 (5th Cir. 2014) .................................................11, 21, 27

*Allen v. Pennsylvania Engr. Corp.*,
   102 F.3d 194 (5th Cir. 1996) .......................................................47, 48

*Am. Tobacco Co. v. Grinnell*,
   951 S.W.2d 420 (Tex. 1997) ...................................................60, 61, 62

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................16

*Asociacion Nacional de Pescadores a Pequena Escala O Artesanales*
   *de Colombia (ANPAC) v. Dow Quimica de Colombia S.A.*,
   988 F.2d 559 (5th Cir. 1993) .......................................................19, 20

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................16

*Bocanegra v. Vicmar Servs., Inc.*,
   320 F.3d 581 (5th Cir. 2003) ............................................................44

*Briarpatch Ltd. v. Phx. Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004) ..............................................................14

*In re Briscoe*,
   448 F.3d 201 (3d Cir. 2006) ..............................................................14

*Brown v. Sw. Bell Tel. Co.*,
   901 F.2d 1250 (5th Cir. 1990) .....................................................21, 22

*Casias v. Wal-Mart Stores, Inc.*,
   695 F.3d 428 (6th Cir. 2012) ............................................................14

*Cavallini v. State Farm Mutual Auto Ins.*,
   44 F.3d 256 (5th Cir. 1995) .......................................................20, 22

*Clark v. Kellogg Brown & Root L.L.C.*,
   414 F. App'x 623 (5th Cir. 2011) ................................................51, 52

*Click v. General Motors LLC*,
  2020 WL 3118577 (S.D. Tex. Mar. 27, 2020) ...................................................34

*Coastal Tankships, U.S.A., Inc. v. Anderson*,
  87 S.W.3d 591 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ................42

*Conley v. Gibson*,
  355 U.S. 41 (1957) ............................................................................................16

*Cox v. American Honda Motor Co., Inc.*,
  2021 WL 3705007 (S.D. Tex. Mar. 26, 2021) ...................................................33

*Curtis v. M&S Petroleum, Inc.*,
  174 F.3d 661 (5th Cir. 1999) .........................................................46, 47, 51, 52

*DeRoeck v. DHM Ventures, LLC*,
  556 S.W.3d 831 (Tex. 2018) ............................................................................15

*Durable Specialties, Inc. v. Liberty Ins. Corp.*,
  2011 WL 6937377 (N.D. Tex. Dec. 30, 2011) ..................................................17

*Dutcher v. Matheson*,
  733 F.3d 980 (10th Cir. 2013) ..........................................................................14

*Edwea, Inc. v. Allstate Ins. Co.*,
  2010 WL 5099607 (S.D. Tex. Dec. 8, 2010) .....................................................17

*Emerson Elec. Co. v. Johnson*,
  627 S.W.3d 197 (Tex. 2021) ............................................................................63

*Gasch v. Hartford Acc. & Indem. Co.*,
  491 F.3d 278 (5th Cir. 2007) ..............................................................17, 25, 35

*Genie Indus., Inc. v. Matak*,
  462 S.W.3d 1 (Tex. 2015).................................................................................63

*Gill v. Michelin N. Am., Inc.*,
  3 F. Supp. 3d 579 (W.D. Tex. 2013) ..........................................................27, 34

*GJP, Inc. v. Ghosh*,
  251 S.W.3d 854 (Tex. App.—Austin 2008, no pet.).............................31, 32, 33

*Goodner v. Hyundai Motor Co., Ltd.*,
   650 F.3d 1034 (5th Cir. 2011) ............................................36

*Grancare, LLC v. Thrower ex rel. Mills*,
   889 F.3d 543 (9th Cir. 2018) ..............................................14

*Griggs v. State Farm Lloyds*,
   181 F.3d 694 (5th Cir. 1999) ..........................................19, 20

*Hamburger v. State Farm Mut. Auto. Ins. Co.*,
   361 F.3d 875 (5th Cir. 2004) ...............................................36

*Helena Chem. Co. v. Wilkins*,
   47 S.W.3d 486 (Tex. 2001) ..................................................30

*Heller v. Shaw Indus., Inc.*,
   167 F.3d 146 (3d Cir. 1999) ............................................45, 52

*Hicks v. Martinrea Auto. Structures (USA), Inc.*,
   12 F.4th 511 (5th Cir. 2021) .........................11, 13, 16, 29, 31

*HOW Ins. Co. v. Patriot Fin. Servs.*,
   786 S.W.2d 533 (Tex. App.—Austin 1990, writ denied),
   *overruled on other grounds by Hines v. Hash*,
   843 S.W.2d 464 (Tex. 1992) ...............................................31

*Howard v. Lowe's Home Centers*, LLC,
   306 F. Supp. 3d 951 (W.D. Tex. 2018) ............................27, 34

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
   920 F.3d 890 (5th Cir. 2019) ...............................................16

*Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Group, Ltd.*,
   818 F.3d 193 (5th Cir. 2016) .......................................13, 16, 18

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
   341 S.W.3d 323 (Tex. 2011) ...........................................32, 33

*Jacob E. Decker & Sons, Inc. v. Capps*,
   164 S.W.2d 828 (Tex. 1942) ...........................................60, 61

*Johnson v. Am. Towers, LLC*,
   781 F.3d 693 (4th Cir. 2015) ...............................................14

*Johnson v. Arkema, Inc.*,
685 F.3d 452 (5th Cir. 2012) ......................................................42, 46, 49, 51, 52

*JSC Nizhnedneprovsky Tube Rolling Plant v. United Resources, LP*,
2016 WL 8921926 (Tex. App.—Corpus Christi–Edinburg
Dec. 21, 2016, no pet.) ......................................................................................29

*Kia Motors Corp. v. Ruiz*,
432 S.W.3d 865 (Tex. 2014) ............................................................................59

*Knight v. Kirby Inland Marine Inc.*,
482 F.3d 347 (5th Cir. 2007) ......................................................................37, 49

*Knudson v. Sys. Painters, Inc.*,
634 F.3d 968 (8th Cir. 2011) ............................................................................14

*Kokkonen v. Guardian Life Ins. Co.*,
511 U.S. 375 (1994) ..........................................................................................35

*Kroger Co. v. Elwood*,
197 S.W.3d 793 (Tex. 2006) ............................................................................62

*In re Lipsky*,
460 S.W.3d 579 (Tex. 2015) ............................................................................15

*Meador v. Apple, Inc.*,
911 F.3d 260 (5th Cir. 2018) ............................................................................37

*Merrell Dow Pharm., Inc. v. Havner*,
953 S.W.2d 706 (Tex. 1997) ............................................................................37

*Norman v. Bodum USA, Inc.*,
44 F.4th 270 (5th Cir. 2022) ............................................................................61

*O'Neill v. Seariver Mar., Inc.*,
246 F. App'x 278 (5th Cir. 2007) ....................................................................52

*Padgett v. Bert Ogden Motor's, Inc.*,
869 S.W.2d 532 (Tex. App.—Corpus Christi 1993, writ denied) ....................31

*Peña v. City of Rio Grande City*,
879 F.3d 613 (5th Cir. 2018) ............................................................................18

*Pennington v. Singleton*,
  606 S.W.2d 682 (Tex. 1980) ............................................................30

*PNC Bank, Nat'l Ass'n v. Ruiz*,
  989 F.3d 397 (5th Cir. 2021) ...........................................................35

*Primrose Oper. Co. v. Nat'l Am. Ins. Co.*,
  382 F.3d 546 (5th Cir. 2004) ...........................................................28

*Prudential Ins. Co. of Am. v. Jefferson Associates, Ltd.*,
  896 S.W.2d 156 (Tex. 1995) ...........................................................31

*Pullman Co. v. Jenkins*,
  305 U.S. 534 (1939)..........................................................................21

*Ranger Conveying & Supply Co. v. Davis*,
  254 S.W.3d 471 (Tex. App.—Houston [1st Dist.] 2007,
  pet. denied).......................................................................................56

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*,
  355 F.3d 370 (5th Cir. 2004) ...........................................................16

*Sarkees v. E. I. Dupont De Nemours & Co.*,
  15 F.4th 584 (2d Cir. 2021) .............................................................52

*Schur v. L.A. Weight Loss Ctrs., Inc.*,
  577 F.3d 752 (7th Cir. 2009) ...........................................................14

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010)..........................................................................28

*Short v. Mitchell*,
  454 S.W.2d 285 (Tex. App.—Waco 1970, writ ref'd n.r.e.)..............31

*Silverman v. Watson Pharm., Inc.*,
  2013 WL 1645771 (S.D. Tex. Apr. 16, 2013)...................................52

*Smallwood v. Illinois Cent. R. Co.*,
  385 F.3d 568 (5th Cir. 2004) (en banc) ...........................................13

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)............................................................................35

*Stevenson v. E.I. DuPont De Nemours & Co.*,
  327 F.3d 400 (5th Cir. 2003) ...........................................................40

*Stevenson v. Allstate Tex. Lloyd's*,
  2012 WL 360089 (S.D. Tex. Feb. 1, 2012) ......................................17

*Stillwell v. Allstate Ins. Co.*,
  663 F.3d 1329 (11th Cir. 2011) .......................................................14

*Ticer v. Imperium Ins. Co.*,
  20 F.4th 1040 (5th Cir. 2021) .................................................12, 34

*Transcon. Ins. Co. v. Briggs Equip. Tr.*,
  321 S.W.3d 685 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ..................29

*Transp. Ins. Co. v. Faircloth*,
  898 S.W.2d 269 (Tex. 1995) ...........................................................32

*Turner v. Iowa Fire Equip. Co.*,
  229 F.3d 1202 (8th Cir. 2000) .........................................................45

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
  546 U.S. 394 (2006).........................................................................36

*Universal Truck & Equip. Co. v. Southworth-Milton, Inc.*,
  765 F.3d 103 (1st Cir. 2014)............................................................14

*Wells v. SmithKline Beecham Corp.*,
  601 F.3d 375 (5th Cir. 2010) ...........................................................37

*Westberry v. Gislaved Gummi AB*,
  178 F.3d 257 (4th Cir. 1999) .....................................................45, 52

*Wright v. Carpenter*,
  579 S.W.2d 575 (Tex. App.—Corpus Christi 1979,
  writ ref'd n.r.e.)..............................................................................31

*Wright v. Willamette Industries*,
  91 F.3d 1105 (8th Cir. 1996) ...........................................................48

*Xitronix Corp. v. KLA-Tencor Corp.*,
  916 F.3d 429 (5th Cir. 2019) ...........................................................35

**Statutes**

28 U.S.C.
    § 1441(a) ...................................................................................11
    § 1447(c) ...................................................................................11

Tex. Bus. & Com. Code § 17.46(b)(7) ...................................................30

Tex. Civ. Prac. & Rem. Code
    § 82.003(a) ................................................................................23
    § 82.003(a)(5)(A) ......................................................................30
    § 82.005.....................................................................................63
    § 82.008.....................................................................................59

**Rules**

Fed. R. Civ. P. 15(a)(1) ........................................................................11

**Other Authorities**

21 C.F.R. § 101.100(a)(3) .....................................................................60

3 Texas Torts and Remedies § 44.02[2][b][v] .......................................31

Federal Judicial Center,
*Reference Manual on Sci. Ev.*,
2011 WL 7724262 (3d ed. 2011).....................................................44

Restatement (Third) of Torts: Prod. Liab. § 9 & cmt. c ........................30

## STATEMENT OF JURISDICTION

Hain removed this case under 28 U.S.C. § 1441, citing diversity jurisdiction. ROA.37-46; 28 U.S.C. § 1332. The district court denied a motion to remand, concluding that non-diverse defendant Whole Foods was improperly joined. ROA.779-83. This ruling was error. *See* pp. 11-35, *infra*. Because Whole Foods was a proper non-diverse defendant, the district court should have remanded the case to state court in accordance with 28 U.S.C. § 1447(c).

Nonetheless, the case proceeded to trial, and the district court granted a motion for judgment under Rule 50 and then entered a final judgment on March 3, 2023. ROA.18417. The Palmquists filed a timely notice of appeal on April 3, 2023, ROA.18526-27, giving this Court jurisdiction under 28 U.S.C. § 1291.

# ISSUES PRESENTED

1.    After this case was removed, the Palmquists filed an amended complaint that clarified their allegations against Whole Foods in light of the newly applicable federal pleading standard. The district court refused to consider the allegations in the amended complaint, and in the alternative, concluded that they did not state a claim against Whole Foods.

    a.    Did the district court err by concluding that it could not consider the new allegations in the amended complaint?

    b.    Did the amended complaint plausibly allege that Whole Foods made an express factual misrepresentation regarding Hain's baby food?

2.    At trial, the Palmquists proved (1) there is a scientific consensus that exposure to heavy metals can cause neurocognitive injuries, even if the exact threshold level of harmful exposure is not known; and (2) every other potential cause of Ethan's neurocognitive injuries was ruled out through a differential diagnosis. The district court ruled this evidence was insufficient for general causation. Did the district court err by granting judgment as a matter of law on the issue of causation?

3.    The district court did not refer to any other grounds in its oral ruling, but its order states that Hain's Rule 50(a) motion was granted in its entirety. Did the Palmquists introduce sufficient evidence to avoid judgment as a matter of law on their liability theories (including a design defect theory on which the court granted summary judgment before trial)?

## INTRODUCTION

Ethan Palmquist is a child who suffers from major neurocognitive disorder and severe to profound intellectual disability. Ethan was healthy as a young child, but after years of consuming baby foods manufactured by the Hain Celestial Group and marketed as safe, organic food by Whole Foods, he became gravely impaired. Ethan's doctors determined that his injuries were caused by heavy metal toxicity, but the source of his exposure was unknown until 2021, when a Congressional report revealed that Hain's baby food was tainted with dangerous levels of heavy metals. Ethan's parents (Sarah and Grant Palmquist) sued Hain, along with Whole Foods— the store that had sold them Hain's products after expressly representing that they were safe, vetted, and free from harmful ingredients.

The Palmquists filed suit in Texas state court, but Hain removed the case on the theory that Whole Foods was improperly joined. The district court refused to consider an amended complaint clarifying the allegations against Whole Foods and denied the Palmquists' motion to remand. Then, at the end of an eight-day trial— after denying a summary judgment motion and overruling *Daubert* objections to the Plaintiffs' experts on causation—the district court granted Hain's Rule 50(a) motion for judgment as a matter of law. Both of those rulings were error.

The Court should reverse and remand the case to state court. In the alternative, it should reverse the Rule 50(a) ruling and remand for a new trial.

## STATEMENT OF THE CASE[1]

### *After beginning life as a normal, healthy child, Ethan Palmquist mysteriously develops major neurocognitive disorder with severe intellectual disability*

Ethan Palmquist began his life as a perfectly healthy child.  Ethan was a bright, happy, and charming baby and toddler who "loved snuggles."  ROA.21201.  He was "really engaged and really sweet," exhibiting a great "sense of humor."  ROA.21202.  Ethan "loved reading books" and listening to music, and he was "very into tools."  ROA.21204-06.  He also enjoyed swimming, riding his tricycle, and playing with other children.  ROA.21206-10.  Ethan started walking at 13 months, and because he wanted to "be like his dad," he would walk around in his father's massive shoes.  ROA.21205-06.

In short, Ethan began life as a normal boy.  His mother, Dr. Sarah Palmquist (a physician at Houston's MD Anderson Cancer Center), confirmed that until Ethan was 2½ years old, he had experienced no developmental issues.  ROA.21211, 21215; *see* ROA.21193-95.  Likewise, medical records prior to his 30-month well-child visit reveal no indication of any developmental issues. ROA.20817; *see* ROA.26664-727.  But then, Ethan's childhood took a tragic turn.

---

[1] In this Statement of the Case, the facts relevant to the Palmquists' challenge to the district court's order granting Hain's Rule 50(a) motion are taken from the trial evidence, while the facts relevant to the Palmquists' threshold challenge to the district court's denial of their motion to remand are taken from the Palmquists' Second Amended Complaint.

Around the age of 30 months, Ethan suddenly experienced significant mental and physical regression. In May 2017, about a month after his 30-month checkup, Ethan's pediatrician expressed significant concerns about Ethan and concluded that he showed signs of autism spectrum disorder ("ASD"). ROA.21217-18, 21556-59; *see also* ROA.26653-26664. Ethan's parents immediately made an appointment with a specialist. ROA.21219.

By the time of that appointment, the situation had worsened. Ethan displayed "significant regression in language. He was losing words. He wasn't able to do things he used to be able to do." ROA.21220. The specialist concluded that Ethan's deteriorating condition was consistent with ASD and prescribed behavioral therapy. ROA.21225-27. But despite therapy, Ethan continued to regress over the course of the next year. ROA.21226-29.

Today, Ethan is a hollow shell of the endearing little boy who began his life "really engaged and really sweet." ROA.21202. He is nonverbal. ROA.21229-30. He has lost his toileting and fine motor skills, experiences gastrointestinal problems, exhibits abnormal losses in muscle tone, and suffers from seizures. ROA.20661-62, 21232-34, 21290. Dr. Lisa Settles, an expert psychologist, testified that when she assessed him at the age of seven years and five months, Ethan's level of functioning was below that of a two-year-old—indeed, Ethan is the lowest functioning patient she has ever assessed. ROA.20652-53, 20645; *see* ROA.20639.

Sadly, Ethan's difficult situation will never get better. Dr. Stephen Nelson, an expert pediatric neurologist and epileptologist, explained that Ethan "will never graduate high school; never live independently; never be gainfully employed. He'll require 24-hour supervision for the rest of his life." ROA.20832; *see* ROA.20802. Dr. Nelson described Ethan's neurocognitive disorder as "one of the most severe" he has ever encountered. ROA.20807.

### *Ethan is ultimately diagnosed with heavy metal toxicity*

The Palmquists naturally searched for the cause of Ethan's severe injuries and rapid decline. ROA.21294. One specialist recommended a "genetics consultation." ROA.21617. But genetic testing revealed no causes for concern. ROA.20551-63; *see also* ROA.20826, 21327. Additional tests ruled out infections, metabolic issues, structural brain defects, congenital injuries, and natal trauma. ROA.20827-30.

Finally, Ethan underwent heavy metals testing. Hair and urine porphyrin tests came back positive for dangerously high levels of arsenic, lead, and mercury. ROA.20999-21009, 21013-14; *see* ROA.21295-99, 25484-97, 25527, 33429-33. Therefore, several doctors diagnosed Ethan with heavy metal toxicity. ROA.20822; *see also* ROA.21011, 26068, 36236, 36478, 36481-84, 36488. Now the Palmquists knew the *cause* of Ethan's injuries: exposure to heavy metals is a well-known cause of neurocognitive injuries that can present as ASD. *See* ROA.20751, 20754-55, 20852-53, 20994-95, 21014, 21580-81, 21673, 21782. But what was the *source*?

*A Congressional report identifies Hain's baby food as a source of heavy metals*

By 2018, the Palmquists knew the cause of Ethan's neurocognitive injuries: heavy metal toxicity. But the source of his heavy metal exposure was still a mystery. ROA.21305, 21325. At last, in 2021, Congress issued a bombshell report disclosing that certain baby foods (including baby foods manufactured by Hain Celestial, Inc.) were tainted with high levels of toxic heavy metals such as arsenic, lead, cadmium, and mercury—many of which had appeared in Ethan's testing. ROA.22846-904.

This development came as a terrible shock to the Palmquists. ROA.21329-30. Because Dr. Palmquist and her husband were well-informed parents who knew that a child's nutrition lays the foundation for his development, they had done significant research into the baby food they fed to Ethan. ROA.258. The Palmquists decided to feed Ethan Hain's baby food products, which they purchased at Whole Foods, because they believed those products offered the highest quality and safest nutrition. ROA.258. Like many affluent consumers, the Palmquists felt especially confident in their choice because Whole Foods expressly represents to its customers not only that its products are safe and of the highest quality but also that it vets its products, including Hain's baby food, to make sure that they are free from harmful ingredients. ROA.258, 271-74. As a result, Ethan ate Hain's baby food for more than two years, almost exclusively. ROA.21305-21. And he ate large quantities of the baby food— often multiple servings at a time. ROA.21308, 21314, 21318-19, 21519.

***The Palmquists sue Hain and Whole Foods in state court, but following removal,
the district court dismisses Whole Foods***

The Palmquists filed suit against Hain and Whole Foods in Texas state court. ROA.148. Hain removed the case on the theory that complete diversity existed because Whole Foods had been improperly joined. ROA.37-46.

After removal, the Palmquists filed an amended complaint that clarified their allegations against Whole Foods under the federal pleading standard. ROA.249-78. They then filed a motion to remand, arguing that they had stated viable negligence and breach of warranty claims against Whole Foods and that Whole Foods had made express factual misrepresentations about Hain's baby food products. ROA.284-303. The district court denied the motion to remand and dismissed the Palmquists' claims against Whole Foods, ruling that their amended complaint could not be considered and that its allegations were too general to state a claim. ROA.779-83.

***At the end of trial, the district court enters judgment for Hain under Rule 50(a)***

The case proceeded against Hain. After discovery was complete, Hain moved to exclude the Palmquists' expert testimony on both general and specific causation. ROA.993-1040, 4194-233. The district court denied the motions. ROA.14809-16.

Hain also moved for summary judgment. ROA.5193-224. The court denied Hain's motion regarding causation, stating that "[c]onsuming heavy metals is widely known to lead to cognitive impairment, severe illness, and—at high levels—death." ROA.16998; *see* ROA.17002-04.

The case then proceeded to trial.  *See generally* ROA.19814-22107.  At trial, the evidence proved that Hain's products contained excessive levels of heavy metals. From 2014 to 2015 (when Ethan was eating large amounts of Hain's rice cereal), Hain's internal specifications for rice cereal permitted 200 parts per billion ("ppb") inorganic arsenic and 100 ppb lead.  ROA.19989, 20037-38; *see also* ROA.35268. As late as 2019, the vitamin premix Hain added to the cereal was found to contain 223 ppb arsenic and 352 ppb lead.  ROA.20032-33, 20880, 22272-73. Similarly, although Hain did not test its final products for heavy metals until 2021, ROA.20049, FDA tests revealed that Hain's products often contained well over 100 ppb arsenic. ROA.22267, 22277; *see also* ROA.20009-10, 20021, 20879-80.

As Hain knows, these are unacceptably high levels of heavy metals for infants and young children.  ROA.20071-78, 22127, 22131, 22452.  In the years since Ethan ate its baby food, Hain has lowered its internal specifications to 100 ppb arsenic. ROA.20028, 20037, 20071.  Additionally, Hain is now in the process of lowering its lead specification to 20 ppb. ROA.19988.  Hain eventually removed its rice cereal from the market altogether because it could not lower the levels of arsenic. ROA.20006, 20035-36, 20040-41.  But it was too late for Ethan.  Numerous doctors testified that Ethan's severe neurocognitive injuries were caused by his consumption of the high quantities of heavy metals in Hain's baby food—the only known source of his exposure to heavy metals.  ROA.21324-25.

As one doctor put it, "Ethan developed the neurological impairments that he did secondary to heavy metal toxicity, and that heavy metal toxicity occurred due to the consumption of baby food made by Hain that had high levels of heavy metals." ROA.20836. Based on Ethan's heavy metal toxicity, the known causal relationship between heavy metals and neurocognitive injuries, and the exclusion of other causes, he concluded that "heavy metal exposure" was "the most likely identifiable cause" of Ethan's brain injuries and that if Ethan "had not suffered the heavy metal toxicity, he would not have suffered the brain injuries." ROA.20831. Another doctor could not find "anything actually in the evidence in the case to explain Ethan's condition other than the heavy metals." ROA.20760. Accordingly, she likewise concluded that "[w]ithout Ethan's heavy metal exposure," Ethan would not "have the injuries that he has today." ROA.20683.

For its part, Hain characterized Ethan as just having "a severe case of autism." *See, e.g.*, ROA.18325. But while it is true that Ethan has all the symptoms necessary for a diagnosis of ASD, ROA.20693, 20843, he also has "other physical symptoms that aren't under [the] criteria for an ASD diagnosis." ROA.20661. Consequently, Ethan's medical experts testified at trial that Ethan's injury is best characterized as "major neurocognitive disorder with severe to profound intellectual disability," which is "a separate diagnosis than ASD." ROA.20662-63; *see also* ROA.20651.

At the close of all the evidence, Hain moved for judgment as a matter of law. ROA.18298-329.  Although it had previously overruled Hain's *Daubert* objections and denied summary judgment on the issue of causation, the district court granted the motion from the bench on the ground that the Palmquists did not "present any expert evidence on general causation."  ROA.22105.  The court subsequently entered a final judgment, ROA.18417, and the Palmquists filed a timely notice of appeal. ROA.18526-27.

## SUMMARY OF ARGUMENT

This case presents two substantial questions that have not been decided by any previous opinion of this Court.

First, the district court erred by denying the Palmquists' motion to remand. The district court believed it could not consider the Palmquists' amended complaint clarifying the basis of their claims against Whole Foods, but its ruling was mistaken as a matter of first principles and reasoned application of existing circuit precedent. The district court also believed the amended complaint did not state a claim against Whole Foods, but again, its ruling was mistaken. The Palmquists fairly alleged that Whole Foods made express factual misrepresentations regarding Hain's baby food, rendering it liable as a non-manufacturing seller under Texas law. Accordingly, Whole Foods was not improperly joined, defeating diversity jurisdiction.

Second, even if the district court had jurisdiction, the court erred by granting Hain's Rule 50(a) motion for judgment as a matter of law. This case presents a rare scenario that has not arisen in any prior case in this circuit: a scientific consensus that exposure to heavy metals cause neurocognitive injuries such as Ethan's at some (unknown) level of exposure *and* a reliable differential diagnosis ruling out every other potential cause of Ethan's injuries. The Court should hold this combination provides a sufficient basis for a finding of causation. Accordingly, the Palmquists introduced sufficient evidence of causation to send the case to a jury.

**ARGUMENT**

## I.   The district court erred by denying the Palmquists' motion to remand.

A defendant may remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a).  Because removing a case from a state court with jurisdiction to adjudicate it has serious federalism implications, "the removing party must bear the burden of showing that removal is proper.  Any doubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction." *African Methodist Episcopal Church v. Lucien*, 756 F.3d 788, 793 (5th Cir. 2014) (cleaned up).  "Any contested issues of facts and any ambiguities of state law must be resolved in favor of remand."  *Id.* (same).  If "it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).

Hain removed this case on the basis of diversity.  ROA.37-46.  However, Defendant Whole Foods is a resident of Texas, as are the Palmquists.  ROA.149-50.  Thus, "removal jurisdiction is proper only if [Whole Foods] was improperly joined." *Hicks v. Martinrea Auto. Structures (USA), Inc.*, 12 F.4th 511, 514 (5th Cir. 2021).  After removal, the Palmquists amended their complaint—as they were entitled to do "as a matter of course," Fed. R. Civ. P. 15(a)(1)—clarifying their factual allegations against Whole Foods and elaborating on the basis for their misrepresentation claim against Whole Foods.  ROA.249-78.

The district court ruled that it could not consider the amended complaint, ROA.780, and in the alternative, it found that the amended complaint did not satisfy the federal pleading standard to state a claim against Whole Foods. ROA.780-82. Thus, it denied the motion to remand and dismissed Whole Foods "with prejudice." ROA.783. These rulings were all erroneous, and each of them is reviewed *de novo*. *Ticer v. Imperium Ins. Co.*, 20 F.4th 1040, 1044 (5th Cir. 2021).

### A. The district court erred by concluding that it could not consider the allegations raised in the Palmquists' amended complaint.

This case presents a question of first impression in light of recent decisions by this Court regarding improper joinder: When a plaintiff files suit in state court under state-law pleading standards that are less demanding than the federal standard and a defendant removes on the basis of improper joinder, is a district court required to consider an amended complaint filed by the plaintiff for purposes of clarifying the allegations against the non-diverse defendant and satisfying the federal standard?

This procedural issue arises because Fifth Circuit precedent holds that the improper joinder analysis must be conducted under the Rule 12(b)(6) standard—even if a state-court pleading would not have been required to satisfy that standard. As a matter of principle and precedent, removed plaintiffs must have an opportunity to demonstrate that their allegations against a non-diverse defendant satisfy the federal pleading standard. The district court erred by ruling otherwise.

### 1. In this circuit, improper joinder is determined by application of the federal pleading standard.

"[A]n improper joinder occurs if a plaintiff is unable 'to establish a cause of action against the non-diverse party in state court.'" *Hicks*, 12 F.4th at 515 (quoting *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 572 (5th Cir. 2004) (en banc)). "The test is whether there is no possibility of recovery by the plaintiff," or stated another way, "whether there is no reasonable basis for predicting recovery against an in-state defendant." *Id.* (cleaned up). "To resolve this inquiry, the district court may conduct a Rule 12(b)(6)-type analysis, 'looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant. Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder.'" *Id.* (quoting *Smallwood*, 385 F.3d at 573).

This Court recently clarified that the improper joinder analysis does not use the relevant state-court pleading standard or some lower federal standard (such as the Rule 12(b)(1) "wholly insubstantial and frivolous" standard). In this circuit, improper joinder analysis must be conducted using the federal standard imposed by Rule 12(b)(6). *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Group, Ltd.*, 818 F.3d 193, 204 (5th Cir. 2016) ("The *Smallwood* opinion instructs us to apply the Rule 12(b)(6)–type analysis, which must mean the entirety of that analysis. Because that analysis is inseparable from the federal pleading standard, this is an instruction to apply the federal pleading standard.") (footnote omitted).

On this issue, the Fifth Circuit stands alone. Every other federal circuit applies

either the applicable state-court pleading standard or some lower federal standard.[2]

This case presents a compelling occasion to refine the Court's singular approach.

---

[2] Some circuits apply the relevant state pleading standard. *See Universal Truck & Equip. Co. v. Southworth-Milton, Inc.*, 765 F.3d 103, 108 (1st Cir. 2014) ("[N]o reasonable possibility that *the state's highest court* would find that the complaint states a cause of action." (emphasis added)); *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 302 (2d Cir. 2004) ("[N]o possibility that the claims against that defendant could be asserted *in state court*." (emphasis added)); *Dutcher v. Matheson*, 733 F.3d 980, 988-89 (10th Cir. 2013) (stating that the test is the "inability of the plaintiff to establish a cause of action against the non-diverse party *in state court*" and recognizing that holding that defendants were not fraudulently joined "does not mean that the plaintiffs have stated a valid claim against [defendants]" (emphasis added)); *Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329, 1334 (11th Cir. 2011) ("To determine whether it is possible that a state court would find that the complaint states a cause of action, *we must necessarily look to the pleading standards applicable in state court*, not the plausibility pleading standards prevailing in federal court." (emphasis added)).

Other circuits apply a lower federal pleading standard. *See In re Briscoe*, 448 F.3d 201, 218 (3d Cir. 2006) ("'[I]t is possible that a party is not fraudulently joined, but that the claim against that party ultimately is dismissed for failure to state a claim upon which relief may be granted' .... Unless the claims against the non-diverse defendant could be deemed 'wholly insubstantial and frivolous,' ... the joinder could not be considered fraudulent." (citation omitted)); *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 704 (4th Cir. 2015) ("[Plaintiffs] must show only a 'glimmer of hope' of succeeding against the non-diverse defendants.... [T]his standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6)." (citation omitted)); *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 433 (6th Cir. 2012) ("When deciding a motion to remand, including fraudulent joinder allegations, we apply a test similar to, but more lenient than, the analysis applicable to a Rule 12(b)(6) motion to dismiss."); *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 764 (7th Cir. 2009) (stating that the test is "whether there is 'any reasonable possibility' that the plaintiff could prevail against the non-diverse defendant" and recognizing that this burden "is even more favorable to the plaintiff than the standard that applies to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)" (citation omitted)); *Knudson v. Sys. Painters, Inc.*, 634 F.3d 968, 980 (8th Cir. 2011) ("By requiring the defendant to prove that the plaintiff's claim against the non-diverse defendant has no reasonable basis in law and fact, we require the defendant to do more than merely prove that the plaintiff's claim should be dismissed pursuant to a Rule 12(b)(6) motion."); *Grancare, LLC v. Thrower ex rel. Mills*, 889 F.3d 543, 549 (9th Cir. 2018) ("A standard that equates fraudulent joinder with Rule 12(b)(6) conflates a jurisdictional inquiry with an adjudication on the merits. Because the purpose of the fraudulent joinder doctrine is to allow a determination whether the district court has subject matter jurisdiction, the standard is similar to the 'wholly insubstantial and frivolous' standard for dismissing claims under Rule 12(b)(1) for lack of federal question jurisdiction.").

**2. Plaintiffs who filed suit in state court are entitled to amend after removal to comply with the federal pleading standard, and courts are not free to ignore such amended complaints when conducting improper joinder analysis.**

Plaintiffs acknowledge this Court's holding in *International Energy Ventures*, and as a necessary corollary to that rule, removed plaintiffs are entitled to amend and clarify that their allegations against a non-diverse defendant satisfy the federal pleading standard before a federal court conducts an improper joinder analysis. District courts are not free to ignore such amended complaints. Basic principles of fairness and federalism dictate this conclusion.

Since *Twombly* and *Iqbal*, state and federal courts have applied different tests to review the sufficiency of pleadings. As relevant here, Texas uses a "fair notice" standard that is more lenient than the federal pleading standard. Under that standard, "[a] petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The key inquiry is whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *DeRoeck v. DHM Ventures, LLC*, 556 S.W.3d 831, 835 (Tex. 2018) (internal quotation marks and footnotes omitted). "[A] plaintiff is not required to 'set out in his pleadings the evidence upon which he relies to establish his asserted cause of action.'" *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (citation omitted). "Even the omission of an element is not fatal if the cause of action 'may be reasonably inferred from what is specifically stated.'" *Id.* (same).

When *Smallwood* (the foundation of the *International Energy Ventures* rule) was decided in 2004, there was no variance between the state and federal standards. At the time, a federal complaint could be dismissed "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 375 (5th Cir. 2004) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Accordingly, it was not unfair to conduct the improper joinder analysis based on the plaintiffs' state-court pleading. But that situation changed with *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Under the federal plausibility standard of *Twombly* and *Iqbal*, a complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *accord Hicks*, 12 F.4th at 515; *see also Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (discussing the plausibility standard).

As noted above, this Court holds that the improper joinder analysis must be conducted using this federal pleading standard. *See International Energy Ventures*, 818 F.3d at 204. But state-court litigants are not required to anticipate that standard; they draft their pleadings with state standards in mind. Evaluating the sufficiency of a removed state-court pleading under the federal standard, without an opportunity to comply with the federal plausibility standard, is fundamentally unfair.

Given this Court's holdings in *Smallwood* and *International Energy Ventures* (which require application of the Supreme Court's holdings in *Twombly* and *Iqbal* to the improper joinder inquiry), the Court should hold that removed plaintiffs are entitled to amend their pleadings before an improper joinder analysis is carried out and district courts are not free to disregard such amendments.[3]

Any other rule would deprive the plaintiff of the right to choose the forum and would raise serious federalism concerns by undermining the strong presumption against removal. *See Gasch v. Hartford Acc. & Indem. Co.*, 491 F.3d 278, 281-82 (5th Cir. 2007) ("As 'the effect of removal is to deprive the state court of an action properly before it, removal raises significant federalism concerns.' The removal statute is therefore to be strictly construed, and any doubt about the propriety of removal must be resolved in favor of remand." (footnotes omitted)).[4]

---

[3] Before *International Energy Ventures*, many district courts in this circuit held that "it is Texas' 'fair notice' pleading standard, and not the federal pleading requirements, that plaintiffs must meet in defeating a fraudulent joinder allegation." *Stevenson v. Allstate Tex. Lloyd's*, 2012 WL 360089, at *3 (S.D. Tex. Feb. 1, 2012) (Ellison, J.); *see also Edwea, Inc. v. Allstate Ins. Co.*, 2010 WL 5099607, at *5 (S.D. Tex. Dec. 8, 2010) (Rosenthal, J.) (collecting cases). They reasoned that "[w]hen a party files suit in a Texas court, such party expects to be governed by the rules of the game that apply to the civil pleading requirements of that state court system" and should not be "put in the untenable position of having to anticipate removal to a federal court system that applies a more exacting pleading standard." *Durable Specialties, Inc. v. Liberty Ins. Corp.*, 2011 WL 6937377, at *5 (N.D. Tex. Dec. 30, 2011) (Lindsay, J.). Although *International Energy Ventures* foreclosed this approach, the same rationale dictates that removed plaintiffs are entitled to show that their allegations against a non-diverse defendant satisfy the federal pleading standard.

[4] Alternatively, the Palmquists preserve for en banc review whether *International Energy Ventures* should be revisited in light of the circuit split exacerbated by that decision. *See supra* note 2.

### 3. The Fifth Circuit already announced the core principles that control this question in the Rule 12 context.

Resolution of the question presented by this case requires only a small step from existing circuit precedent. In the context of Rule 12, this Court has held that removed state-court plaintiffs are entitled to amend their pleadings to satisfy the federal pleading standard before the sufficiency of their allegations is determined. In *Peña v. City of Rio Grande City*, the Court held that when defendants challenge the pleadings on the merits after a case has been properly removed to federal court, "the federal pleading standard applies." 879 F.3d 613, 617 (5th Cir. 2018) (citing *International Energy Ventures*, 818 F.3d at 199). The Court then determined that because the federal pleading standard applies, "[t]he district court should not have denied Peña leave to amend to conform to the federal standard." *Id.*

Insofar as the federal pleading standard applies to improper joinder analysis in the same way that it applies to judgments on the merits, *Peña* controls this case. As the Court explained in *International Energy Ventures*, "[t]he *Smallwood* opinion instructs us to apply the Rule 12(b)(6)–type analysis, *which must mean the entirety of that analysis*." 818 F.3d at 204 (emphasis added). If removed state-court plaintiffs are entitled to amend their pleadings before a district court can consider a challenge to their pleadings on the merits, they are also entitled to do so before a court conducts an improper joinder analysis. Under the logic of *Peña*, the district court erred by refusing to consider the allegations in the Palmquists' amended complaint.

### 4. Longstanding Fifth Circuit precedent holds that plaintiffs may "clarify" and "amplify" their jurisdictional allegations after removal for purposes of improper joinder analysis.

In addition to *Peña* and first principles, the Palmquists' position draws support from longstanding circuit precedent allowing plaintiffs who filed suit in state court to clarify or amplify their jurisdictional allegations against non-diverse defendants after removal.

In *Griggs v. State Farm Lloyds*, this Court held that a post-removal affidavit could be considered when deciding whether a defendant had been improperly joined "to the extent that the factual allegations in [the] affidavit clarify or amplify the claims actually alleged in the amended petition that was controlling when the suit was dismissed." 181 F.3d 694, 699-700 (5th Cir. 1999). *Griggs* was grounded in prior precedent recognizing that plaintiffs cannot defeat removal by changing the substance of their pleadings "because post-removal events cannot deprive a court of jurisdiction once it has attached." *Asociacion Nacional de Pescadores a Pequena Escala O Artesanales de Colombia (ANPAC) v. Dow Quimica de Colombia S.A.*, 988 F.2d 559, 565 (5th Cir. 1993). But they are allowed to "clarify a petition that previously left the jurisdictional question ambiguous. Under those circumstances, the court is still examining the jurisdictional facts *as of the time* the case is removed, but the court is considering information submitted after removal." *Id.*

Under this line of authority, removed state-court plaintiffs cannot amend their pleadings to add new claims before the improper joinder analysis is conducted. Jurisdiction is judged "on the basis of claims in the state court complaint as it exists at the time of removal." *Cavallini v. State Farm Mutual Auto Ins.*, 44 F.3d 256, 264 (5th Cir. 1995). But at the same time, "information submitted after removal may be considered in examining the jurisdictional facts as of removal." *Id.* (citing *ANPAC*, 988 F.2d at 565). Therefore, while "[p]ost-removal filings may not be considered ... to the extent that they present new causes of action or theories not raised in the controlling petition filed in state court," they can be considered to the extent they "clarify or amplify the claims actually alleged" in the removed pleading. *Griggs*, 181 F.3d at 700 (citing *Cavallini*, 44 F.3d at 263). Such clarifying amendments are not gamesmanship but an opportunity to protect a plaintiff's substantial rights.

Here, because the Palmquists drafted their state-court petition in reliance on Texas's generous pleading standard without detailing the factual basis for their claim that Whole Foods was liable for express misrepresentations, whether that pleading stated a cognizable claim against Whole Foods under the federal pleading standard was ambiguous. Therefore, under *Griggs*, *ANPAC*, and *Cavallini* (as well as *Peña*), the Palmquists were entitled to amend their complaint and clarify their allegations against Whole Foods in light of the federal pleading standard—and the district court was not at liberty to ignore the clarifying allegations in their amended complaint.

5. **The district court wrongly ruled that Fifth Circuit precedent prevents courts from considering amended complaints when conducting an improper joinder analysis.**

The district court erroneously concluded that Fifth Circuit precedent barred it from considering the Palmquists' amended complaint. The entirety of its analysis on this issue was as follows:

> As an initial matter, the Palmquists base their remand motion on the allegations in their second amended complaint, which includes new claims such as breach of express warranty and negligent undertaking. But because jurisdiction 'is resolved by looking at the complaint at the time petition for removal [was] filed,' *Brown v. Sw. Bell Tel. Co.*, 901 F.2d 1250, 1254 (5th Cir. 1990) (citing *Pullman Co. v. Jenkins*, 305 U.S. 534, 537-38 (1939)), the new claims cannot be considered.

ROA.780 (internal docket citations omitted).

Under *Griggs* and *Cavallini*, the district court did not err by failing to consider the Palmquists' new negligent undertaking claim as part of its jurisdictional analysis. But it was wrong to suggest that the Palmquists' amended complaint raised a new "breach of express warranty" claim. The Palmquists' state-court petition alleged a "breach of warranties" claim against Whole Foods, ROA.169, and their amended federal court complaint merely contained new *allegations* clarifying how that claim satisfied the newly applicable federal pleading standard. ROA.271-74. Given that "any doubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction," *African Methodist Episcopal Church*, 756 F.3d at 793 (cleaned up), the district court erred by treating these allegations as a new claim.

Likewise, the district court erred by ruling that *Brown v. Southwestern Bell* precluded it from considering the amended complaint. *Brown* has nothing to do with the question presented here; it simply stands for the proposition that "when there is a subsequent narrowing of the issues such that the federal claims are eliminated and only pendent state claims remain, federal jurisdiction is not extinguished." *Brown*, 901 F.2d at 1254. And *Brown*'s statement that jurisdiction is determined by looking at the pleading at the time of removal is not absolute. Rather, as explained above, "information submitted after removal may be considered in examining the jurisdictional facts as of removal." *Cavallini*, 44 F.3d at 264.

The Palmquists did not amend their complaint to remove any federal claims, so the precise holding of *Brown* does not apply. To the extent that any language in *Brown* could be read to cover the present case, that language is non-binding dicta. Rather, this case is governed by *Peña*, *Griggs*, *ANPAC*, and *Cavallini*.

*** 

As a matter of both principle and precedent, the Palmquists were entitled to amend their pleading post-removal to comply with the federal pleading standard and the district court was not at liberty to ignore their amended pleading. Accordingly, the district court erred by concluding that it could not consider the allegations in the Palmquists' amended complaint when conducting its improper joinder analysis.

### B. The Palmquists' amended complaint alleged viable claims against Whole Foods, defeating diversity jurisdiction.

In addition to mistakenly concluding that it could not consider the allegations in the Palmquists' amended complaint, the district court concluded that "even if the court were to rely on the Palmquists' second amended complaint,[5] there is still no reasonable basis to predict that they could recover from Whole Foods." ROA.780. That ruling was also erroneous.

The Palmquists' amended complaint alleged that Whole Foods sold them baby food containing dangerously high levels of heavy metals, which caused Ethan to suffer severe neurological impairments. ROA.252-64. They sued Whole Foods for negligence and breach of warranty. ROA.265-67, 271-74. But under Texas law, "[a] seller that did not manufacture a product is not liable for harm caused to the claimant by that product" unless one of seven enumerated exceptions is established. Tex. Civ. Prac. & Rem. Code § 82.003(a). The district court held that Whole Foods was improperly joined because the allegations in the Palmquists' amended complaint did not satisfy any of the exceptions. ROA.780-83. That conclusion was incorrect. The amended complaint plausibly alleged an express factual misrepresentation under Section 82.003(a)(5). ROA.271-73. Thus, the district court erred by denying the Palmquists' motion to remand and dismissing Whole Foods with prejudice.

---

[5] This pleading was titled a "Second Amended Complaint" because the petition had been amended while the case was still pending in state court; it was the first amended pleading in federal court.

**1.    The Palmquists' amended complaint plausibly alleged an express factual misrepresentation.**

Section 82.003(a)(5) of the Texas Products Liability Act provides that a seller

is liable for the harm caused by a product if the plaintiff proves that:

> (A) the seller made an express factual representation about an aspect of the product; (B) the representation was incorrect; (C) the claimant relied on the representation in obtaining or using the product; and (D) if the aspect of the product had been as represented, the claimant would not have been harmed by the product or would not have suffered the same degree of harm.

Tex. Civ. Prac. & Rem. Code § 82.003(a)(5).

The Palmquists plausibly alleged a viable claim under Section 82.003(a)(5).

Specifically, their amended complaint alleged that "Whole Foods markets [Hain's]

Earth's Best Organic baby food products as *safe*, natural, and organically produced,"

ROA.273 (emphasis added), "and in doing so warranted and *expressly represented*

to the public generally, and specifically to Plaintiffs, *that the products were safe for*

*consumption by infants and young children*." ROA.271-72 (emphases added).

> As a seller of "natural and organic foods," Whole Foods specifically represents to its customers that it only sells products that are of the "*highest quality*." Whole Foods further represents to the public that it "*carefully vet[s] our products to make sure they meet our high standards by researching ingredients, reading labels and auditing sourcing practices*." And it promises its customers that "*if it doesn't meet our standards, we don't sell it*." In short, "Whole Foods" claims to "take pride in what we do sell and even more in what we don't" by *refusing to sell products with harmful ingredients*. Whole [F]oods made these express factual representations about Hain's Earth's Best Baby Food.

ROA.272 (emphases added) (footnotes omitted) (first alteration in original).

In short, the Palmquists alleged that Whole Foods expressly represents that Hain's baby food is "safe," "highest quality," and free from "harmful ingredients." The Palmquists also alleged that Whole Foods represents that it "vets" its products "by researching ingredients, reading labels, and auditing sourcing practices"— cultivating customer confidence by assuring consumers that Whole Foods possesses special knowledge about its products. These allegations satisfy the first requirement of Section 82.003(a)(5), that "the seller made an express factual representation about an aspect of the product." Indeed, if one takes seriously the principles of federalism that have led this Court to hold that the removal statute is "to be strictly construed, and any doubt about the propriety of removal must be resolved in favor of remand," *Gasch*, 491 F.3d at 281-82, this is an easy case. The district court erred by ruling that these express factual representations are not actionable under Texas law.

Before turning to the district court's erroneous analysis, it is important to note that the Palmquists plausibly alleged the other requirements of Section 82.003(a)(5), none of which is open to serious debate. They alleged that "Whole Foods' warranties and express representations were incorrect given the high levels of heavy toxic metal Hain's baby food products contained," ROA.272, satisfying the second requirement (that "the representation was incorrect"). The Palmquists' allegations regarding the high levels of heavy toxic metals in Hain's baby food and the dangers those metals pose to young children made this allegation plausible. *See* ROA.252-57.

Next, the Palmquists specifically alleged that they "relied on Whole Foods' express factual representations that Hain's Earth's Best Organic baby food products were safe and of the highest quality," ROA.272-73, satisfying the third requirement (that "the claimant relied on the representation in obtaining or using the product"). The Palmquists' allegations that they "conducted significant research into the food that they would provide their son" and purchased baby food from Whole Foods "because of Whole Foods' express representations about the quality of the products it sold—including Earth's Best Baby Food," ROA.258, made this specific allegation of reliance plausible.

Finally, the Palmquists alleged that if Whole Foods' numerous representations had been true, Ethan would not have been injured:

> If Hain's products were as advertised (and as expressly represented by Whole Foods), Plaintiffs would not have been injured by the product. Hain and Whole Foods markets the Earth's Best Organic baby food products as safe, natural, and organically produced. If the products had been in a condition as advertised, E.P. would not have been exposed to extremely high, toxic levels of arsenic, lead, cadmium, and mercury and would not have suffered cognitive brain injuries as a result.

ROA.273. This allegation satisfied the fourth requirement of Section 82.003(a)(5) ("if the aspect of the product had been as represented, the claimant would not have been harmed by the product or would not have suffered the same degree of harm"). And the Palmquists explained how consuming the toxic metals in Hain's baby food caused Ethan's injuries, making this allegation plausible. *See* ROA.258-64.

### 2. The district court erred by concluding that the express factual misrepresentation exception does not apply.

Despite these detailed allegations and the principle that "any contested issues of facts and any ambiguities of state law must be resolved in favor of remand," *African Methodist Episcopal Church*, 756 F.3d at 793 (cleaned up), the district court concluded that the amended complaint did not satisfy Section 82.003(a)(5) because "[c]ourts have consistently held that generalized positive statements about a product and general representations about its safety are insufficient under § 82.003(a)(5)." ROA.782. But it cited just two non-binding decisions from another district court: *Howard v. Lowe's Home Centers, LLC*, 306 F. Supp. 3d 951, 958 (W.D. Tex. 2018), and *Gill v. Michelin N. Am., Inc.*, 3 F. Supp. 3d 579, 585 (W.D. Tex. 2013). *Id.*

After listing a few of the Palmquists' allegations, the district court stated that "[t]he Palmquists fail to show how any of the above statements amount to anything more than generalized positive statements and general representations about safety. Indeed, the statements are neither specific to Hain as a company nor specific about any particular aspect of Hain's product." ROA.782. Unfortunately, the district court both misread the Palmquists' amended complaint and misinterpreted Texas law. Rather than following the guiding principle that "any doubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction," *African Methodist Episcopal Church*, 756 F.3d at 793 (cleaned up), the district court misinterpreted the full scope of the Palmquists' allegations and Texas law.

### a. The district court misread the Palmquists' complaint.

First, the district court erred in ruling that the Palmquists simply alleged that Whole Foods makes "generalized positive statements" about all of its products and "general representations about safety." ROA.782. In fact, the Palmquists alleged that Whole Foods "claims to ... refus[e] to sell products with harmful ingredients" and expressly makes this claim "about Hain's Earth's Best Baby Food." ROA.272. Thus, the Palmquists alleged that Whole Foods made a specific misrepresentation about a specific aspect of Hain's baby food products. The district court did not list those allegations when it denied the Palmquists' motion to remand. ROA.781-82. The court appears simply to have overlooked them.

### b. The district court misinterpreted Texas law.

More troubling, the district court based its conclusion that Whole Foods' express misrepresentations are not actionable on two federal district court decisions. *See* ROA.782. But "federal courts sitting in diversity apply state substantive law," *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 437 (2010) (citation omitted), so the district court should have looked to authoritative decisions of the Texas courts—not other federal district courts. Federal courts should look to the decisions of the Texas Supreme Court (and lacking any authoritative decision, decisions from the intermediate appellate courts) to determine matters of Texas law. *Primrose Oper. Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 564-65 (5th Cir. 2004).

28

There are very few Texas cases specifically interpreting Section 82.003(a)(5), and the Palmquists are not aware of any Texas appellate decision that has dismissed a claim under that statute on the basis that an alleged representation was too general to be actionable. On the contrary, one leading decision—issued by an intermediate appellate court that was one of the most conservative courts in Texas at the time— found a viable claim against a product seller who simply assembled a hydraulic lift and "told [the purchaser's] employees that it was 'okay' not to use the outriggers." *Transcon. Ins. Co. v. Briggs Equip. Tr.*, 321 S.W.3d 685, 702 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Another intermediate court found a viable claim where a seller "represented that the pipe was P-110 grade." *JSC Nizhnedneprovsky Tube Rolling Plant v. United Resources, LP*, 2016 WL 8921926, at *9 (Tex. App.— Corpus Christi–Edinburg Dec. 21, 2016, no pet.).

If the Texas courts hold that sellers may be held liable for these statements under Section 82.003(a)(5), it is hard to see how a federal court sitting in diversity can hold there is "'no possibility of recovery'" on claims that a seller misrepresented its product as "safe," "highest quality," free of "harmful ingredients," and "vetted." *Hicks*, 12 F.4th at 515 (citation omitted). By relying on federal district court cases and ignoring the Texas appellate decisions that have applied Section 82.003(a)(5), the district court completely inverted the appropriate approach to *Erie* analysis.

In addition to these Texas cases applying Section 82.003(a)(5), the concept of an express factual misrepresentation is well-developed in other areas of Texas law. In particular, Texas cases regarding the Deceptive Trade Practices Act ("DTPA")[6] and common law fraud[7] confirm that Whole Foods' representations are actionable.

The Texas Supreme Court has long recognized that "[s]ometimes language only generally related to a product or its attributes will convey definite implications." *Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex. 1980). Accordingly, the DTPA "prohibits false general descriptions about the good, as well as misrepresentations pertaining to more specific information." *Id.*

*Pennington* involved statements that a product was in "'excellent condition,' 'perfect condition,' and 'just like new.'" *Id.* at 685. The Supreme Court held these statements were "actionable even though they are broad descriptions." *Id.* at 687; *see also Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 503 (Tex. 2001) (noting that the statements in *Pennington* were not puffing but "actionable misrepresentations").

---

[6] Like Section 82.003(a)(5), the DTPA is specifically concerned with actionable representations. *Compare* Tex. Bus. & Com. Code § 17.46(b)(7) (prohibiting "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another") *with* Tex. Civ. Prac. & Rem. Code § 82.003(a)(5)(A) (requiring seller to have "made an express factual representation about an aspect of the product").

[7] The Restatement of Products Liability explains that the common law of fraud is relevant for determining when a product seller makes a misrepresentation. The Restatement imposes liability on one "who, in connection with the sale of a product, makes a fraudulent ... misrepresentation," and it incorporates general tort law regarding "what constitutes a material misrepresentation" and "what is a material fact." Restatement (Third) of Torts: Prod. Liab. § 9 & cmt. c.

Numerous Texas decisions have likewise held that general statements about the quality of a good or service are actionable misrepresentations.[8]  In context, Whole Foods' representations to its customers that Hain's baby food products were "safe" and contained no "harmful ingredients" were actionable statements of fact. They are more akin to the statements deemed to be "actionable misrepresentations" in *Pennington* and *Helena Chemical* than those that have been rejected as "puffing." *See Prudential Ins. Co. of Am. v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) (contrasting the statements in *Pennington* with non-actionable puffery). Indeed, respected Texas treatises treat this rule as black-letter law:

> Occasionally, however, representations that go to the quality of goods are held to be actionable.  For example, terms such as "meticulous construction," "solid construction," "excellent," and "perfect" have been recognized as actionable misrepresentations of fact, rather than mere puffery.

3 Texas Torts and Remedies § 44.02[2][b][v].  In light of this well-established law, it cannot fairly be said that there is "'no possibility of recovery'" from Whole Foods. *Hicks*, 12 F.4th at 515 (citation omitted).

---

[8] *See, e.g.*, *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889-90 (Tex. App.—Austin 2008, no pet.) (statements that a vehicle was "in fine running order" and that it had "strong mechanicals"); *Padgett v. Bert Ogden Motor's, Inc.*, 869 S.W.2d 532, 535 (Tex. App.—Corpus Christi 1993, writ denied) (statement that a car had been "completely fixed"); *HOW Ins. Co. v. Patriot Fin. Servs.*, 786 S.W.2d 533, 543-44 (Tex. App.—Austin 1990, writ denied) (statement that a condominium was of "meticulous construction"), *overruled on other grounds by Hines v. Hash*, 843 S.W.2d 464 (Tex. 1992); *Wright v. Carpenter*, 579 S.W.2d 575, 579-80 (Tex. App.—Corpus Christi 1979, writ ref'd n.r.e.) (statement that roof was in "good shape"); *Short v. Mitchell*, 454 S.W.2d 285, 288 (Tex. App.—Waco 1970, writ ref'd n.r.e.) (statement that structure was of "sound construction").

The prospect of recovery is particularly strong in this case because Texas law recognizes that "'[w]hether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made.' Special or one-sided knowledge may help lead to the conclusion that a statement is one of fact, not opinion," because whether a given statement is actionable depends in part on "'the comparative levels of the speaker's and the hearer's knowledge.'" *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 338 (Tex. 2011) (citing *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995)). "'When a speaker purports to have special knowledge of the facts, or does have superior knowledge of the facts—for example, when the facts underlying the opinion are not equally available to both parties—a party may maintain a fraud action.'" *Id*. (citation omitted).

In *Italian Cowboy*, the Texas Supreme Court applied this doctrine and held a seller's false representations that a property had "[n]o problems" and was "perfect" were actionable misrepresentations. *Id*. at 337-39. And it relied on a case in which a seller's representations that a car drove "very well," had "no problems whatever," was in "fine running order" and "very, very reliable," and had "strong mechanicals" were held actionable. *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 889–90 (Tex. App.— Austin 2008, no pet.); *see also Italian Cowboy*, 341 S.W.3d at 338-39 (citing *GJP*). Similarly, the superior knowledge doctrine applies perfectly to this case.

The Palmquists alleged that Whole Foods represents that it "carefully vet[s] our products to make sure they meet our high standards by researching ingredients, reading labels and auditing sourcing practices." ROA.272. Whole Foods thus has (and purports to have) special knowledge about the ingredients in Hain's baby food that is not available to customers. Indeed, the entire Whole Foods business model depends on this reputation. Customers pay substantial premiums on product prices with the expectation that they are paying for a curated shopping experience and can trust that the products are healthy and high quality. As in *Italian Cowboy* and *GJP*, Whole Foods' statements regarding the safety of the ingredients in Hain's baby food "were not mere sales hype; but were in the nature of factual representations." *GJP*, 251 S.W.3d at 890. They are actionable. *Italian Cowboy*, 341 S.W.3d at 338-39.

### c. Federal district court orders do not support dismissal.

The Texas decisions should control this issue. But the district court also erred by implying that the federal district courts speak with one voice when considering similar allegations in the context of motions to remand. District courts have found allegations even more generalized than those asserted in this case to be actionable, defeating diversity jurisdiction. *See*, *e.g.*, *Cox v. American Honda Motor Co., Inc.*, 2021 WL 3705007, at *2 (S.D. Tex. Mar. 26, 2021) (granting a motion to remand because Section 82.003(a)(5) was satisfied by allegations that a seller "made express and incorrect factual representations that the Subject Vehicle was fit for use").

Similarly, district courts have applied the superior knowledge doctrine to sustain fraud allegations based on statements regarding a product's "superiority," "durability," and "reliability." *See*, *e.g.*, *Click v. General Motors LLC*, 2020 WL 3118577, at *4-5 (S.D. Tex. Mar. 27, 2020) (citing *CJP*).

There is little point in cataloguing the federal district court cases on this issue, which turn on their individual facts and are not authoritative in this diversity case. But it bears emphasis that the two cases cited by the district court involved extreme, barebones pleadings. *See Gill*, 3 F. Supp. 3d at 585 (vehicle was a "good truck"); *Howard*, 306 F. Supp. 3d at 958 (refrigerator was "new," "worked normally," etc.). Those cases have little in common with the allegations in this case.

Here, the Palmquists did not simply allege that Whole Foods represented that Hain's baby food was "safe." In addition, they alleged that Whole Foods represented that Hain's baby food was free from "harmful ingredients" and "vets" products by "researching ingredients," a classic allegation of superior knowledge. ROA.272. These allegations involved specific facts at the heart of the Palmquists' complaints. Consequently, this case presents a very different situation from *Gill* and *Howard* (where the superior knowledge doctrine was not discussed).

In sum, Whole Foods' alleged misrepresentations are actionable. Therefore, it was not improperly joined and should not have been dismissed—especially not "with prejudice." *Ticer v. Imperium Ins. Co.*, 20 F.4th 1040, 1049 (5th Cir. 2021).

**C.    The jurisdictional nature of this error demands correction.**

The district court's jurisdictional error is a matter of particular significance. As courts of limited jurisdiction, federal courts "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) (citations omitted). The duty to respect this limited jurisdiction "'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)).  Consequently, the federal courts "cannot resort to considerations of convenience and efficiency, albeit serious and legitimate ones, to exercise jurisdiction where we have none." *PNC Bank, Nat'l Ass'n v. Ruiz*, 989 F.3d 397, 402 (5th Cir. 2021).

These concerns are especially heightened when improper joinder is alleged, since "removal raises significant federalism concerns" by depriving "the state court of an action properly before it." *Gasch*, 491 F.3d at 281-82 (citation omitted).  Thus, "any doubt about the propriety of removal must be resolved in favor of remand." *Id*. The district court lost sight of that guiding principle of judicial restraint.

In accordance with these principles of limited jurisdiction, the Court should reverse the order denying the Palmquists' motion to remand, vacate the judgment, and remand the case with instructions that it be remanded to state court.

**II.** **Even if the district court did have jurisdiction over this case, it erred by granting judgment as a matter of law on the issue of causation.**

At the close of evidence, the district court granted Hain's Rule 50(a) motion for judgment as a matter of law. ROA.22104-06; *see also* ROA.18417. If the court had jurisdiction, it erred by taking this case away from the jury.

Judgment as a matter of law is appropriate when "'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue.'" *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004) (citation omitted). The court is bound to consider "all of the evidence—not just that evidence which supports the non-mover's case— but in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1040 (5th Cir. 2011) (citation omitted). Review is *de novo*. *Hamburger*, 361 F.3d at 884.

In most cases, district courts are "encouraged to submit the case to the jury, rather than granting such motions." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006). Wright and Miller advise "'it usually is desirable to take a verdict, and then pass on the sufficiency of the evidence on a post-verdict motion,'" so "'if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial.'" *Id.* at 406 (citation omitted). Unfortunately, the district court did not take that prudent course in this case.

The district court's decision to grant Hain's Rule 50(a) motion was erroneous. The court orally granted Hain's motion on the ground that the Palmquists introduced "no evidence of general causation" and that "[a] failure to offer evidence of general causation is fatal to all of the plaintiffs' claims." ROA.22105. Therefore, this brief focuses on that issue. But the final judgment also stated (without further analysis) that the district court "granted in its entirety the defendants' motion for judgment as a matter of law." ROA.18417. Therefore, strictly out of an abundance of caution, Part III will address the additional grounds for judgment raised in Hain's motion. But make no mistake: the principal battle at the Rule 50(a) stage, and the sole basis upon which the district court announced its ruling, concerned general causation.

The Palmquists asserted negligence and products liability claims against Hain. ROA.265-71. Under Texas law, "[n]egligence and products liability claims both require proof of causation." *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018). "Causation has two levels, general and specific, and a plaintiff must prove both." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 377-78 (5th Cir. 2010). Here, the focus is on general causation. "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)).

This case presents a novel fact pattern. The Palmquists introduced evidence showing both that heavy metals are widely accepted to cause neurocognitive injuries at some level of exposure and that all other potential causes of Ethan's injuries have been eliminated through a differential diagnosis. This Court has not confronted such a rare situation in its previous cases. The Court should issue a narrow holding that, even if science has not yet established the exact threshold level of harmful exposure, the combination of these two showings was sufficient to establish causation. Indeed, with a medical diagnosis of heavy metal toxicity, there is no need for precision about the threshold of harmful exposure—whatever it is, it was exceeded here.

## A. The Palmquists introduced sufficient evidence of general causation.

Hain's motion argued that the Palmquists "failed to offer expert testimony to support general causation." ROA.18307. Specifically, it complained that no expert "identified a harmful level, or even a range, at which exposure to heavy metals causes major neurocognitive disorder, severe intellectual disability, or autism spectrum disorder." ROA.18308 (emphasis omitted).

Nevertheless, the Palmquists introduced expert testimony establishing both a scientific consensus that heavy metal exposure is harmful at some level and that all other potential causes of Ethan's injuries were eliminated by a differential diagnosis. This evidence was sufficient for a reasonable jury to find that heavy metal exposure from Hain's baby food caused Ethan's injuries.

1. **Even though the threshold of harmful exposure is unknown, reliable expert testimony proved a scientific consensus that heavy metal poisoning can cause neurocognitive injuries.**

As the district court observed, the scientific literature has not yet established the exact level of heavy metal exposure that is sufficient to cause harm. ROA.22105; *see also* ROA.20853 ("I don't think anybody knows it."). Even still, the Palmquists introduced expert evidence of a scientific consensus that exposure to heavy metals, *at some level*, can cause neurocognitive injuries—especially to infants and children. Notably, the district court deemed the Palmquists' experts reliable under *Daubert*, ROA.14809-16, and it denied summary judgment on causation. ROA.17002-04. Given Ethan's diagnosis of heavy metal toxicity, there was no need to quantify the threshold of harmful exposure; Ethan's exposure necessarily crossed that line.

As an initial matter, the Food and Drug Administration recognizes that "infants and children may be particularly susceptible to adverse neurodevelopmental effects of exposure to inorganic arsenic" and also that "exposure to inorganic arsenic during pregnancy, infancy, and early childhood may increase the risk of neurodevelopmental toxicity." ROA.22283. The trial evidence further showed that organizations such as the American Academy of Pediatrics, the Baby Food Council, Consumer Reports, the Environmental Defense Fund, and Healthy Babies Bright Futures agree that heavy metal exposure can cause serious neurocognitive injuries. ROA.22134, 22296, 22373, 22460, 22518.

In their response to Hain's *Daubert* motion, the Palmquists demonstrated the depth of this consensus with statements from the American Psychiatric Association, the DSM-5 (which is the Diagnostic and Statistical Manual of Mental Disorders), psychiatry textbooks, and the Texas and United States Departments of Health and Human Services. ROA.8289-90.[9] Quite simply, the fact that heavy metals can cause neurocognitive injuries is undisputed—as Hain's internal documents acknowledge. *See* ROA.22129 ("Inorganic Arsenic highly toxic to biological systems").

At trial, the Palmquists' experts confirmed this scientific consensus. Once the district court admitted their testimony, questions about its weight were for the jury. *See Stevenson v. E.I. DuPont De Nemours & Co.*, 327 F.3d 400, 407 (5th Cir. 2003) (even though sufficiency can be challenged after the admission of expert testimony, "challenges [that] go to the weight of the evidence" should be left to the jury).

Dr. Rao, an expert allergist and immunologist, testified that heavy metals have been linked to causing some of the symptoms that can present as ASD. ROA.20994; *see* ROA.20952. Dr. Rao also confirmed that "heavy metals can be a cause of what is presenting as ASD" and "arsenic exposure can cause neurological problems" that "can present as some of the symptoms of ASD." ROA.20995, 21014.

---

[9] The research described in the Palmquists' *Daubert* response provided part of the foundation for the testimony of their experts, and the Palmquists' experts were not required to restate it at trial. *See* Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data.").

Similarly, Dr. Settles, an expert psychologist, testified that baby foods tainted with heavy metals can cause neurocognitive problems. ROA.20754-55, 20639. Referring to the scientific literature, Dr. Settles explained that "when you read the potential effects of the different heavy metals, they talk about cognitive changes, which would be changes in the brain." ROA.20751.

Finally, Dr. Nelson, an expert pediatric neurologist and epileptologist, testified that "there is no safe level of heavy metals." ROA.20853; *see* ROA.20802. "[W]e should minimize heavy metal exposure as much as possible." ROA.20853.

These opinions are not controversial; Hain's own experts corroborated them. One of Hain's experts (Dr. Keil) agreed that babies are particularly susceptible to outside toxins: "If there is a level of toxicity that is high, it can cause a problem." ROA.21782. Another Hain expert (Dr. Lasics) testified that "heavy metals in excess can be associated with developmental delays" and that "too much of heavy metals ... could be associated with developmental delays." ROA.21580-81. And critically, a third Hain expert (Dr. Koshy) agreed that "toxic doses of lead, mercury, or arsenic singularly or in combination can cause injury to the developing brain." ROA.21673. Thus, Hain's Rule 50(a) motion conceded "there is no dispute in this case that heavy metals can have certain neurotoxic effects." ROA.18307; *see also* ROA.17004 n.4 ("Hain does not generally dispute, that exposure to heavy metals will, at some point, cause cognitive decline.").

In short, the trial record establishes a scientific consensus that heavy metals, at some level of exposure, can cause serious neurocognitive injuries such as those experienced by Ethan. The district court acknowledged this consensus in its order denying summary judgment: "Consuming heavy metals is widely known to lead to cognitive impairment, severe illness, and—at high levels—death." ROA.16998. That fact puts this case in a different category than any previous case in this circuit, particularly in light of Ethan's medical diagnosis of heavy metal toxicity. The jury should have been allowed to weigh the experts' testimony on general causation.

> 2.      **The Palmquists' experts eliminated all potential causes of Ethan's injuries other than heavy metal poisoning.**

In addition to proving that heavy metals can cause neurocognitive injuries such as those experienced by Ethan, the Palmquists ruled out other potential causes of Ethan's neurocognitive injuries through differential diagnosis. This methodology is generally accepted:

> A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests," including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

*Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012) (citation omitted); *see also Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 604 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (further defining differential diagnosis).

In this case, Dr. Nelson, the expert pediatric neurologist and epileptologist, performed a reliable differential diagnosis and ruled out infections, metabolic issues, structural brain defects, congenital injuries, natal trauma, and genetic factors as potential causes of Ethan's neurological conditions. ROA.20826-30.[10] By contrast, Dr. Nelson determined that "Ethan's conditions and injuries" could "be explained by exposure to heavy metal through the environment." ROA.20830. Accordingly, he concluded that "heavy metal exposure" was "the most likely identifiable cause" of "Ethan's brain injury" and that if Ethan "had not suffered the heavy metal toxicity, he would not have suffered the brain injuries." ROA.20831; *see also* ROA.20836 ("Ethan developed the neurological impairments that he did secondary to heavy metal toxicity."); ROA.20866 ("[A]ll of the issues, whether we're talking about the autism, intellectual disability, the abnormal EEGs, the epilepsy, what have you, they're all caused by the same thing, meaning that the heavy metal toxicity in this case would be the cause for all of the symptoms that Ethan has.").

Another expert, Dr. Settles, could not "find anything actually in the evidence in the case to explain Ethan's condition other than the heavy metals." ROA.20760. Therefore, she too concluded that heavy metal exposure was the most likely cause of Ethan's brain injuries. ROA.20683.

---

[10] Dr. Torkami, an expert geneticist, determined that "[b]ased on the results of this genetic testing … Ethan's case is unlikely to be caused by genetics." ROA.20603, 20538; *see also* ROA.20569.

### 3. The combination of a scientific consensus that exposure to a toxic substance can generally cause injury and a reliable differential diagnosis ruling out other causes is sufficient to prove general causation.

As discussed above, the Palmquists introduced expert testimony proving that (1) there is a scientific consensus that heavy metals, at some amount of exposure, can cause neurocognitive injuries; and (2) all other plausible causes of Ethan's neurocognitive injuries have been eliminated through a differential diagnosis, leaving exposure to heavy metals as the only possible cause. The Palmquists are not aware of any prior Fifth Circuit case that presented both of these facts. Accordingly, this is a case of first impression in this circuit.

Under these rare circumstances, the Court should hold that a reasonable jury could find that heavy metal exposure caused the injuries that Ethan experienced— even if science has not yet established an exact threshold of exposure to heavy metals that can cause harm. Such a narrow holding would be consistent with the reality of scientific inquiry and, if anything, narrower than the rule in other circuits.

Scientific precision is often unattainable. "[O]nly rarely are humans exposed to environmental chemicals in a manner that permits a quantitative determination of adverse outcomes." Federal Judicial Center, *Reference Manual on Sci. Ev.* 639-40, 2011 WL 7724262, at *5 (3d ed. 2011); *see also Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 589 (5th Cir. 2003) ("The real world … does not operate like a controlled study.").

For this reason, the law does not impose impossible burdens on plaintiffs. Recognizing that an overly rigorous standard of general causation can lead to results that defy common sense, other circuits have held that a reliable differential diagnosis can satisfy the general causation requirement in certain circumstances. In the words of the Eighth Circuit:

> The first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed. If a properly qualified medical expert performs a reliable differential diagnosis through which, to a reasonable degree of medical certainty, all other possible causes of the victims' condition can be eliminated, leaving only the toxic substance as the cause, a causation opinion based on that differential diagnosis should be admitted.

*Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1209 (8th Cir. 2000).[11]

This Court need not go that far. The Palmquists are not suggesting that a differential diagnosis, *by itself*, constitutes sufficient evidence of general causation in all cases. But when a differential diagnosis is combined with expert testimony of a scientific consensus that exposure to a substance can cause the plaintiff's injury and other evidence of harmful exposure, it is sufficient to send the case to a jury.

---

[11] *See also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999) (the fact that an expert physician used a differential diagnosis "to 'testify to a novel conclusion' is not sufficient grounds for excluding his testimony"); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264, 266 (4th Cir. 1999) ("[W]hile precise information concerning the exposure necessary to cause specific harm to humans ... [is] beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure.... A reliable differential diagnosis provides a valid basis for an expert opinion on causation.").

This Court has not decided whether the combination of a scientific consensus on causation without a known threshold of exposure, evidence of harmful exposure, and a reliable differential diagnosis is sufficient to establish general causation. Because this question remains open, the Court is free to follow the dictates of reason and common sense and answer "yes."  If not, given the current state of the science, all claims of heavy metal poisoning would be barred—which cannot be correct.

> **4.    The district court incorrectly ruled that Fifth Circuit precedent forecloses the argument that the Palmquists introduced sufficient evidence of general causation.**

The district court announced from the bench that it granted Hain's Rule 50(a) motion because the Palmquists had presented "no evidence of general causation." ROA.22104.  As the court explained:

> We heard no testimony from a qualified expert that the ingestion of heavy metals can cause the array of symptoms that Ethan suffers from, much less any evidence of at what level those metals would have to be ingested to bring about those symptoms. The law is clear that such testimony is necessary to show general causation.

ROA.22105.  Although the district court did not identify any particular authorities, it appears to have relied on two cases that were cited in the general causation section of Hain's motion: *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999) and *Johnson v. Arkema, Inc.*, 685 F.3d 452 (5th Cir. 2012).  But both *Curtis* and *Johnson*, as well as the cases on which they rely, involved very different facts from this case. Neither case forecloses the narrow rule proposed by the Palmquists.

### a.   The *Curtis* line of cases is distinguishable.

*Curtis* held that "the law does not require [p]laintiffs to show the precise level of [toxin] to which they were exposed," 174 F.3d at 671, but still suggested that "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Id.* at 670 (quoting *Allen v. Pennsylvania Engr. Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)).  Importantly, general causation was not at issue in *Curtis*.  *Id.* (finding that plaintiff's expert had "adequate support for his general causation opinion" and observing that defendants "do not seriously challenge this conclusion").  Rather, the court focused on whether the plaintiffs had been exposed to sufficient amounts of the toxin to cause injury. *See id.* at 671.  Thus, to understand the reference to "scientific knowledge of the harmful level of exposure," one must look to *Allen*—the case that *Curtis* quoted.

In *Allen*, the plaintiffs argued that a chemical known as EtO had caused the decedent's brain cancer.  102 F.3d at 195.  But that theory was scientifically invalid, as the court explained that "numerous reputable epidemiological studies covering in total thousands of workers indicate there is not a correlation between EtO exposure and cancer of the human brain." *Id.* at 197.  Accordingly, the court upheld a ruling excluding an expert's testimony on general causation as unreliable. *Id.* at 195.  Here, by contrast, the district court *admitted* the Palmquists' expert testimony at trial.

*Allen* thus did not involve a situation where there was a scientific consensus that a chemical can cause an injury at some level of exposure coupled with a reliable differential diagnosis eliminating all other potential causes of the plaintiff's injury. On the contrary, there was scientific consensus that the chemical at issue could *not* cause the injury, at *any* level of exposure.  This case is entirely different.

The limitations of *Allen* become even more stark when one considers the case upon which *Allen* relied for its statement of the rule quoted in *Curtis*.  *See id.* at 199 (citing *Wright v. Willamette Industries*, 91 F.3d 1105 (8th Cir. 1996)).  In *Wright*, the Eighth Circuit held that "there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered."  91 F.3d at 1107.

> We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains before there can be a recovery.

*Id*.  In this case, even if science has not ascertained with "mathematical precision" the dangerous level of exposure, the unique fusion of a scientific consensus that heavy metal poisoning can cause neurocognitive injuries and a differential diagnosis eliminating all other possible causes of the plaintiff's injuries is a sufficient basis for a reasonable person to conclude that heavy metals can generally cause injuries and did so in this case.  Neither *Curtis* nor *Allen* holds otherwise.

### b. *Johnson* **is distinguishable.**

The other case cited by Hain's Rule 50(a) motion provides no greater support. *Johnson* held that "before courts can admit an expert's differential diagnosis, which, by its nature, only addresses the issue of specific causation, the expert must first demonstrate that the chemical at issue is actually capable of harming individuals in the general population, thereby satisfying the general causation standard." 685 F.3d at 469. The court based this holding on the proposition that "[e]vidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence." *Id.* at 468 (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007)).

The Palmquists do not question *Johnson*'s holding that, as a general matter, evidence of a differential diagnosis cannot be considered unless the plaintiffs first introduce some independent evidence of general causation. In *Johnson*, however, the theory "that exposure to MBTC or HCl will result in chronic lung disease" was "not generally accepted in the scientific community." *Id.* at 460. Here, by contrast, there is a scientific consensus that exposure to heavy metals, at some unknown level, can cause neurocognitive injuries. *See* pp. 39-42, *supra.* Thus, *Johnson* is inapposite and does not foreclose a rule that the combination of a reliable differential diagnosis and a scientific consensus regarding the injurious effects of heavy metal exposure is sufficient evidence of general causation.

***

In sum, the Court should hold that when a plaintiff presents expert testimony that (1) there is a scientific consensus that exposure to a chemical can cause an injury and (2) a reliable differential diagnosis rules out every other potential cause of the plaintiff's injury, the plaintiff has introduced sufficient evidence of general causation to send the case to a jury—regardless of whether the existing scientific literature has quantified the exact level of exposure that causes harm.[12]

This rule is legally sound, compatible with circuit precedent, and makes sense. When a plaintiff is diagnosed with a distinctive injury—like heavy metal toxicity— there is no need for precision about the level of exposure at which injury *can* occur. It is established that the injury *did* occur, meaning that the threshold of exposure was necessarily exceeded. The only question in such a case is the source of the exposure. The district court's ruling to the contrary elevated form over substance.

**B.      The Palmquists introduced sufficient evidence of specific causation.**

Hain's Rule 50(a) motion also challenged specific causation. ROA.18302. But the district court implicitly rejected that argument, ROA.22104, and rightly so. The Palmquists introduced sufficient evidence for a jury to conclude that exposure to heavy metals specifically caused Ethan's injuries.

---

[12] Alternatively, the Palmquists preserve for en banc review the issue of whether the statements in *Curtis*, *Allen*, and *Johnson* about proof of general and specific causation should be reconsidered.

As described above, Dr. Nelson performed a differential diagnosis on Ethan that eliminated all possible causes of his neurocognitive injuries other than exposure to heavy metals. *See* p. 43, *supra.* Dr. Settles also ruled out all other possible causes, and Dr. Torkamani ruled out genetics. *Id.* This testimony is sufficient evidence of specific causation. *See Johnson*, 685 F.3d at 468 ("Many courts have found that a properly performed differential diagnosis can yield a reliable expert opinion.").

Hain argued that the Palmquists did not establish specific causation because none of their experts "even attempted to (1) calculate the level of heavy metals in any of Hain's baby foods; (2) compare those foods to what Ethan ate; or (3) estimate Ethan's alleged exposure based on the purported levels in those foods." ROA.18304. But as noted previously, "the law does not require [p]laintiffs to show the precise level of [toxin] to which they were exposed." *Curtis*, 174 F.3d at 671. Thus, in *Clark v. Kellogg Brown & Root L.L.C.*, 414 F. App'x 623 (5th Cir. 2011), this Court rejected the argument that an expert was "required to quantify precisely the dosage of benzene that is hazardous and the dosage of benzene to which Clark was exposed before he could lawfully be permitted to testify, and similarly that the district court was required to make those same determinations before it could find specific causation." *Id.* at 629. Rather, "the [district] court had sufficient factual evidence to conclude that Clark was exposed to *some* level of benzene high enough to cause AML." *Id.* So too here.

The Palmquists introduced reliable scientific evidence that Ethan was exposed to a level of heavy metals sufficient to cause heavy metal poisoning, regardless of whether that amount is quantifiable. Thus, the Palmquists proved specific causation. *Id.*; *see also O'Neill v. Seariver Mar., Inc.*, 246 F. App'x 278, 279-80 (5th Cir. 2007) ("We have not required the plaintiff to show the precise level of toxic chemicals to which they were exposed. Circumstantial evidence can be used to establish injurious exposure.") (citing *Curtis*).[13]

In sum, to provide sufficient evidence of specific causation, the Palmquists were not required to quantify Ethan's exposure precisely. *Curtis*, 174 F.3d at 671. Rather, they were simply required to prove that Ethan "was exposed to *some* level" of heavy metals substantial enough to cause his injuries. *Clark*, 414 F. App'x at 629. The differential diagnosis testimony of Drs. Nelson, Settles, and Torkami satisfied that standard under circuit precedent. *Johnson*, 685 F.3d at 468.[14]

---

[13] Other circuits agree. *See, e.g.*, *Sarkees v. E. I. Dupont De Nemours & Co.*, 15 F.4th 584, 593 (2d Cir. 2021) (explaining that "precise quantification is often not available and not required"); *Westberry*, 178 F.3d at 264 (Fourth Circuit holds that "exact details pertaining to the plaintiff's exposure are beneficial" but not essential to expert causation testimony); *Heller*, 167 F.3d at 157 (Third Circuit recognizes that "even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness").

[14] The rule that plaintiffs are not required to quantify the precise amount of the toxin to which they were exposed makes particular sense in cases like this one, where the product containing the toxin was eaten and cannot be tested. *See Silverman v. Watson Pharm., Inc.*, 2013 WL 1645771, at *6 (S.D. Tex. Apr. 16, 2013) ("[S]ince Mrs. Silverman did not save pills from each and every lot of pills she ingested, there is no way for her—or anyone else—to show how much arsenic, if any, was in each lot.").

## C. The Palmquists introduced sufficient evidence that Hain's baby food contained harmful levels of heavy metals and that Ethan suffered from heavy metal toxicity.

As a coda to its causation arguments, Hain's Rule 50(a) motion also argued that the Palmquists did not prove either "that Hain's products contain harmful levels of toxic metals" or "that Ethan had heavy metal toxicity." ROA.18310, 18313. Neither argument is substantial, and neither provides a basis for affirmance.

First, the evidence established that Hain's products contained harmful levels of heavy metals. Hain's corporate representative testified that from 2014 to 2015, the time period during which Ethan was eating large amounts of Hain rice cereal, Hain's internal specifications for its rice cereal were 200 ppb inorganic arsenic and 100 ppb lead. ROA.19989, 20037-38; *see also* ROA.35268. Hain now recognizes that 200 ppb is a dangerously high level of arsenic; accordingly, Hain has lowered its internal specifications to 100 ppb arsenic. ROA.20028, 20037, 20071. Additionally, the company is lowering its lead specification to 20 ppb. ROA.19988. Nonetheless, as late as 2019, the vitamin premix that Hain added to the cereal was found to contain 223 ppb arsenic and 352 ppb lead—far in excess of current limits. ROA.20032-33, 20880, 22272-73. Similarly, although Hain did not start testing its final products for heavy metals until 2021, ROA.20049, FDA testing revealed that Hain's final products often contained well over 100 ppb arsenic. ROA.22267, 22277; *see also* ROA.20009-10, 20021, 20879-80.

These are unacceptably high levels of heavy metals for infants and children. Hain's own internal documents confirm that products with over 100 ppb arsenic are "very toxic to biological systems," "can cause severe adverse effects in humans, especially infants and toddlers," and are "UNSAFE." ROA.22127, 22131, 22452.

There is no exact threshold of acceptable heavy metal consumption at this age, but these quantities of heavy metals were far above any safe line. In drinking water, for example, the FDA limits arsenic to 10 ppb and lead to 5 ppb. ROA.20119, 22138. Moreover, Plaintiffs' experts testified that almost any level of heavy metal exposure is dangerous to developing infants and young children. *See* pp. 40-41, *supra*. Tellingly, Hain eventually took its rice cereal off the market because it could not reduce the levels of heavy metals in the product. ROA.20006, 20035-36, 20040-41. Given all this evidence, the Palmquists introduced more than sufficient evidence for a reasonable jury to find that the Hain's baby food products contained dangerously high levels of heavy metals.

Second, the evidence also established that Ethan had heavy metal toxicity. Multiple physicians diagnosed Ethan with heavy metal poisoning based on hair tests, urine porphyrin tests, and differential diagnoses that ruled out other causes such as genetics, metabolic derangements, natal trauma, infection, or brain malformation. Consider the following:

- Dr. Rao testified that Ethan's hair and urine porphyrin tests showed elevated levels of arsenic, lead, and mercury. ROA.20999-21009, 21013-14; *see also* ROA.25484-97, 25527, 33429-33. For this reason, Dr. Rao diagnosed Ethan with heavy metal load (toxicity). ROA.21011; *see also* ROA.26068.

- Dr. Megson and Dr. Nikogosian also diagnosed Ethan with heavy metal toxicity. ROA.20822; *see also* ROA.36236, 36478, 36481-84, 36488 (Dr. Nikogosian's records).

- Dr. Nelson agreed with all these diagnoses and testified, based on these diagnoses and his differential diagnosis, that if Ethan "had not suffered the heavy metal toxicity, he would not have suffered the brain injuries." ROA.20822-23, 20831.

- Dr. Settles testified that the cause of Ethan's neurocognitive disorder was "exposure to toxic metals." ROA.20682.

In short, the Palmquists introduced overwhelming evidence proving both that Hain's baby food contained harmful levels of heavy metals and that Ethan suffered from heavy metal toxicity.[15] This evidence presented a question of fact for the jury, and the district court erred by granting judgment as a matter of law.

---

[15] Hain's motion briefly argued that "Plaintiffs' experts failed to rule out that Ethan's condition was caused by a severe case of autism" and that "there is no evidence that heavy metals can cause autism spectrum disorder as a general matter, nor that they caused Ethan's autism spectrum in this specific case." ROA.18325-27. On the contrary, while Ethan has all the symptoms necessary for a diagnosis of ASD, ROA.20693, 20843, he also has "other physical symptoms that aren't under [the] criteria for an ASD diagnosis." ROA.20661. Ethan's injury is instead best characterized as "major neurocognitive disorder with severe to profound intellectual disability," which represents "a separate diagnosis than ASD." ROA.20662-63; *see also* ROA.20651. And even if ASD is the best label for Ethan injuries, the Palmquists presented expert evidence that "certain heavy metals have been linked to causing some of the symptoms that can present as ASD." ROA.20994. Ultimately, as Dr. Nelson testified, "all of the issues, whether we're talking about the autism, intellectual disability, the abnormal EEGs, the epilepsy, what have you, they're all caused by the same thing, meaning that the heavy metal toxicity in this case would be the cause for all of the symptoms that Ethan has." ROA.20866. Thus, Hain's autism theory is a red herring.

## III. The Palmquists introduced sufficient evidence to establish liability.

Because the final judgment states that the district court "granted in its entirety the defendants' motion for judgment as a matter of law," ROA.18417, this brief will address Hain's challenges to the Palmquists' liability theories. But the district court did not actually base its ruling on these grounds, which are meritless.

### A. There is sufficient evidence of a marketing defect.

The Palmquists presented sufficient evidence of their marketing defect claim; indeed, Hain did not even seek summary judgment on this claim. *See* ROA.17012.

### 1. The Palmquists proved a marketing defect.

The Palmquists' marketing defect claim asserted that Hain's baby food was unreasonably dangerous because of Hain's failure to provide adequate warnings. This claim required the Palmquists to prove:

(1) a risk of harm that is inherent in the product or that may arise from its anticipated use;

(2) Hain knew or reasonably should have foreseen the risk at the time the product was marketed;

(3) the product failed to provide adequate warnings or instructions;

(4) the lack of warnings or instructions rendered the product unreasonably dangerous to the ultimate user; and

(5) the failure to warn or instruct caused the user's injury.

*See Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471, 480 (Tex. App.— Houston [1st Dist.] 2007, pet. denied). The Palmquists proved each element.

***Elements 1 & 2.*** On the first two elements, the presence of heavy metals in Hain's baby food created a substantial and foreseeable risk to infants and children. Witnesses from both parties testified that *any* level of heavy metals in baby food creates a risk of neurological damage to infants and children. *See, e.g.*, ROA.20853 ("no safe level of heavy metals"); ROA.20995 ("heavy metals can be a cause of what is presenting as ASD"). Hain's own experts testified that heavy metals pose a risk to the neurocognitive development of young children. *See* ROA.21782 ("a baby, especially in their first year of life, has more susceptibility to outside toxins coming into their neurological system"); ROA.21580-81 ("too much of heavy metals … could be associated with developmental delays."); ROA.21673 ("toxic doses of lead, mercury, or arsenic … can cause injury to the developing brain."). Hain's baby food contained these heavy metals in dangerous quantities. *See* pp. 53-54, *supra*.

These risks were foreseeable to Hain. Its corporate representative admitted that "inorganic arsenic alone or combined with other substances is very toxic to biological systems" and "[r]egardless of the geography, arsenic poisoning can cause severe adverse effects in humans, especially infants and toddlers, since their immune system is not fully developed." ROA.20076. And Hain's own internal documents demonstrate that it realizes products with over 100 ppb arsenic are "very toxic to biological systems," "can cause severe adverse effects in humans, especially infants and toddlers," and are "UNSAFE." ROA.22127, 22131, 22452.

*Element 3.*  It is undisputed that Hain's baby food came without any warning or "even the slightest indication of the potential [presence of] heavy metals," ROA.20057, much less that its products contained dangerous levels of such metals. *See also* ROA.21043 ("there is no statement around a warning" about heavy metals); ROA.19987 ("we do not say there is heavy metals on the label"); ROA.20016 (nothing on Hain's website revealed that Hain's baby food products contained untested vitamin premix).  Even customers who contact Hain are not informed that its products contain heavy metals.  *See, e.g.*, ROA.20060 ("[T]hat is information we do not provide to consumers.").  The absence of adequate warnings is undisputed.

*Elements 4 & 5*.  Hain's failure to warn consumers that its baby food contained high levels of arsenic and heavy metals made the product unreasonably dangerous and caused Ethan's injuries.  The fact that Hain's baby food products contained dangerous levels of heavy metals has been discussed at length.  *See* pp. 53-54, *supra*. And the absence of any warning meant that Ethan was "eating nearly exclusively" Hain's baby food from the age of eight months, consuming multiple servings of the arsenic-laden rice cereal every day.  ROA.21311, 21308.  Dr. Palmquist testified that "[i]f Earth's Best on any of its baby food had said 'contains' heavy metals'" or even "may contain heavy metals," there is "no way" she would have fed it to him. ROA.21322.  The remainder of the causation analysis has been detailed extensively. *See* pp. 38-52, *supra*.

## 2. The nonliability presumption does not apply.

Hain's Rule 50(a) motion dropped a footnote arguing that it is entitled to a "nonliability presumption" under Texas law. ROA.18319-20 at n.14. It is not.

A manufacturer is only entitled to a nonliability presumption if it shows that a product complied with mandatory federal safety standards or regulations that were applicable to the product at the time of manufacture and governed the product risk that allegedly caused the harm. *See Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 870 (Tex. 2014); *see also* Tex. Civ. Prac. & Rem. Code § 82.008. This presumption only applies if the federal standard or regulation governs the *risk* that caused the harm, "not a particular product *defect*." *Kia*, 432 S.W.3d at 873.

As the district court correctly held in its order denying summary judgment, the risk in this case is "properly frame[d]" as the risk of "consuming harmful levels of toxic metals." ROA.17008. The district court denied summary judgment because the rules that formed the basis for Hain's argument do not govern that specific risk. *See* ROA.17009 (holding that 21 C.F.R. § 101.17 "does not … regulate the risk of consuming toxins or heavy metals"); ROA.17009-10 (heavy metals are not "FDLCPA-governed allergens"). And while Hain's Rule 50 motion mentioned the Food Safety Modernization Act in passing, ROA.18319 at n.14, it failed to explain which provisions of this statute applied, how Hain complies with those provisions, or how they relate to the relevant risk.

Finally, the district court correctly ruled that 21 C.F.R. §§ 101.4 and 101.100 only exempt "insignificant" levels of "incidental additives" from public disclosure. ROA.17010; *see* 21 C.F.R. § 101.100(a)(3). As noted above, *see* pp. 53-54, *supra*, the level of heavy metals in Hain's baby food products was far from "insignificant," so these rules are inapplicable. The nonliability presumption does not apply.

## B.     There is sufficient evidence of a manufacturing defect.

The Palmquists proved that Hain's baby food contained dangerously unsafe levels of heavy metals. *See* pp. 53-54, *supra*. From this evidence, a jury could find that the baby food was defectively manufactured. *See Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 434 (Tex. 1997) ("[A] plaintiff has a manufacturing defect claim when a finished product deviates … from the specifications or planned output in a manner that renders it unreasonably dangerous.").

Hain's Rule 50(a) motion argued that the Palmquists failed to demonstrate (1) that the product deviated from its design or (2) that the deviation rendered the product unreasonably dangerous. ROA.18320-22. When a product is contaminated unintentionally by a foreign substance (such as heavy metals), Texas law holds that the product "deviates" from its specifications. *See Grinnell*, 951 S.W.2d at 434 (unintended pesticides in cigarettes); *see also Jacob E. Decker & Sons, Inc. v. Capps*, 164 S.W.2d 828, 834 (Tex. 1942) (adopting strict liability for "any food containing any added poisonous or deleterious ingredients").

In 2019, FDA testing revealed that Hain's finished baby food products often contained over 100 ppb arsenic, exceeding Hain's own internal specifications. ROA.22267, 22277; *see* ROA. 20028. In addition, Hain's vitamin premix contained 223 ppb arsenic and 352 ppb lead, again exceeding Hain's internal specifications. ROA.22273. This premix was "a major factor" contributing to the discrepancy between Hain's theoretical tests and the excessive arsenic levels found by the FDA. ROA.20032-33. It is reasonable to infer that the baby food products manufactured in 2014 and 2015 exhibited similar deviations from Hain's specifications. *See*, *e.g.*, *Norman v. Bodum USA, Inc.*, 44 F.4th 270, 272 (5th Cir. 2022) ("A manufacturing defect may be established exclusively through circumstantial evidence.") (applying Texas law). In sum, the Palmquists offered sufficient evidence that Hain's products deviated from their design and internal specifications.

The evidence was also sufficient to prove that the deviation was dangerous, *see* pp. 53-54, *supra*, and caused Ethan's injuries. Ethan has heavy metal poisoning. *See* ROA.21013-14 (Ethan exhibits "elevated levels" of arsenic, lead, and mercury); *see also* pp. 54-55, *supra*. And Hain's baby food was the only potential source of the heavy metals. ROA.21324-25. From this evidence, a reasonable jury could find that Hain's baby food deviated from its internal specifications in a way that caused Ethan's injuries. *See Grinnell*, 951 S.W.2d at 434; *Capps*, 164 S.W.2d at 834. Again, the remainder of the causation analysis has been detailed. *See* pp. 38-52, *supra*.

## C.    There is sufficient evidence of negligence.

Finally, the Palmquists introduced sufficient evidence of negligent testing. Negligence requires a plaintiff to establish a duty, a breach of that duty, and damages caused by the breach. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006).

A product manufacturer has a "duty to test and ascertain the dangers inherent in its products about which it must warn consumers." *Grinnell*, 951 S.W.2d at 437. Prior to 2020, Hain did not test its final products, preferring to test the ingredients individually and then make a "theoretical calculation" of their heavy metal content. ROA.20006-08, 20029-31, 20034, 20048-49, 21145-46. But its theoretical estimates grossly underestimated the heavy metal content of Hain's rice cereal, ROA.21133, and it never bothered to confirm whether its theoretical estimates matched reality. ROA.20007-09. It now does both "ingredient testing *and* finished product testing" to ensure that its products comply with the FDA's safety standards. ROA.20009. Contrary to Hain's assertion, *see* ROA.18323, expert testimony was not required to recognize that this flagrant dereliction was negligence.

The record shows that final product testing was feasible in 2014, ROA.20009, and that it would have revealed the risks that caused Ethan's neurocognitive injuries. ROA.21185. The remainder of the causation analysis has been detailed extensively. *See* pp. 38-52, *supra*. There was sufficient evidence that Hain failed its "duty to test and ascertain the dangers inherent in its products." *Grinnell*, 951 S.W.2d at 437.

**D.** **The district court erred in granting summary judgment on the Palmquists' design defect claim.**

Unlike the other products liability claims, summary judgment was granted on the Palmquist's design defect claim. ROA.17012-15. That ruling should be reversed and the design defect claim should be submitted to the jury on remand.

Design defect claims require proof that (1) a product was defectively designed so as to render it unreasonably dangerous; (2) there was a safer alternative design; and (3) the defect caused the plaintiff's injury. *See Emerson Elec. Co. v. Johnson*, 627 S.W.3d 197, 203 (Tex. 2021); Tex. Civ. Prac. & Rem. Code § 82.005. Here, Hain's summary judgment motion challenged the safer-alternative-design element. ROA.5210. "A safer alternative design is one that would have prevented or significantly reduced the risk of the injury, would not substantially impair the product's utility, and was economically and technologically feasible at the time." *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 7 (Tex. 2015).

The district court assumed the existence of an alternative design—baby food containing lower levels of heavy metals—but held that the Palmquist had failed to "establish the feasibility of their proposed safer alternative design." ROA.17015. But even a cursory review of the Palmquist's response reveals substantial evidence that the alternative design—which Hain is currently using—was feasible at the time Ethan was fed the dangerous baby food.

For example, Hain's Senior Vice President of Technical Services testified that an alternative design that eliminates the vitamin premix and contains lower levels of heavy metals has been tested and is currently in use. *See* ROA.8465. Similarly, Hain's former Senior Director of Quality and Food Safety Systems testified that Hain has lowered the arsenic specification for its baby food from "200 parts per billion inorganic arsenic" to 100 ppb. ROA.8694.

In addition, Hain's Senior Director of Regulatory Compliance testified that Hain has switched from brown rice (which contains more arsenic) to white rice (which contains less). ROA.8896-97; *see* ROA.8825. Its corporate representative admitted that the switch to white rice "could have been done" in 2014. ROA.8825. The corporate representative also testified that "I don't believe there was anything that would have prevented us" from conducting final product testing in 2014. ROA.8825. Such testing would have been financially feasible for Hain at that time, ROA.8793-94, and it would have revealed the elevated levels of heavy metals in Hain's products that caused Ethan's injuries. ROA.8851.

Because there is substantial evidence that Hain has produced baby food with significantly lower levels of heavy metals—and that nothing prevented Hain from switching to white rice or conducting final product testing in 2014—the Palmquists presented sufficient evidence to sustain their design defect claim. The district court erred in granting summary judgment on that claim.

## CONCLUSION

The Court should reverse the district court's order denying the Palmquists' motion to remand and dismissing the Palmquists' claims against Whole Foods, vacate the district court's take-nothing judgment in favor of Hain, and remand the case to the district court with instructions that the case be remanded to state court. At a minimum, the district court erred by dismissing Whole Foods "with prejudice," ROA.783, so the dismissal order should be reformed to be "without prejudice."

Alternatively, the district court erred by granting Hain's Rule 50(a) motion for judgment as a matter of law. The Court should reverse the district court's order granting Hain's Rule 50(a) motion, vacate the district court's take-nothing judgment in favor of Hain, and remand the case for a new trial.

The Palmquists request all other relief to which they are entitled.

Respectfully submitted,

**BECK REDDEN LLP**

By: <u>/s/ *Russell S. Post*</u>
Russell S. Post
Owen McGovern
Bennett J. Ostdiek
1221 McKinney Street, Suite 4500
Houston, TX  77010
(713) 951-3700
(713) 951-3720 (Fax)

**YETTER COLEMAN LLP**
Constance H. Pfeiffer
Jason R. LaFond
Austin Brumbaugh
811 Main Street, Suite 4100
Houston, TX 77002
(713) 632-8000
(713) 632-8022 (Fax)

***Counsel for Appellants,***
***Sarah Palmquist, Individually and as***
***Next Friend of E.P., a minor;***
***Grant Palmquist***

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2023, a copy of the foregoing Brief of Appellants was filed electronically with the Clerk of the Court using the Court's ECF System.  Notice of this filing will be sent electronically by operation of the Court's electronic filing system to all counsel of record.  Courtesy copies will also be sent to counsel for both Defendant-Appellees.

*/s/ Russell S. Post*
Russell S. Post

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 16,913 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and on July 5, 2023, the Court granted a motion for leave to file a brief not to exceed 17,000 words.  *See* 5th Cir. R. 32.4.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point font.

Dated:  July 12, 2023.

*/s/ Russell S. Post*
Russell S. Post
*Attorney of Record for Appellants*