No. 23-40197

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

SARAH PALMQUIST, INDIVIDUALLY AND AS NEXT FRIEND OF E.P., A
MINOR; GRANT PALMQUIST,

*Plaintiffs–Appellants*

v.

THE HAIN CELESTIAL GROUP, INCORPORATED; WHOLE FOODS
MARKET, INCORPORATED, ALSO KNOWN AS WHOLE FOODS MARKET
ROCKY MOUNTAIN/SOUTHWEST, L.P.

*Defendants–Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, GALVESTON DIVISION; NO. 3:21-CV-90

## APPELLEE THE HAIN CELESTIAL GROUP, INC.'S BRIEF

Paul W. Schmidt
Michael X. Imbroscio
Phyllis A. Jones
Nicole M. Antoine
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
202-662-6000
202-778-5868 [Fax]
pschmidt@cov.com
mimbroscio@cov.com
pajones@cov.com
nantoine@cov.com

Thomas C. Wright
Raffi Melkonian
Eric B. Boettcher
Cristina De La Cruz
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321
(713) 572-4320 (Fax)
wright@wrightclosebarger.com
melkonian@wrightclosebarger.com
boettcher@wrightclosebarger.com
delacruz@wrightclosebarger.com

*Attorneys for Defendant-Appellee The Hain Celestial Group, Inc.*

# CERTIFICATE OF INTERESTED PERSONS

No. 23-40197

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

SARAH PALMQUIST, INDIVIDUALLY AND AS NEXT FRIEND OF E.P., A
MINOR; GRANT PALMQUIST,

*Plaintiffs–Appellants*

v.

THE HAIN CELESTIAL GROUP, INCORPORATED; WHOLE FOODS
MARKET, INCORPORATED, ALSO KNOWN AS WHOLE FOODS MARKET
ROCKY MOUNTAIN/SOUTHWEST, L.P.

*Defendants–Appellees*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## <u>Counsel for Plaintiffs-Appellants</u>

Russell S. Post
Owen J. McGovern
Bennett J. Ostdiek
BECK REDDEN LLP

Constance H. Pfeiffer
Jason R. LaFond

Austin Brumbaugh
YETTER COLEMAN LLP

Kurt Arnold
Caj Boatright
Roland Christensen
Andrew Gould
Brittany Clark
Alec Paradowski
ARNOLD & ITKIN LLP

Charles R. Parker
Anderson Parker
PARKER & SANCHEZ PLCC

**Plaintiffs-Appellants**

**Sarah Palmquist, Individually and as Next Friend of E.P., a minor; Grant Palmquist**

**Counsel for Defendant-Appellee**

Thomas C. Wright
Raffi Melkonian
Eric B. Boettcher
Cristina De La Cruz
WRIGHT CLOSE & BARGER, LLP

Paul W. Schmidt
Michael X. Imbroscio
Phyllis A. Jones
Nicole Antoine
COVINGTON & BURLING LLP

Brian G. Cano
FEE, SMITH & SHARP, L.L.P.

**Defendant-Appellee**

**The Hain Celestial Group, Inc.** The Hain Celestial Group, Inc. has no parent

corporation, and no publicly held corporation owns 10% or more of its stock.

**Defendant-Appellee**
**Whole Foods Market, Incorporated, also known as Whole Foods Market Rocky Mountain/Southwest, L.P.**

**Counsel for Defendant-Appellee**

Bradley E. Chambers
Samuel Lanier Felker
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.

/s/ *Thomas C. Wright*
Thomas C. Wright
**Attorney for Defendant-Appellee The Hain Celestial Group, Inc.**

## STATEMENT REGARDING ORAL ARGUMENT

Although the Palmquists' arguments are meritless for the reasons explained in this brief, Hain recognizes that this case is complex and was litigated through trial, and thus oral argument could aid this Court by providing it the opportunity to resolve any procedural or factual questions it may have regarding the case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

STATEMENT REGARDING ORAL ARGUMENT .............................................. v

TABLE OF CONTENTS............................................................................................ vi

INDEX OF AUTHORITIES.................................................................................... ix

JURISDICTIONAL STATEMENT ........................................................................ xv

STATEMENT OF THE ISSUES............................................................................ xvi

INTRODUCTION ...................................................................................................... 1

STATEMENT OF THE CASE................................................................................... 2

I.     Factual Background.......................................................................................... 2

       A.     The Hain Celestial Group, Inc. Manufactures Organic
              Baby Foods............................................................................................ 2

       B.     Ethan Palmquist Is Diagnosed With Severe Autism
              Spectrum Disorder................................................................................ 4

       C.     The Palmquists Seek Alternative Treatments. ................................... 6

II.    Procedural History ......................................................................................... 10

       A.     The State Court Action and Eventual Removal. ............................... 10

       B.     The Palmquists Disclose Six Causation Experts,
              Including Two Toxicologists, and Hain Moves to
              Exclude. ................................................................................................ 11

       C.     The Palmquists Jettison All But Two Causation Experts
              at Trial and Present No Toxicology Expert......................................... 13

       D.     Hain Moves For Judgment as a Matter of Law.................................. 16

STANDARD OF REVIEW .................................................................................... 17

SUMMARY OF THE ARGUMENT ...................................................................... 18

ARGUMENT ..................................................................................21

I.  The District Court Properly Denied the Palmquists' Motion to
    Remand, and, In Any Event, Vacatur is Not the Correct Remedy.
    ..............................................................................................21

    A.  Whole Foods Was Improperly Joined as a Defendant. ......................22

        1.  The District Court Correctly Considered the First
            Amended Complaint Pursuant to Fifth Circuit Precedent. ........22

        2.  Even Considering the Second Amended Complaint, the
            Palmquists Failed to Plead a Claim Against Whole Foods.
            ......................................................................................25

    B.  Regardless, the District Court Had Federal Diversity
        Jurisdiction When Judgment Was Entered and This Court
        Should Affirm. ..........................................................................27

II. The District Court Correctly Concluded That the Palmquists
    Failed to Present Legally Sufficient Evidence of Causation. ........................29

    A.  The District Court Correctly Concluded That the
        Palmquists Failed to Present Legally Sufficient Evidence
        Establishing General Causation. ........................................................30

        1.  The Palmquists Presented No Evidence Establishing a
            "Harmful Level" of Heavy Metals That Could Have
            Caused Ethan's Condition. ..........................................................31

        2.  Principles of Federalism Foreclose the Palmquists'
            Request for a New Substantive Causation Standard Under
            Texas Law. ..............................................................................35

        3.  The Palmquists Failed to Present Evidence Supporting
            General Causation at Any Level of Exposure. ..........................40

    B.  The Palmquists Failed to Present Legally Sufficient
        Evidence of Specific Causation. ........................................................46

        1.  The Palmquists Failed to Present Any Evidence That
            Ethan Was Exposed to a Level of Heavy Metals Through

Hain's Baby Foods That Was Sufficient to Cause His Condition..................................................................................46

2.      The Palmquists Did Not Present Legally Sufficient Evidence That Ethan Had Heavy Metal Toxicity.....................53

III.    The Palmquists Failed To Present Sufficient Evidence That Hain's Baby Foods Contained Harmful Levels of Heavy Metals.
.................................................................................................................55

IV.     The Palmquists Failed to Present Substantial Evidence to Establish Other Elements of Their Substantive Causes of Action.
.................................................................................................................59

A.      The Palmquists Presented Legally Insufficient Evidence That Hain's Baby Food Contained a Marketing Defect. ....................59

B.      The Palmquists Presented Legally Insufficient Evidence That Hain's Baby Food Contained a Manufacturing Defect. ................................................................................................60

C.      The Palmquists Failed to Present Legally Sufficient Evidence to Support a Negligent Testing Claim.................................61

D.      The District Court Correctly Granted Hain Summary Judgment on the Palmquists' Design Defect Claim...........................62

CONCLUSION .........................................................................................62

# INDEX OF AUTHORITIES

CASES                                                                    Page(s)

*In re 1994 Exxon Chem. Fire*,
    558 F.3d 378 (5th Cir. 2009) ...............................................................28

*Abraham v. Union Pac. R. Co.*,
    233 S.W.3d 13 (Tex. App. 2007)...............................31, 44, 47, 48, 49

*Allen v. Pennsylvania Engineering Corp.*,
    102 F.3d 194 (5th Cir. 1996) ..............................................31, 41, 47

*Alviar v. Lillard*,
    854 F.3d 286 (5th Cir. 2017) ....................................................23, 24

*Amazon.com, Inc. v. McMillan*,
    625 S.W.3d 101 (Tex. 2021) ...........................................................26

*Anderson v. Siemens Corp.*,
    335 F.3d 466 (5th Cir. 2003) ..........................................................30

*Artesanales de Colombia (ANPAC) v. Dow Quimica de Colombia
    S.A.*,
    988 F.2d 559 (5th Cir. 1993) .....................................................24, 25

*Avenatti v. Fox News Network LLC*,
    41 F.4th 125 (3d Cir. 2022) ............................................................28

*Blackmon v. Am. Home Prods. Corp.*,
    346 F. Supp. 2d 907 (S.D. Tex. 2004)............................................61

*Borg-Warner Corp. v. Flores*,
    232 S.W.3d 765 (Tex. 2007) ....................................................33, 47

*Bostic v. Ga.-Pac. Corp.*,
    439 S.W.3d 332 (Tex. 2014) ....................................................32, 33

*Brock v. Merrell Dow Pharms., Inc.*,
    874 F.2d 307 (5th Cir. 1989) ..........................................................45

ix

*Builder Servs. Grp., Inc. v. Taylor*,
 No. 03-18-00710-CV, 2020 WL 5608484 (Tex. App.—Austin
 Sept. 17, 2020, pet. denied) ...............................................................33

*Burleson v. Texas Department of Criminal Justice*,
 393 F.3d 577 (5th Cir. 2004) .....................................................31, 41

*Camsoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*,
 756 F.3d 327 (5th Cir. 2014) ............................................................23

*Cano v. Everest Mins. Corp.*,
 362 F. Supp. 2d 814 (W.D. Tex. 2005) ............................................51

*Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*,
 770 F.3d 322 (5th Cir. 2014) .....................................................59, 60

*Caterpillar Inc. v. Lewis*,
 519 U.S. 61 (1996)............................................19, 22, 27, 28

*Cavallini v. State Farm Mut. Auto Ins.*,
 44 F.3d 256 (5th Cir. 1995) .....................................................23, 24, 25

*City of Keller v. Wilson*,
 168 S.W.3d 802 (Tex. 2005) ............................................................30

*Clark v. Kellogg Brown & Root L.L.C.*,
 414 F. App'x 623 (5th Cir. 2011)......................................................50

*Coastal Tankships, U.S.A., Inc. v. Anderson (In re Estate of
 Anderson)*,
 87 S.W.3d 591 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ...........36, 40

*Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*,
 136 S.W.3d 227 (Tex. 2004) ............................................................44

*Current v. Atochem N. Am., Inc.*,
 No. CIV. W-00-CA-332, 2001 WL 36101283 (W.D. Tex. Nov. 30,
 2001) ...........................................................................................37, 41

*Curtis v. M&S Petroleum, Inc.*,
 174 F.3d 661 (5th Cir. 1999) .............................. 31, 36, 37, 38, 47, 49

*Erie R.R. Co. v. Tompkins*,
    304 U.S. 64 (1938)...............................................................................2, 20, 35

*Exxon Corp. v. Makofski*,
    116 S.W.3d 176 (Tex. App.—Houston [14th Dist.] 2003, pet.
    denied)..................................................................................................................41

*FFE Transp. Servs. Inc. v. Fulgham*,
    154 S.W.3d 84 (Tex. 2004)..........................................................................60, 61

*Frith v. Guardian Life Ins. Co. of Am.*,
    9 F. Supp. 2d 734 (S.D. Tex. 1998)..................................................................26

*Garrick v. Autoliv ASP, Inc.*,
    No. 14-17-00818-CV, 2018 WL 3385159 (Tex. App.—Houston
    [14th Dist.] July 12, 2018, pet. denied) ...........................................................59

*Goodner v. Hyundai Motor Co.*,
    650 F.3d 1034 (5th Cir. 2011) ....................................................................17, 42

*Griggs v. State Farm Lloyds*,
    181 F.3d 694 (5th Cir. 1999) ......................................................................24, 25

*Grupo Dataflux v. Atlas Global Grp., LP*,
    541 U.S. 567 (2004).............................................................................................23

*Guevara v. Ferrer*,
    247 S.W.3d 662 (Tex. 2007) .............................................................30, 42, 55

*Harbuck v. Ford Motor Co.*,
    No. 4:18-CV-576-A, 2018 WL 4375079 (N.D. Tex. Sept. 13,
    2018) ..................................................................................................................27

*Herrmann Holdings Ltd. v. Lucent Techs. Inc.*,
    302 F.3d 552 (5th Cir. 2002) ...........................................................................35

*Howard v. Lowe's Home Ctrs. LLC*,
    306 F. Supp. 3d 951 (W.D. Tex. 2018) ..........................................................26

*Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*,
    818 F.3d 193 (5th Cir. 2016) ....................................................................17, 22

*Jefferson v. Certain Underwriters at Lloyd's London*,
   658 F. App'x 738 (5th Cir. 2016) ........................................................28

*Johnson v. Arkema, Inc.*,
   685 F.3d 452 (5th Cir. 2012) ........................................ 31, 36, 37, 38, 39, 47, 49

*Knight v. Kirby Inland Marine Inc.*,
   482 F.3d 347 (5th Cir. 2007) .....................................................30, 47

*Kroger Co. v. Elwood*,
   197 S.W.3d 793 (Tex. 2006) ............................................................60

*Matt Dietz Co. v. Torres*,
   198 S.W.3d 798 (Tex. App.—San Antonio 2006, pet. denied).........................39

*McManaway v. KBR, Inc.*,
   852 F.3d 444 (5th Cir. 2017) ....................................................30, 36, 37, 39, 44

*Mercado v. Lynch*,
   823 F.3d 276 (5th Cir. 2016) ............................................................23

*Merrell Dow Pharm., Inc., v. Havner*,
   953 S.W.2d 706 (Tex. 1997) .............................................................40, 41, 47

*Moore v. Ashland Chem. Inc.*,
   151 F.3d 269 (5th Cir. 1998) .........................................................33, 47, 49

*Mullins v. Atlantic Richfield Co.*,
   No. 01-20-00013-CV, 2021 WL 2931355 (Tex. App.—Houston
   [1st Dist.] July 13, 2021, pet. denied)...............................................49

*N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins.*,
   898 F.3d 461 (5th Cir. 2018) ......................................................17, 46

*Newman-Green, Inc. v. Alfonzo-Larrain*,
   490 U.S. 826 (1989).....................................................................19, 28

*Norman v. Bodum USA, Inc.*,
   44 F.4th 270 (5th Cir. 2022) ............................................................60

*Norman v. Grove Cranes U.S., L.L.C.*,
   750 F. App'x 269 (5th Cir. 2018)......................................................61

*O'Neill v. Seariver Mar., Inc.*,
246 F. App'x 278 (5th Cir. 2007) .......................................................50

*Peña v. City of Rio Grande City*,
879 F.3d 613 (5th Cir. 2018) ............................................................24

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ...............................................................2

*Seaman v. Seacor Marine L.L.C.*,
326 F. App'x 721 (5th Cir. 2009) .......................................................31

*Smallwood v. Illinois Central Ralroad Co.*,
385 F.3d 568 (5th Cir. 2004) .............................................21, 22, 23

*Sobranes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp.*,
509 F.3d 216 (5th Cir. 2007) ............................................................18

*Starr v. A.J. Struss & Co.*,
No. 01–14–00702–CV, 2015 WL 4139028 (Tex. App.—Houston
[1st Dist.] July 9, 2015, no pet.) ......................................................30

*Timpte Indus., Inc. v. Gish*,
286 S.W.3d 306 (Tex. 2009) .............................................................61

*TOTAL Gas & Power N. Am., Inc. v. Fed. Energy Regul. Comm'n*,
859 F.3d 325 (5th Cir. 2017) ......................................................18, 48

*Tyre v. Excel Indus., Inc.*,
No. 4:19-CV-951-A, 2020 WL 791052 (N.D. Tex. Feb. 14, 2020)..................26

*Union Pump Co. v. Allbritton*,
898 S.W.2d 773 (Tex. 1995), *abrogated on other grounds by Ford
Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007).............................29, 48, 52

*Weatherly v. Pershing, L.L.C.*,
945 F.3d 915 (5th Cir. 2019) ............................................................35

*Wells v. SmithKline Beecham Corp.*,
601 F.3d 375 (5th Cir. 2010) ...............................................29, 30, 42

*Wyvill v. United Cos. Life Ins.*,
212 F.3d 296 (5th Cir. 2000) ............................................................46

**STATUTES**

Tex. Civ. Prac. & Rem. Code § 82.003 ...................................................27

**RULES**

Fed. R. Civ. P. 9(b) ...............................................................19, 26, 27

Fed. R. Civ. P. 12(b)(6).......................................................................24

Fed. R. Civ. P. 21 ...............................................................................28

Fed. R. Civ. P. 50(a)...............................................................16, 17, 29, 48

Fed. R. Civ. P. 15 ...............................................................................24

Fed. R. Ev. 702.....................................................................11, 12, 14

Fed. R. Ev. 705...................................................................................45

**OTHER**

Federal Judicial Center, *Reference Manual on Scientific Evidence*
   *2011* WL 7724262 (3d ed. 2011)........................................................47

## JURISDICTIONAL STATEMENT

The district court had jurisdiction for the reasons set forth in Part I of this brief. This Court has appellate jurisdiction because this is an appeal from a final judgment of a district court.

## STATEMENT OF THE ISSUES

1.    After Hain removed this case, the Palmquists amended their state court complaint and moved to remand. In doing so, they conceded that their original state court complaint did not state valid claims against Whole Foods. Removal was therefore proper at the time Hain removed the case. The questions presented are:

    (a)    Was the district court obligated to consider the Palmquists' post-removal amendment to their complaint, or did it correctly follow Circuit precedent in analyzing the Palmquists' complaint at the time of removal?

    (b)    Even considering the post-removal second amended complaint, was the district court's decision denying remand proper?

    (c)    Regardless of whether the district court's decision denying remand was proper, should this Court nonetheless affirm under *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996) because the district court had jurisdiction at the time of judgment?

2.    General causation requires proof that "a substance is capable of causing a particular injury or condition in the general population." Evidence that a substance can cause *some* kind of condition or is generally harmful is insufficient. The questions presented are:

(a)  Did the district court correctly rule that the Palmquists failed to present any evidence, as they were required to, of the level of exposure to heavy metals that could cause the particular condition they allege Ethan experienced?

(b)  Did the district court err in holding that the Palmquists did not prove that ingestion of heavy metals at *any level of exposure* could cause the particular condition they allege Ethan experienced?

3.  Specific causation requires the Palmquists to show Ethan was exposed to a level of a harmful substance that could cause his actual injuries. But the Palmquists presented no witnesses who could state, or even estimate, how much heavy metals Ethan allegedly ingested from Hain's products. Did the Palmquists present legally sufficient evidence of specific causation?

4.  The Palmquists' claims require them to prove that Hain's products were unreasonably dangerous. Did the Palmquists present legally sufficient evidence that Hain's products were unreasonably dangerous?

5.  Did the Palmquists present legally sufficient evidence that Hain's products contained a marketing defect, manufacturing defect, design defect, or were harmful because of negligent testing?

**INTRODUCTION**

The Palmquists' son Ethan suffers from an unusually profound case of Autism Spectrum Disorder ("ASD"). The Palmquists' search for answers led them to sue The Hain Celestial Group, Inc. ("Hain"), alleging that the trace amounts of heavy metals in our food supply, including in Hain's "Earth's Best" brand of baby food, led to Ethan's condition. After giving the Palmquists the full opportunity to present their case, the district court directed a verdict for Hain because "the scientific facts are simply not there." ROA.22105.

The Palmquists' case foundered on two broad failures of proof. First, the Palmquists have no evidence that the minute levels of heavy metals present in certain ingredients in Hain's baby food are capable of causing Ethan's condition (whether characterized as severe autism or otherwise). That is, the Palmquists did not and could not prove general causation. Second, they could not prove that Ethan was exposed to a level of heavy metals, through Hain's baby foods, that was sufficient to cause his condition. That is, they could not prove specific causation. Texas law requires proof of both specific and general causation in this kind of case. Without reliable expert testimony on both points, the district court properly granted judgment as a matter of law.

This outcome was not a close call: there was a basic failure of proof to present any evidence of causation. Indeed, the Palmquists do not seriously dispute that their

claims fail under prevailing Texas law. Instead, they call on this Court to dramatically expand what counts as sufficient evidence of causation under Texas law. But that invitation cannot be reconciled with *Erie*: "It is axiomatic" that this Court "will not expand state law beyond its presently existing boundaries." *Rubinstein v. Collins*, 20 F.3d 160, 172 (5th Cir. 1994); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938).

Signaling their lack of faith in their causation argument, the Palmquists devote most of their brief to the claim that the district court somehow improperly denied remand. But the district court's remand ruling reflected a straightforward application of settled Circuit precedent and was clearly correct. The Palmquists' proposed remedy—a do-over for a case fully litigated to final judgment—is inconsistent with Supreme Court precedent and reinforces their argument's lack of merit.

The judgment below should be affirmed in all respects.

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    The Hain Celestial Group, Inc. Manufactures Organic Baby Foods.

Hain manufactures organic baby food under its Earth's Best brand, ROA.9967, 19985, which it sells to many retailers, including Whole Foods Market Rocky Mountain/Southwest, L.P. ("Whole Foods"). ROA.19985-86. Dr. Sarah Palmquist fed Hain's baby food to Ethan when he was a baby and a toddler but did

not keep track of or estimate how much baby food Ethan consumed cumulatively. ROA.21305-21.

Hain puts great care and effort into selecting its food suppliers and regulating and monitoring its factories to produce high-quality organic baby food. ROA.19986, 20001. It monitors the entire process of production, conducts tests at the factory level, and makes sure that the baby food is transported in a safe manner. ROA.20001. The FDA actively oversees the safety of commercial baby food, including Earth's Best products. ROA.19976, 19999, 20480.

As the FDA recognizes, heavy metals "are present in the environment, including in our air, water and soil, and therefore are unavoidable in the general food supply." ROA.18777, 20839. That is because, as part of the natural process in which fruit, vegetables, grains, and legumes are grown, they necessarily take up trace amounts of heavy metals—including lead, arsenic, and mercury—from the soil and water in which they are grown. ROA.20890-91, 21078, 21164-65. That is true for all foods, including the fresh fruit, vegetables, grains, and legumes that Hain sources to make its baby foods. ROA.20891, 21165-66. Indeed, the uncontested trial evidence demonstrated that the levels of heavy metals in the fruits, vegetables, and grains used in baby foods (Hain's and otherwise) are not materially different from (and often lower than) the levels found in those same items in the grocery store—all of which are safe. ROA.18815-24, 19987, 20891, 21165-66.

## B. Ethan Palmquist Is Diagnosed With Severe Autism Spectrum Disorder.

Ethan is the oldest son of Dr. Sarah Palmquist and Grant Palmquist. Ethan is non-verbal and exhibits the typical signs of severe autism, including violent and anti-social behaviors, meltdowns, biting, irritability, and trouble socializing. ROA.21219-20, 21227-29. As is common in autistic children, Ethan's early development appeared normal, ROA.21197-214. But as Ethan grew, his parents noticed that he was "regressing" and displaying concerning symptoms. For example, beginning at around two and a half years old, Dr. Palmquist noted that Ethan would "space out" for a few seconds. ROA.21336. She also noticed that Ethan's language "plateaued a little" and he experienced "meltdowns." ROA.21338, 21340. At 31 months, Dr. Palmquist noticed that Ethan was flapping his hands, prompting concern. ROA.21215-16.

Regression, having limited or no language, hand flapping, and meltdowns are common symptoms of ASD, ROA.21606-07, 21921, 21934, 21941-42, a specifically defined early-onset neurodevelopmental condition characterized by persistent deficits in social communication and interaction and restricted, repetitive patterns of behavior, interests, or activities. ROA.21920-21; *see* ROA.21953. ASD typically presents in infancy and involves a period of apparently normal development, as evidenced by attaining specific developmental milestones, followed by an apparent regression of language or other skills in approximately 30% of those

affected. ROA.21941-42. For a child to be diagnosed with ASD, as opposed to another neurological disorder, the child must meet the relevant diagnostic criteria. ROA.21932-33. ASD can be very difficult for parents to identify, and sometimes only experts notice the early symptoms. ROA.21930, 21944.

Dr. Palmquist took Ethan to his pediatrician, Dr. Brooke Lasics, after noticing Ethan's hand flapping. ROA.21217, 21557. Dr. Lasics observed some behaviors consistent with early symptoms of ASD, such as poor eye contact, not responding to his name, opening and closing a door, and not engaging with her. ROA.21558, 21583-84. She referred Ethan for an evaluation at the University of Texas Physicians Pediatric Center for Autism and Related Conditions. ROA.21560, 21601. Dr. Lasics explained that Ethan was at an age when parents and pediatricians generally start noticing ASD symptoms and behaviors in children. ROA.21570.

Dr. Anson Koshy, a developmental and behavioral pediatrician and the Medical Director at the University of Texas Physicians Pediatric Center for Autism and Related Conditions, ROA.21590, 21593, conducted developmental testing of Ethan and had a speech pathologist come in to evaluate Ethan. ROA.21605-07. Dr. Koshy subsequently diagnosed Ethan with ASD: "At this time, Ethan's profile reflects the presence of autism spectrum disorder together with mixed receptive-expressive language disorder and aggressive behaviors." ROA.21614. In his words, Ethan had a "classic case of severe autism." ROA.21611-13.

Based on that diagnosis of severe autism, Dr. Koshy recommended a range of "evidence-based" treatments for Ethan's care: Applied Behavior Analysis therapy, a private therapeutic preschool, a family therapist, speech and language therapy, and occupational therapy. ROA.21226-27, 21616-17. Dr. Lasics ultimately saw Ethan for four years, ROA.21554, during which time she saw no evidence of heavy metal exposure. ROA.21579.

## C.  The Palmquists Seek Alternative Treatments.

Understandably wanting to find a cause or cure for Ethan's condition, the Palmquists sought alternative treatments. ROA.21293-94, 21304. Through Internet research, they identified three practitioners, none recommended by Ethan's core care team: Dr. Mary Megson, a Richmond, Virginia-based pediatrician who claims to treat 2,500 patients with autism at a single time and touts her experience curing autistic children with cod liver oil, ROA.21867, 21869; Dr. Armen Nikogosian, a "functional medicine" physician in Las Vegas, Nevada, ROA.23575, 23828-44; and Dr. Seshagiri Rao, a Dallas allergist who ultimately surrendered his medical license following Texas Medical Board complaints for his use of high-risk treatments to autistic children. ROA.20743, 20951-52, 21292, 21304, 21874. Drs. Megson, Nikogosian, and Rao all agreed that Ethan was properly diagnosed with autism, ROA.21876, 21877-78, 20956-57, 20961, and none identified any other secondary

or tertiary diagnoses for Ethan, ROA.21878, 20957-58.[1]

As part of their purported treatment of children with autism, both Drs. Megson and Rao prescribed controversial so-called "biomedical" or other alternative treatments, which Dr. Megson acknowledged are not recommended by the American Academy of Pediatrics or by the FDA, and which are recognized by "[v]ery few places." ROA.21873, 21880. Indeed, the Palmquists' expert Dr. Lisa Settles testified that the type of medicine Dr. Megson practices "isn't mainstream medicine." ROA.20747. Both Drs. Megson and Rao routinely test their autistic patients for heavy metals, despite recognizing that doing so is contrary to the American Academy of Pediatrics' standard of care. ROA.21894-96; *see also, e.g.*, ROA.21621-22 (Dr. Koshy stating that testing autistic children for heavy metals is "not the standard of care," "lacks evidence to support it," and is not "accepted in the scientific community"). And both Drs. Megson and Rao routinely prescribed chelation therapy—a potentially "dangerous" treatment in which heavy metals are stripped from the body—to their patients with autism. *See* ROA.21902-03, 20969. Neither the FDA, CDC, nor the American Academy of Pediatrics support chelation as a treatment for autism. ROA.20987-88; *see also* ROA.21623 (Dr. Koshy

---

[1] Although the Palmquists retained Dr. Nikogosian as a paid expert in this litigation, they ultimately disavowed any expert testimony by him, *see* ROA.8923-8964, and he did not testify at trial.

testifying that chelation treatment for children with autism is not accepted in the scientific community as an evidence-based treatment). Indeed, prior to surrendering his medical license, Dr. Rao was reprimanded and monitored by the Texas Medical Board because he "used IV chelation therapy" to "treat the patients with autism spectrum disorder." ROA.20988-89.

Ethan's parents initially sought out Dr. Megson, whose involvement in Ethan's care lasted for less than a year in 2017-2018. During that period, Dr. Megson had only two brief Skype visits with Ethan's mother Dr. Palmquist, and never actually conducted a physical examination of Ethan or met him in person. ROA.21859-61. Instead, Dr. Megson observed Ethan for only 15-20 minutes through a computer screen. ROA.21875. By her own admission, Dr. Megson never reviewed any of Ethan's other medical records, ROA.21863, even though she was not Ethan's primary pediatrician and knew that he had seen other doctors, ROA.21866. As was her standard practice for treating children with autism, Dr. Megson recommended heavy metal testing for Ethan and ordered a hair test and urine porphyrin test in 2017. ROA.21296, 36156-63.[2]

---

[2] Porphyrins are a category of related substances that combine with iron to form heme, a portion of hemoglobin, and porphyrin tests measure the levels of porphyrins found in urine. Used frequently by alternative medicine practitioners in this area, porphyrin tests do not directly measure metal levels, but, according to Dr. Rao, they can be used as an indirect biomarker of potential metal presence in the body. ROA.20975.

Ethan's 2017 hair test showed elevated levels of arsenic. ROA.21882-83. But the arsenic result bore all the hallmarks of a false positive: the result was 53 times higher than the reference level, ROA.21718; was accompanied by none of the established signs of arsenic poisoning, such as hyperpigmentation, kidney and liver problems, anemia, and dermatosis, ROA.21724-25; and the result was never replicated, ROA.21885-86. The test also showed completely normal levels of lead and mercury. ROA.21717-18. Despite recognizing that hair and porphyrin tests are not intended to be used for diagnostic purposes and that hair tests "may not be reliable," ROA.21897, Dr. Megson purportedly diagnosed Ethan with heavy metal toxicity based on those tests. ROA.21861, 21886. Dr. Megson recommended chelation therapy, as well as other treatments including nutritional supplements, a gluten-free diet, and camel milk. ROA.21900-02, 21905-06, 21908.

The Palmquists next sought the help of then-Dr. Rao, who ordered additional porphyrin tests. ROA.21301-02. Dr. Rao testified that he would not rely on the hair test that Dr. Megson ordered because a "hair analysis is not a good test to diagnose mercury or any other heavy metals." ROA.20967. He further explained that while the porphyrin tests gave him a suspicion of heavy metal toxicity, the hair tests and porphyrin tests could not confirm that Ethan had a heavy metal burden because they were not reliable on their own. ROA.20966. Although Dr. Rao believed that Ethan had a heavy metal burden, ROA.21008, he did not diagnose Ethan with anything

besides autism, ROA.21021.

Aside from the hair test, Ethan also received six other tests that measured the levels of arsenic, lead, and mercury in his blood and hair. All of those direct tests of heavy metals, apart from the initial hair test positive for only arsenic, showed no elevated levels of any heavy metal for Ethan:

- June 2018 blood test: Ethan had normal (non-elevated) levels of lead; the test did not test for arsenic or mercury. ROA.21719.

- August 2018 blood test: Ethan had normal (non-elevated) levels of lead, arsenic, and mercury. ROA.21720.

- January 2020 blood Test: Ethan had normal (non-elevated) levels of lead, arsenic, and mercury. ROA.21721.

- April 2021 blood test:  Ethan had normal (non-elevated) levels of lead, arsenic, and mercury. ROA.21721-22.

- July 2021 hair test:  Ethan had normal (non-elevated) levels of lead, arsenic, and mercury. ROA.21722-23.

- December 2021 blood test: Ethan had normal (non-elevated) levels of lead, arsenic, and mercury. ROA.21723-24.

## II. Procedural History

### A. The State Court Action and Eventual Removal.

The Palmquists sued both Hain and Whole Foods, a Texas resident, in Texas state court. *See* ROA.148-72. In their pre-removal First Amended Petition, the Palmquists asserted negligence and gross negligence claims against both Hain and Whole Foods, ROA.163-64, products liability claims against Hain, ROA.164-69, and a breach of warranties claim against Whole Foods. ROA.169-70.

Hain removed the case to federal court on the basis of diversity jurisdiction, explaining that Whole Foods had been improperly joined given its exemption from liability under Texas's innocent seller statute. ROA.37-46. The Palmquists filed a Second Amended Complaint, adding breach of express warranty and negligent undertaking claims against Whole Foods, ROA.249-78, and then moved to remand, ROA.284-303.

The district court denied the remand motion and dismissed the claims against Whole Foods, ruling that Whole Foods had been improperly joined because the Palmquists failed to plead a claim against it. ROA.779-83. Because "jurisdiction is resolved by looking at the complaint at the time [the] petition for removal [was] filed," the district court did not consider the Second Amended Complaint. ROA.780 (second alteration in original) (quotation omitted). The district court alternatively ruled, however, that "even if the court were to rely on the Palmquists' second amended complaint, there is still no reasonable basis to predict that they could recover from Whole Foods." ROA.780.

## B.     The Palmquists Disclose Six Causation Experts, Including Two Toxicologists, and Hain Moves to Exclude.

In discovery, the Palmquists disclosed six causation experts, and Hain moved under Federal Rule of Evidence 702 to exclude each of these experts.[3] In response

---

[3] Hain did not challenge a seventh expert, Dr. Ali Torkamani, a geneticist who offered no causation opinion.

to Hain's Rule 702 motions, the Palmquists withdrew two experts—Drs. Mary Megson and Armen Nikogosian—while arguing that their remaining four experts could properly testify: two specific causation experts, Drs. Stephen Nelson and Lisa Settles, ROA.8961-64; and two toxicology experts, Drs. Michael Aschner and Damani Parran, who purported to "offer[] estimates of Ethan's exposure" to heavy metals from Hain's products, ROA.8927, 993-1040, 4194-233. The Palmquists insisted on the importance of their toxicologists, arguing that "(1) they established the mechanisms by which heavy metals exposure injures the brain and thereby harms a child's neurodevelopment; (2) they estimated Ethan's exposure to heavy metals through Hain's products; and (3) they interpreted Ethan's diagnostic testing for biomarkers of harmful heavy metals exposure." ROA.8958.

The district court denied Hain's motion, explaining that "the Palmquists' toxicology experts [] point to evidence of the 'harmful level of exposure' needed to establish general causation," ROA.14815, and finding Dr. Parran's opinions important because they provided "helpful information to the jury about Ethan's consumption patterns." ROA.14820.

Hain also moved for summary judgment on all claims, which the district court granted in part and denied in part. ROA.5193-224. The district court denied the motion on causation. The court did, however, grant Hain summary judgment on the Palmquists' design defect claim because the Palmquists did not present sufficient

evidence "as to the feasibility of their proposed safer alternative design." ROA.17012. The court further held that "[t]he Palmquists' negligent-testing claim survives," but granted summary judgment on the Palmquists' "other negligence claims." ROA.17020.

### C. The Palmquists Jettison All But Two Causation Experts at Trial and Present No Toxicology Expert.

Trial proceeded in February 2023. Although the Palmquists originally named six experts to speak to causation, ROA.15792-802, they called only two of those experts at trial.

Most conspicuously absent were Drs. Parran and Aschner, the only witnesses who might attempt to provide the essential opinions about the purported levels of heavy metals Ethan ingested by consuming Hain's baby food and that those levels were high enough to—and in fact did cause—Ethan's condition.[4] Indeed, the Palmquists' counsel in opening explained the crucial role that toxicologist Dr. Parran would play. ROA.19867 ("You're going to also hear from Dr. Damani Parran. He's

---

[4] Having disavowed Drs. Megson and Nikogosian as retained experts, the Palmquists also ultimately declined to present either Dr. Megson or Nikogosian at trial in any respect, and only Hain presented Dr. Megson's testimony at trial. The Palmquists did offer the deposition testimony of the former-Dr. Rao as Ethan's treating physician. ROA.20951-21025. Dr. Rao testified only about his treatment of Ethan and did not offer a causation opinion. *See* ROA.20991-92, 21011. Dr. Rao also confirmed that Ethan had autism. ROA.20956-57.

a toxicologist … and he's going to come explain the toxicological side of this case, which is pretty complicated….").

As set forth in Hain's Rule 702 motions, the extensive depositions of both toxicologists showed that they faced profound methodological and substantive challenges even if they were allowed to testify at trial. ROA.993-1083, 4194-230. Perhaps not surprisingly then, the Palmquists withdrew Dr. Aschner as an expert immediately before trial, ROA.19578, and ultimately decided not to call Dr. Parran, although he was apparently in town and ready to testify. ROA.21545-46 (Plaintiffs' counsel explaining that "Dr. Parran -- he was here in Houston," "[h]e was here to call.").

Ultimately, only Drs. Settles and Nelson offered expert causation testimony. Dr. Settles, a clinical psychologist, testified that she was retained by the Palmquists to examine Ethan for this litigation, and that she performed that examination in March 2022, when Ethan was seven-and-a-half years old. ROA.20652, 20695. Dr. Settles agreed, based on her examination, that Ethan has Autism Spectrum Disorder. ROA.20693. She further agreed with Dr. Koshy's diagnosis from 2016 that Ethan has autism, ROA.20693, and that Ethan's behaviors meet all the criteria necessary for diagnosing ASD. ROA.20693-94. But Dr. Settles also diagnosed Ethan with "Major neurocognitive disorder." ROA.20651. She conceded that she was the first and only person to make that diagnosis: despite the fact that Ethan had seen over a

dozen doctors in his life while seeking to treat his condition, no other doctor outside of litigation had ever diagnosed Ethan with "major neurocognitive disorder." ROA.20696-97.

Dr. Nelson, for his part, agreed with the many physicians that diagnosed Ethan with ASD, but he also testified that he relied on Dr. Settles's diagnosis to assume that Ethan also had major neurocognitive disorder (without making that diagnosis himself). ROA.20843.

Drs. Settles and Nelson purported to have concluded, via differential diagnosis, that heavy metals caused Ethan's condition. But both Dr. Settles—a clinical psychologist—and Dr. Nelson—a pediatric neurologist—affirmatively disclaimed any expertise on this issue. Dr. Settles admitted that that she was not an expert on heavy metals; that she had never before offered the opinion that heavy metals in the levels found in baby foods could cause ASD; and that she did not read any epidemiological literature in forming this opinion and could not recall whether she reviewed any toxicology literature. ROA.20681, 20749-50. Dr. Nelson also confirmed that in his clinical practice he had never determined that a child's ASD was caused by heavy metals or published anything stating such. ROA.20844-46. And both testified that they could not (1) identify the level of heavy metal, if any,

that could cause a condition such as Ethan's,[5] or (2) identify what level of heavy metals, even as a range or estimate, Ethan was allegedly exposed to.[6]  Instead, they offered only conclusory testimony that heavy metals contained in Hain's baby food caused Ethan's condition. ROA.20682, 20831.

## D. Hain Moves For Judgment as a Matter of Law.

At the close of the Palmquists' case, Hain moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), arguing, among other things, that the Palmquists failed to prove general and specific causation under Texas law. ROA.18298-329.  After argument, the court granted Hain's Rule 50 motion.

---

[5] *See* ROA.20852-53 (Dr. Nelson testifying that he does not know what "level of metals … might actually present a risk of heavy metal toxicity for a child," let alone what level could cause major neurocognitive disorder, autism spectrum disorder, severe intellectual disability, or any other neurocognitive disorder); ROA.20753-54 (Dr. Settles testifying that it "would be outside of" her "expertise, to give any opinion on what levels of metal exposure, if any, would be necessary to cause autism").

[6] *See, e.g.*, ROA.20681, 20683-84, 20733 (Dr. Settles testifying that she left it up to "other experts" "as far as tallying up how much Ethan ate of the baby food, the parts per billion levels, things like that," that she is "obviously not an expert on heavy metals, the amounts of heavy metals, interpreting the tests, anything like that," and that she does not "know one way or the other whether there were heavy metals in any of the specific foods that Ethan ate"); ROA.20851, 20852-53, 20842-43 (Dr. Nelson testifying that he did not "form any independent opinions about what Ethan actually ate," that he did not "do any kind of testing, analysis, mathematical calculations … to determine whether there were, in fact, heavy metals in what Ethan ate," that he does not know what "level of metals … might actually present a risk of heavy metal toxicity for a child," and that he could not testify as to whether Ethan's condition would have been any different if Ethan's parents had fed him a different brand of baby food or homemade baby food).

ROA.22105. Judge Brown highlighted this fatal evidentiary gap and ruled that the

Palmquists had failed to prove general causation:

> We heard no testimony from a qualified expert that the ingestion of heavy metals can cause the array of symptoms that Ethan suffers from, much less any evidence of at what level those metals would have to be ingested to bring about those symptoms. The law is clear that such testimony is necessary to show general causation.

ROA.22104-05. The district court subsequently issued an order formally granting

Hain's Rule 50(a) motion "in its entirety." ROA.18417. This appeal followed.

## STANDARD OF REVIEW

This Court reviews a district court's denial of a motion for remand de novo.

*Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 199

(5th Cir. 2016) ("*IEVM*").

This Court reviews a district court's ruling on a motion for judgment as a

matter of law de novo. *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins.*, 898

F.3d 461, 473 (5th Cir. 2018). To survive a motion for judgment as a matter of law,

"the party opposing the motion must at least establish a conflict in substantial

evidence on each essential element of their claim." *Goodner v. Hyundai Motor Co.*,

650 F.3d 1034, 1039 (5th Cir. 2011) (quotation omitted). "Substantial evidence is

more than a scintilla, less than a preponderance, and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *N. Cypress*, 898

F.3d at 473 (quotation omitted).

This Court may affirm the district court's order granting Hain judgment as a matter of law "on any basis supported by the record." *TOTAL Gas & Power N. Am., Inc. v. Fed. Energy Regul. Comm'n*, 859 F.3d 325, 332 (5th Cir. 2017); *see Sobranes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp.*, 509 F.3d 216, 221 (5th Cir. 2007) ("It is an elementary proposition, and the supporting cases too numerous to cite, that this Court may affirm the district court's judgment on any grounds supported by the record." (quotation omitted)).

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's decisions denying the Palmquists' motion to remand and granting Hain judgment as a matter of law.

The district court correctly denied the Palmquists' motion to remand. The Palmquists assert that the district court was obligated to consider their post-removal Second Amended Complaint in determining whether they had improperly joined Whole Foods as a defendant, but this Court's precedents squarely foreclose their arguments. This Court has straightforwardly held that amending a complaint post-removal cannot divest a federal court of jurisdiction and that, therefore, the district court must consider the allegations in a plaintiff's initial state-court petition, rather than an amended complaint filed in district court.

Moreover, even if the Palmquists' attempted end run around this Court's precedent were viable, the Second Amended Complaint does not state valid claims

against Whole Foods. Chapter 82 of the Texas Civil Practice and Remedies Code provides that non-manufacturing sellers are not liable for the alleged harm caused by the products they sell unless a plaintiff alleges facts qualifying for one of the statutory exceptions to Chapter 82's innocent-seller protections. The Palmquists' attempt to fit within the exception contained in Section 82.003(a)(5)—for an express factual representation about the product that is incorrect—fails because the alleged Whole Foods statements to which they refer are non-actionable, generalized positive statements. The Palmquists also make no attempt to satisfy the heightened pleading requirements for fraud claims under Federal Rule of Civil Procedure 9(b).

Furthermore, the Palmquists' brief assumes (without explaining) that if the initial removal of this case were improper, then the correct remedy is vacatur. But because there was complete diversity jurisdiction at the time judgment was entered, under *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996) and *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826 (1989), this Court can and should preserve the judgment below even if the Court determines remand should have been granted at the beginning of the case.

As to the district court's grant of judgment as a matter of law to Hain, the court correctly ruled that the Palmquists failed to present legally sufficient evidence of general or specific causation. Indeed, far from offering evidence adequate to submit their case to the jury, the Palmquists suffered from a fundamental—and

dispositive—absence of proof. The district court correctly ruled that the Palmquists failed to present legally sufficient evidence of general causation because they offered no qualified expert testimony showing (i) what level of heavy metals exposure would be necessary to cause Ethan's particular condition, or, more generally, (ii) that heavy metals exposure could cause Ethan's particular condition at all—whether that condition is major neurocognitive disorder, ASD, or another condition. And the Palmquists' argument that this case presents a novel fact pattern that warrants a new rule relaxing the general causation requirements is soundly foreclosed by binding precedent and *Erie*.

Likewise, the Palmquists failed to establish specific causation because they failed to offer legally sufficient evidence that Ethan's level of exposure to heavy metals was sufficient to cause his severe condition. They also failed to establish but-for causation because other brands of baby food, and fresh produce and grains in general, contain amounts of heavy metals comparable to those in Hain's baby food, and the Palmquists expert admitted that he could not say Ethan's outcome would have been different if he ate different food.

Put simply, this was not a close call. The Palmquists made carefully considered strategic judgments about what causation evidence they would present. Their failure to present legally sufficient evidence of general or specific causation is fatal to each of their substantive causes of action against Hain. In addition, their

substantive causes of action fail for other independent reasons, including the failure to present evidence that Hain's baby food was unreasonably dangerous.

## ARGUMENT

### I. The District Court Properly Denied the Palmquists' Motion to Remand, and, In Any Event, Vacatur is Not the Correct Remedy.

The Palmquists focus the bulk of their brief on the argument that the district court should have granted their motion to remand. *See* Br. at 11-34. The Palmquists then assume, without meaningful argument, that this supposed error requires vacatur of the district court's judgment. Br. at 35. Both propositions are wrong.

First, the district court correctly denied the Palmquists' motion to remand. The Palmquists do not contest the district court's ruling that, under the First Amended Complaint, removal was proper. Instead, they argue that the district court should have considered their post-removal Second Amended Complaint in evaluating their remand motion. But not only is that procedural argument wrong as a matter of Circuit precedent, *Smallwood v. Illinois Central Railroad Co.*, 385 F.3d 568 (5th Cir. 2004), it is equally wrong on the merits, as the district court held, because the Palmquists' Second Amended Complaint also does not state a valid claim against Whole Foods.

Even if removal were somehow improper, and the district court should have remanded the case, vacatur of the final judgment is not the correct remedy. The Supreme Court has held that when a diversity case is litigated to judgment, the interests of judicial efficiency and finality obligate both this Court and the district

court to preserve that judgment if possible. Here, this Court can simply hold that because this case was litigated to conclusion over several years and diversity existed at the time of final judgment, considerations of "finality, efficiency, and economy [have] become overwhelming." *Caterpillar*, 519 U.S. at 63.

### A. Whole Foods Was Improperly Joined as a Defendant.

#### 1. The District Court Correctly Considered the First Amended Complaint Pursuant to Fifth Circuit Precedent.

The Palmquists effectively concede that no valid claims were pleaded against Whole Foods in the pre-removal First Amended Complaint. *See* Br. at 22-36 (making no argument about the First Amended Complaint). Instead, they argue that the district court needed to evaluate their post-removal Second Amended Complaint in deciding the remand motion. As their argument goes, either this Court's approach to evaluating state court petitions on removal is wrong, or this Court should hold that plaintiffs *must* be allowed to file amended complaints after removal to attempt to destroy diversity jurisdiction. *Compare* Br. at 14 (complaining that the Fifth Circuit "stands alone" in its approach to removal) *with id.* at 15 (insisting that plaintiffs are entitled to amend). Both arguments are directly foreclosed by this Court's precedent.

First, this Court's decisions in *Smallwood v. Illinois Central Railroad Co.*, 385 F.3d 568 (5th Cir. 2004) and *International Energy Ventures Management, L.L.C. v. United Energy Group, Ltd.*, 818 F.3d 193 (5th Cir. 2016), make it clear that removed state court petitions are evaluated under federal pleading standards. Under

this Court's "rule of orderliness, one panel [] may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or [the] en banc court." *Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016). The Palmquists do not (and cannot) point to any such intervening change in law. Thus, the Palmquists' challenge to *Smallwood* is foreclosed.

In the alternative, the Palmquists insist that this Court ought to take the "small step" from existing circuit precedent to hold for the first time that a district judge confronted with a motion to remand *must* consider an amendment filed after removal. Br. at 18. That is not a "small step," and in any event it defies this Court's precedent. A "complaint amended post-removal cannot divest a federal court of jurisdiction." *Cavallini v. State Farm Mut. Auto Ins.*, 44 F.3d 256, 264 (5th Cir. 1995). Thus, a district court must consider the "allegations in [the plaintiff's] initial state-court petition, rather than his [amended] complaint filed in district court." *Alviar v. Lillard*, 854 F.3d 286 n.1 (5th Cir. 2017) (citing *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002)). *Cf. Camsoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*, 756 F.3d 327, 336-37 (5th Cir. 2014) ("We do not generally recognize post-filing or post-removal amendment as cure for jurisdictional defect"). *See also Grupo Dataflux v. Atlas Global Grp., LP*, 541 U.S. 567, 571 (2004) ("We have adhered to the time-of-filing rule regardless of the costs it imposes").

*Peña v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018), which the Palmquists puzzlingly cite as controlling, Br. at 18, is not to the contrary. *Peña* is about dismissal of a case with prejudice under Federal Rule of Civil Procedure 12(b)(6) and the liberal standard for leave to amend pleadings under Federal Rule 15. In the context when a plaintiff can lose the case on the merits, it makes sense that the liberal amendment standard would control. Removal is about jurisdiction, and neither Rule 12(b)(6) nor Rule 15 control here. Even if *Peña* somehow addressed the question presented here, that case could not overrule *Cavallini* and *Alviar*.

The Palmquists' attempt to graft this Court's line of cases about "amplifying" jurisdictional allegations with affidavits onto post-removal amendments is just as misplaced. The *Cavallini* plaintiffs made exactly that argument, and this Court directly rejected it. *See* 44 F.3d at 264. In fact, this Court held that *Asociacion Nacional de Pescadores a Pequena Escala o Artesanales de Colombia (ANPAC) v. Dow Quimica de Colombia S.A.*, 988 F.2d 559 (5th Cir. 1993), was inapplicable because the plaintiffs in *Cavallini* were trying to "amend away the basis for federal jurisdiction." *Cavallini*, 44 F.3d at 265. This Court also observed that *ANPAC* "involved an affidavit, not an amended complaint." *Id.* at n.18.

Finally, even if *Griggs v. State Farm Lloyds*, 181 F.3d 694 (5th Cir. 1999), and *ANPAC* had something to do with this case, they would change nothing. Here, the district court's decision correctly followed *Cavallini*. Unlike in *Griggs* and

*ANPAC*, the Palmquists did not merely try to clarify a damages amount or add a few supporting facts: their amended complaint **added two new causes of action** against Whole Foods to try to defeat diversity jurisdiction (negligent undertaking and express breach of warranty). *Compare* ROA.163-70 (First Am. Compl.) *with* ROA.265-74 (Second Am. Compl.). Expanding the substantive claims is precisely what *Griggs* and *ANPAC* say a plaintiff cannot do. Accordingly, *Cavallini*, *Griggs*, and *ANPAC* foreclose looking at the post-removal Second Amended Complaint.

### 2. Even Considering the Second Amended Complaint, the Palmquists Failed to Plead a Claim Against Whole Foods.

Even ignoring the Palmquists' end run around Circuit precedent, the Second Amended Complaint does not state valid claims against Whole Foods. Under Texas law, non-manufacturing sellers cannot normally be held liable under Chapter 82 of the Texas Civil Practice and Remedies Code for the harm caused by the products they sell. To state a valid claim, the Palmquists must allege facts fitting this case into one of the statutory exceptions to Chapter 82's innocent-seller protections.

The only exception the Palmquists invoke is Section 82.003(a)(5), for an express factual representation about the product that is incorrect. Tex. Civ. Prac. & Rem. Code § 82.003(a)(5). The Palmquists do not come close to making such an allegation. The only statements set forth in the Second Amended Complaint are generalized statements about **all of Whole Foods' products**—nothing about Hain's products specifically. *See, e.g.*, Br. at 24 (reciting Whole Foods' statements such as

Whole Foods sells products of the "highest quality"). And such generalized positive statements, even if they were specifically about Hain's foods, are not actionable under Texas law. *See, e.g., Howard v. Lowe's Home Ctrs. LLC*, 306 F. Supp. 3d 951, 958 (W.D. Tex. 2018), *aff'd* 765 F. App'x 76 (5th Cir. 2019). If the Palmquists' position is taken to its logical conclusion, any grocery store that makes general comments about its food (*i.e.*, "We sell fresh, high-quality food"), as most do, would lose the protections of Section 82.003, thus vitiating the rule entirely. But Texas cases are clear that such generalized claims are insufficient to make a case under this section of Chapter 82. *See, e.g., Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 109 (Tex. 2021) ("Chapter 82 does not expand the pool of potentially liable non-manufacturing sellers beyond those recognized at common law; it reduces that pool.").

In addition, a "factual misrepresentation" claim asserted under Section 82.003(a)(5) constitutes a claim for fraud that must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) because it contains each element of a fraud cause of action: (a) an express statement; (b) that was false; (c) reliance; and (d) harm. *See* § 82.003(a)(5) (listing elements). Rule 9(b) applies to all cases where the heart of the claim is fraud, even if the theory supporting the claim is not technically termed "fraud." *See Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998) (collecting cases); *Tyre v. Excel Indus., Inc.*, No. 4:19-

CV-951-A, 2020 WL 791052, at *4 (N.D. Tex. Feb. 14, 2020) (dismissing defendant where plaintiff "made no attempt to meet the pleading requirements of Fed. R. Civ. P. 9(b) as to the alleged misrepresentations" necessary for Tex. Civ. Prac. & Rem. Code § 82.003(a)); *Harbuck v. Ford Motor Co.*, No. 4:18-CV-576-A, 2018 WL 4375079, at *3 (N.D. Tex. Sept. 13, 2018) ("Rule 9(b) of the Federal Rules of Civil Procedure is applicable" to Claims under Tex. Civ. Prac. & Rem. Code § 82.003(a)). Because the Palmquists did not even purport to claim they could satisfy the stringent requirements of Rule 9(b) as to Whole Foods' generalized promotional statements, the allegations of the Second Amended Complaint were not sufficient to trigger Section 82.003(a)(5)'s limited exception to Texas's innocent seller statute.

## B. Regardless, the District Court Had Federal Diversity Jurisdiction When Judgment Was Entered and This Court Should Affirm.

The Palmquists' brief assumes (without explaining) that if the initial removal of this case were improper, then the correct remedy is vacatur. *See* Br. at 35 (insisting that the "jurisdictional" nature of the error demands correction and remand to state court). That is simply not true. The Supreme Court's decision in *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996) makes clear that vacatur is not a proper remedy where the case was litigated to judgment in federal court and the district court "did have jurisdiction of the parties at the time it entered judgment." *Id.* at 73; *id.* at 75 ("Once a diversity case has been tried in federal court, with rules of decision supplied by state law …, considerations of finality, efficiency, and economy become

overwhelming" and the judgment must be affirmed). To be sure, if there is a jurisdictional defect, such as the lack of complete diversity at the time judgment is entered, then the "judgment must be vacated." *Id.* at 76-77. But in all other circumstances, the judgment should be affirmed to avoid imposing "an exorbitant cost on our dual court system, a cost incompatible with the fair and unprotracted administration of justice." *Id.* at 77. The Supreme Court's rule in *Caterpillar* makes particular sense given that this Court has authority to dismiss Whole Foods under Federal Rule of Civil Procedure 21 on its own motion to preserve jurisdiction, *Newman-Green v. Alfonzo-Larrain,* 490 U.S. 826 (1989) (allowing court of appeals to dismiss a dispensable nondiverse party), which the district court also had the power to do at any point. *Jefferson v. Certain Underwriters at Lloyd's London*, 658 F. App'x 738 (5th Cir. 2016); *see also Avenatti v. Fox News Network LLC*, 41 F.4th 125, 130 (3d Cir. 2022) (collecting cases showing that it is "well established" that courts "have the power under Fed. R. Civ. P. 21 to dismiss dispensable parties to the suit in order to preserve diversity" (quotation omitted)).

This Court has followed *Caterpillar* in refusing to vacate a take-nothing judgment years after remand was improperly denied. *See In re 1994 Exxon Chem. Fire*, 558 F.3d 378 (5th Cir. 2009). Under *Caterpillar* and *In re 1994 Exxon*, the judgment below should be affirmed even if the initial denial of remand was improper. As the Supreme Court observed in *Caterpillar* itself, any perceived

unfairness of that result could have been resolved early on in the case by seeking permissive appeal or through mandamus. That the Palmquists chose not to seek such remedies at that stage does not mean they should get a second bite of the apple now that they are aggrieved by the trial's result.

## II.    The District Court Correctly Concluded That the Palmquists Failed to Present Legally Sufficient Evidence of Causation.

The district court correctly granted Hain's Rule 50(a) motion for judgment as a matter of law because the Palmquists failed to present legally sufficient evidence of general or specific causation. Indeed, as explained below, the Palmquists presented no evidence on critical elements of their claims.

As the Palmquists concede, Texas law requires that plaintiffs prove causation for negligence and products liability claims, *see* Br. at 37, *i.e.*, that "that the defendant's act or omission was a substantial factor in bringing about the injury," absent which the injury "would not otherwise have occurred." *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007). The Palmquists further agree that "[c]ausation has two levels, general and specific, and a plaintiff must prove both." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 377-78 (5th Cir. 2010); Br. at 37. "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Knight v. Kirby Inland Marine*

*Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (quoting *Merrell Dow Pharm., Inc., v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)). A plaintiff must first "establish general causation before moving to specific causation," and "[w]ithout the predicate proof of general causation, the tort claim fails." *Wells*, 601 F.3d at 378; *McManaway v. KBR, Inc.*, 852 F.3d 444, 454-55 (5th Cir. 2017) (same).

Further, Texas law provides "that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007). Indeed, "[e]xpert testimony is particularly necessary in toxic-tort and chemical-exposure cases, in which medically complex diseases and causal ambiguities compound the need for expert testimony." *Starr v. A.J. Struss & Co.*, No. 01–14–00702–CV, 2015 WL 4139028, at *6 (Tex. App.—Houston [1st Dist.] July 9, 2015, no pet.); *see also Anderson v. Siemens Corp.*, 335 F.3d 466, 475 (5th Cir. 2003). Accordingly, "[w]hen expert testimony is required, lay evidence supporting liability is legally insufficient." *City of Keller v. Wilson*, 168 S.W.3d 802, 812 (Tex. 2005).

A. **The District Court Correctly Concluded That the Palmquists Failed to Present Legally Sufficient Evidence Establishing General Causation.**

The district court correctly observed that "[w]e heard no testimony from a qualified expert that the ingestion of heavy metals can cause the array of symptoms that Ethan suffers from, much less any evidence of at what level those metals would

have to be ingested to bring about those symptoms. The law is clear that such testimony is necessary to show general causation." ROA.22104-05. This ruling was correct.

### 1. The Palmquists Presented No Evidence Establishing a "Harmful Level" of Heavy Metals That Could Have Caused Ethan's Condition.

Texas law is clear that, to prove causation, "[s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that the plaintiffs were exposed to such quantities are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Abraham v. Union Pac. R. Co.*, 233 S.W.3d 13, 22 (Tex. App. 2007); *see also Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) (quoting same); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 670 (5th Cir. 1999) (quoting same). Texas courts have repeatedly applied this bedrock requirement.[7]

Indeed, the Texas Supreme Court explicitly reaffirmed this causation requirement (and affirmed summary judgment on account of plaintiffs' failure to meet it) just this year in *Helena Chemical Co. v. Cox*, explaining that "[i]n a toxic-tort case alleging human exposure to harmful substances," a plaintiff must, at minimum, demonstrate "'*[s]cientific knowledge of the harmful level of exposure*

---

[7] *See also, e.g.*, *Johnson v. Arkema, Inc.*, 685 F.3d 452, 458, 472 (5th Cir. 2012); *Burleson v. Texas Department of Criminal Justice*, 393 F.3d 577 (5th Cir. 2004); *Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 723 (5th Cir. 2009).

*to a chemical*, plus knowledge that the plaintiff was exposed to such quantities.'" 664 S.W.3d 66, 76 (Tex. 2023) (quoting *Builder Servs. Grp., Inc. v. Taylor*, No. 03-18-00710-CV, 2020 WL 5608484, at *6 (Tex. App.—Austin Sept. 17, 2020, pet. denied)) (emphasis added), *reh'g denied* (May 5, 2023).[8] The Court further explained that "[w]e have often articulated the requirement in similar cases that the plaintiff establish with evidence the dosage required to produce the alleged injury." *Id.* at 79. That is because "[o]ne of toxicology's central tenets is that 'the dose makes the poison.'" *Id.* (quoting *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770 (Tex. 2007)). Thus, "[w]ithout some scientifically reliable evidence of these facts, the evidence of causation offered does not rise above subjective belief" and is legally insufficient to support the Palmquists' claim. *Id.* at 76.

This requirement holds true even where the substance itself is widely recognized to be injurious. For example, there is, without a doubt, a scientific consensus that exposure to asbestos can cause mesothelioma. Numerous courts, including the Texas Supreme Court, have recognized that fact. *See, e.g.*, *Bostic v. Ga.-Pac. Corp.*, 439 S.W.3d 332, 339-40 (Tex. 2014) ("[W]e have recognized that

---

[8] Although *Helena Chemicals* addressed this requirement in the context of specific causation rather than general, that does not alter the fact that Plaintiffs have failed entirely to meet it, regardless of how it is labeled. Whether couched in terms of specific or general causation, the Palmquists would still have to satisfy that requirement, which they decidedly did not do.

'[e]xposure to asbestos, a known carcinogen, is never healthy but fortunately does not always result in disease.'" (citation omitted)). Yet, even given that consensus and the fact that most people are *not* exposed to asbestos in their day-to-day life (unlike heavy metals, which are ubiquitous and omnipresent), the Texas Supreme Court still requires plaintiffs to present evidence of a threshold dose, and that the plaintiff's exposure was above that dose. *Id.* at 338 ("Because most chemically induced adverse health effects clearly demonstrate 'thresholds,' there must be reasonable evidence that the exposure was of sufficient magnitude to exceed the threshold before a likelihood of 'causation' can be inferred.").[9] For that reason, any attempt by the Palmquists to assert that they need not prove a threshold dose because "there is no safe level of heavy metals" similarly fails—Texas courts and this Court have rejected as insufficient expert testimony that any amount of a harmful substance is unsafe. *See, e.g., Helena Chem. Co.*, 664 S.W.3d at 79-80; *Bosti*, 439 S.W.3d at 338; *Builder Servs. Grp., Inc.*, 2020 WL 5608484 at *6; *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998).

The Palmquists **concede** that they have not met this requirement. *See* Br. at

---

[9] *See also, e.g., Helena Chem. Co.*, 664 S.W.3d at 79 ("Still later, in *Bostic*, we required proof of dose in mesothelioma cases, even though 'relatively minute quantities of asbestos can result in mesothelioma.' The Court held that 'proof of 'some exposure' or 'any exposure' alone will not suffice to establish causation.' Instead, 'the dose must be quantified' because '[t]he essential teaching of *Flores* is that dose matters.'" (citation omitted)).

39 ("Even though the threshold of harmful exposure is unknown…."); *id.* ("[T]he scientific literature has not yet established the exact level of heavy metal exposure that is sufficient to cause harm."). None of the Palmquists' testifying experts offered even a general estimate of what levels of heavy metal exposure could cause Ethan's particular condition—not Dr. Nelson, Dr. Settles, or Dr. Torkamani. To the contrary, they testified definitively that "***what level is the threshold to cause that injury is unknown***." ROA.20853 (emphasis added).[10]

That fundamental gap in evidence is fatal to the Palmquists' claims. Thus, under a straightforward application of the binding precedent of the Texas Supreme Court and this Court, the district court correctly ruled that the Palmquists' failed to present any expert evidence to establish "the harmful level of exposure" to lead, mercury, or arsenic—a necessary element of their claims. *Abraham*, 233 S.W.3d at 22; *see also Helena Chem.*, 664 S.W.3d at 76. That ends the inquiry.

---

[10] *See also, e.g.*, ROA.20852-53 (Dr. Nelson testifying that he does not know what "level of metals … might actually present a risk of heavy metal toxicity for a child," let alone what level could cause major neurocognitive disorder, autism spectrum disorder, severe intellectual disability, or any other neurocognitive disorder); ROA.20753-54 (Dr. Settles testifying that it "would be outside of" her "expertise, to give any opinion on what levels of metal exposure, if any, would be necessary to cause autism").

### 2. Principles of Federalism Foreclose the Palmquists' Request for a New Substantive Causation Standard Under Texas Law.

Faced with this fatal gap in evidence, the Palmquists now argue that this Court should ignore that substantial precedent and fashion new substantive Texas law, Br. at 46 (requesting the Court follow "the narrow rule proposed by the Palmquists"), by holding that a plaintiff can establish causation if they present evidence that "(1) there is a scientific consensus that exposure to a chemical can cause an injury and (2) a reliable differential diagnosis rules out every other potential cause of the plaintiff's injury … regardless of whether the existing scientific literature has quantified the exact level of exposure that causes harm." Br. at 50.

This proposed new standard is flatly inconsistent with Texas law that unambiguously requires that establishing the harmful dose of a substance is a necessary and indispensable step to establish causation. *Erie* and its progeny prohibit this Court from accepting the Palmquists' invitation to forge new state law. *See Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938)) (in applying state law in a diversity case, this Court's "task is to attempt to predict state law, not to create or modify it"); *Weatherly v. Pershing, L.L.C.*, 945 F.3d 915, 920 (5th Cir. 2019) ("[The Court] [does] not adopt innovative theories of state law but aim[s] simply to apply that law as it currently exists.").

The Palmquists contend that the Court should take that disfavored step here because, in their view, the fact that heavy metals are recognized to be harmful (including causing, at some level, cognitive decline and, at high levels, death), coupled with a differential diagnosis, "puts this case in a different category than any previous case in this circuit." Br. at 42. But the Fifth Circuit, applying Texas law, has resoundingly rejected this very argument:

> ***Plaintiffs claim*** that "***a differential diagnosis*** [excluding other potential causes of injury] ***constitutes an accepted means of proving causation when it is scientifically accepted that a particular toxin is capable of giving rise to the underlying injury***." However, a differential diagnosis is only relevant after general causation has been reliably established "because a differential diagnosis presumes that chemical X can cause condition Y generally, but does not itself so prove." *Coastal Tankships, U.S.A., Inc. v. Anderson (In re Estate of Anderson)*, 87 S.W.3d 591, 609 (Tex. App. 2002). Carson's ***differential diagnosis does not relieve Plaintiffs of their burden of adducing reliable evidence of general causation***.

*McManaway*, 852 F.3d at 454-55 (emphases added). And the fact pattern here is not in any way "novel" or "rare." Br. at 38. Courts—including in Texas and the Fifth Circuit—are regularly faced with toxic torts cases where the substance at issue is widely recognized to be harmful at some level. Yet in each of those cases, the plaintiff was still required to demonstrate the necessary level of exposure to cause the specific alleged injury, even where the substance was recognized to be harmful at some level,[11] and even where a differential diagnosis was offered, *see, e.g.*

---

[11] *See, e.g.*, *Curtis*, 174 F.3d at 670 (requiring evidence of "[s]cientific knowledge of the harmful level of exposure to a chemical," in toxic tort case alleging injury

*Johnson*, 685 F.3d at 458, 464 (requiring expert testimony regarding level of exposure to a chemical necessary to cause restrictive lung disease and pulmonary fibrosis, even though exposure to the chemical was recognized by EPA to be "disabling" and possibly "lethal" by the Occupational Safety and Health Administration, the National Institute for Occupational Safety and Health, and the National Research Council). This requirement is logically essential, because there is no way to "rule in" the substance as a cause without determining that it was present in a sufficient amount to cause harm. *See McManaway*, 852 F.3d at 454-55.

The Palmquists do not address *McManaway*, and their attempts to distinguish *Curtis* and *Johnson* fail. First, the Palmquists attempt to wave away this general causation requirement by arguing that *Curtis* addressed specific causation. That is incorrect. Although the Court in *Curtis* focused on the second element of the requirement—whether the expert had "knowledge that the plaintiff was exposed to such quantities"—that was because, as the court explicitly held, the expert "had adequate support for his general causation opinion that exposure to benzene ***at levels***

---

from Benzene, a known carcinogen widely recognized to have "hazardous effects"); *Current v. Atochem N. Am., Inc.*, No. CIV. W-00-CA-332, 2001 WL 36101283, at *5 (W.D. Tex. Nov. 30, 2001) (explaining in a case involving rectal cancer allegedly caused by exposure to ***arsenic***, that "the minimal facts necessary to sustain the plaintiff's burden in a toxic tort" include "'[s]cientific knowledge of the harmful level of exposure to a chemical,'" despite also stating that arsenic is a recognized carcinogen).

*of 200–300 ppm would cause the injuries suffered by Plaintiffs*." *Curtis*, 174 F.3d at 670. No expert offered any such testimony here, and Texas courts have repeatedly applied this bedrock requirement.

Nor can the Palmquists distinguish *Johnson* by suggesting that the potential harm there was "not generally accepted in the scientific community," whereas there is an alleged "scientific consensus" here. Br. at 49. That circular reasoning just dodges the question: that heavy metals at some level can cause some "***injurious effects***" does nothing to answer the general causation question in this case of what that necessary level of exposure is to cause the condition Ethan is alleged to have experienced here. No reading of *Johnson* could suggest any intent to alter the longstanding rule that identifying a harmful exposure level is a necessary element of causation. On the contrary, the Court found general causation had not been established for multiple reasons, including a lack of studies showing causation as to the ***particularized*** injury suffered by the Plaintiff. *See, e.g.*, *Johnson*, 685 F.3d at 461-62; *id.* at 462 (explaining that general causation expert did not demonstrate how "Johnson's exposure to MBTC and HCl was at a sufficient concentration level to cause restrictive lung disease and pulmonary fibrosis"). *Johnson* thus stands for the rule—directly applicable here—that a plaintiff cannot use a differential diagnosis to attempt to evade the requirement of proving general causation. *Id.* at 467-69. But that is precisely what the Palmquists now attempt to do.

The Palmquists also contend that they are excused from the requirement of proving general causation because "with a medical diagnosis of heavy metal toxicity, there is no need for precision about the threshold of harmful exposure—whatever it is, it was exceeded here." Br. at 38, 39. That argument is similarly circular; setting aside that no expert reliably testified that Ethan was diagnosed with heavy metal toxicity (or what heavy metal toxicity even entails), no expert testified that whatever level of exposure constitutes "heavy metal toxicity" could actually cause the condition Ethan is claimed to have experienced. In other words, by redefining what they have to prove, the Palmquists gloss over their lack of evidence on the critical next step—that high levels of heavy metals are in fact capable of causing the type of neurocognitive injury that manifests itself as Ethan's extremely severe condition.

In short, Texas law requires that, to prove general causation, plaintiffs must demonstrate the level of exposure at which the substance can cause the specific harm alleged in the case. By the Palmquists' own admission, they have not done so. And Texas law is equally explicit that the Palmquists cannot skirt this requirement by using a differential diagnosis. *See Johnson*, 685 F.3d at 469; *McManaway*, 852 F.3d at 454-55 (a differential diagnosis "is only relevant after general causation has been reliably established"); *Matt Dietz Co. v. Torres*, 198 S.W.3d 798, 805 (Tex. App.— San Antonio 2006, pet. denied) ("A reliable differential diagnosis in this case would … first require establishing that exposure to the alleged chemicals causes laryngeal

cancer—a requirement that remains unfulfilled."); *Coastal Tankships U.S.A, Inc. v. Anderson*, 87 S.W.3d 591, 609 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("[B]ecause Dr. Miller's diagnosis simply presumed that naphtha could cause BOOP, that diagnosis, without more, would not be reliable to show general causation, *i.e.*, that naphtha can cause BOOP generally."). Accordingly, the Palmquists' requested new rule is soundly foreclosed by Texas and Fifth Circuit precedent.

### 3. The Palmquists Failed to Present Evidence Supporting General Causation at Any Level of Exposure.

Even if this Court were inclined to set aside these cases and announce a new standard for determining causation under Texas law, the Palmquists' argument still fails because, as the District Court concluded, ROA.22104-05, the Palmquists failed to present sufficient expert testimony that heavy metal exposure generally—at *any* level—can cause Ethan's *particular injury*.

As the district court correctly concluded, "'[g]eneral causation is whether a substance is capable of causing *a particular injury or condition* in the general population.'" ROA.17003 (quoting *Wells*, 601 F.3d at 377) (emphasis added); *see also Havner*, 953 S.W.2d at 714 (same). Under that requirement, generic testimony that a substance is *generally harmful* or can cause a *general class* of injuries is legally insufficient to show the substance is capable of causing the *particular* injury at issue in the lawsuit.

In *Havner*, for example, the plaintiffs alleged that Bendectin caused an infant to be born with a limb reduction birth defect. 953 S.W.3d at 708. The Texas Supreme Court found that published studies showing statistically significant results that Bendectin caused certain birth defects could not show that Bendectin could cause the plaintiffs' particular injury, *i.e.*, *limb reduction* birth defects. 953 S.W.3d at 725; *see also, e.g.*, *Exxon Corp. v. Makofski*, 116 S.W.3d 176, 188 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that epidemiological studies showing that benzene causes acute myelogenous leukemia is not evidence that benzene can cause acute lymphocytic leukemia because "[w]e cannot treat an epidemiological study regarding one disease as if it applied to another."); *Allen*, 102 F.3d at 195-97 (holding same regarding various types of cancer); *Burleson v. Tex. Dep't of Crim. Just.*, 393 F.3d 577 (5th Cir. 2004) (same); *Current*, 2001 WL 36101283, at *3 (holding that where plaintiff developed rectal cancer, "the proper issue before [the] Court [was] not whether arsenic can cause cancer generically, but rather whether it [was] generally accepted in the scientific community that arsenic causes *rectal* cancer" (emphasis added)).

Yet the Palmquists attempt to generalize Ethan's particular condition to the point of absurdity, contending that they "introduced expert evidence of a scientific consensus that exposure to heavy metals, at some level, can cause ***neurocognitive injuries***." Br. at 39. "Neurocognitive injuries" could include anything from

moderately decreased IQ to traumatic brain injury to dementia to ADHD to ASD. ROA.21940. But as the Palmquists' own experts agree, Ethan has been repeatedly diagnosed with severe ASD, and his symptoms are so severe that he is "one in thousands" and "very atypical in [it's] presentation and severity." ROA.20836, 20824. Whether Ethan's injury is characterized as severe ASD, Major Neurocognitive Disorder, or even severe intellectual disability, the Palmquists' proclamation that their experts showed "that exposure to heavy metals, at some level, can cause neurocognitive injuries," Br. at 39, falls woefully short of specifically connecting heavy metals to *Ethan*'s "particular injury." *Wells*, 601 F.3d at 377.

Notably, the first evidence the Palmquists invoke to support their claim that they "introduced expert evidence of a scientific consensus" that heavy metals can cause the type of condition Ethan is alleged to experience, Br. at 39, consists of (1) non-expert documentary evidence regarding generalized dangers of heavy metals, Br. at 39, which is not sufficient as a matter of law, *see, e.g.*, *Guevara*, 247 S.W.3d at 665; and (2) citation to their *Daubert* oppositions, Br. at 40, which is obviously not evidence.

Beyond those snippets, the Palmquists could marshal only three paragraphs of testimony purporting to establish general causation. *See* Br. at 40-41. The Palmquists' own recitation of that evidence demonstrates that it does not come close to creating a "conflict in substantial evidence." *Goodner*, 650 F.3d at 1039. The

entirety of the expert evidence cited by the Palmquists amounts to only conclusory, generalized statements that lacked support and were not specific to the condition they have alleged Ethan has experienced:

- From their expert Dr. Settles: "when you read the potential effects of the different heavy metals, they talk about cognitive changes, which would be changes in the brain," Br. at 41 (quoting ROA.20751);

- From their expert Dr. Nelson: "there is no safe level of heavy metals" and "[w]e should minimize heavy metal exposure as much as possible," Br. at 41 (quoting ROA.20853); and

- From Dr. Rao, the former allergist who briefly treated Ethan before surrendering his medical license, ROA.20951, 20992: "'heavy metals can be a cause of what is presenting as ASD' and 'arsenic exposure can cause neurological problems' that 'can present as some of the symptoms of ASD.'" Br. at 40 (quoting ROA.20995, 21014).

Notably, Dr. Rao *also* testified that Ethan has no neurological conditions other than ASD and that Ethan was "appropriate[ly]" diagnosed with ASD, ROA.20956-57, 20971, and, when asked whether it is "generally accepted in the scientific community that exposure to heavy metals generally causes ASD," Dr. Rao answered: "*No*." ROA.20986 (emphasis added). Indeed, Dr. Rao testified that he had never "seen scientific evidence to prove that arsenic plays a role in causing autism." ROA.20970-71; *see also* ROA.20987 ("Q. So there is still an open question in the medical community about whether heavy metals have an etiological relationship with ASD? A. I believe so."). Dr. Rao's own testimony, therefore, refutes rather than supports the Palmquists' assertion of a "scientific consensus."

Drs. Settles's and Nelson's generalized, conclusory statements that heavy metals "can cause cognitive changes" are so broad as to be meaningless. These statements are not testimony that heavy metal exposure can cause Ethan's particular and severe condition. Indeed, neither expert purported to link up Dr. Settles's unique new diagnosis of Major Cognitive Disorder with heavy metals exposure; they offered not a single piece of data, peer-reviewed literature, or other authority establishing such a link. Expert testimony that is "mere *ipse dixit*" is "incompetent evidence" and "cannot support a judgment." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004); *see also Helena Chem.*, 664 S.W.3d at 73 ("[I]f no basis for the [expert] opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence." (alteration in original) (quotation omitted)); *Abraham*, 233 S.W.3d at 17 (citing *Havner*, 953 S.W.2d at 714); *McManaway*, 852 F.3d at 454 ("Because the evidence underlying Gibb's and Carson's opinions is unreliable as a matter of Texas law, their testimony is also insufficient to prevent summary judgment.").

It is also notable that the Palmquists have offered no epidemiological studies in support of their general causation argument. This Court has observed that in toxic tort cases, "[u]ndoubtedly, the most useful and conclusive type of evidence … is epidemiological studies" and that although "epidemiologic proof is [not] a necessary

element in all toxic tort cases, it is certainly a very important element." *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 311, 313 (5th Cir. 1989). In the face of this deficiency, the Palmquists argue that "[t]he research described in the Palmquists' *Daubert* response provided part of the foundation for the testimony of their experts, and the Palmquists' experts were not required to restate it at trial," citing Federal Rule of Evidence 705. Br. at 40 n.9. But Rule 705 requires that an expert states "the reasons for" the opinion, Fed. R. Evid. 705, as does Texas law. Plaintiffs' experts here did not recite any such "reasons" for a general opinion because of the simple fact that they did not offer such an opinion in the first place.

Nor can it reasonably be argued that "Hain's experts" corroborated the Palmquists' "consensus." Br. at 41. Drs. Lasics and Koshy were Ethan's treating physicians, not Hain-retained experts, and they did no more than confirm the uncontroversial fact that heavy metals may be harmful, *not* that heavy metals are capable of causing Ethan's condition, whether called ASD, Major Neurocognitive Disorder, or otherwise. To the contrary, Dr. Lasics and Koshy were explicit that they had not seen any evidence that heavy metals could cause ASD or that Ethan's condition was caused by heavy metals. *See, e.g.*, ROA.21624 (Dr. Koshy: "Q. Would you say that the scientific community has accepted that heavy metals are a cause of ASD? A. No.").

\* \* \*

At best, the testimony of Drs. Settles and Nelson was unsupported *ipse dixit* legally insufficient to support a judgment. Accordingly, the Palmquists' failed to offer a "conflict in substantial evidence," *i.e.*, "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions" as to a necessary element of their claim—general causation as to Ethan's particular injury. *Wyvill v. United Cos. Life Ins.*, 212 F.3d 296, 301 (5th Cir. 2000) (quotation omitted). Thus, "a reasonable jury would not have a legally sufficient evidentiary basis to find for [them] on that issue." *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins.,* 898 F.3d 461, 473 (5th Cir. 2018) (quoting Fed. R. Civ. P. 50(a)(1)). This failure of proof is sufficient to affirm the district court's judgment.

**B. The Palmquists Failed to Present Legally Sufficient Evidence of Specific Causation.**

**1. The Palmquists Failed to Present Any Evidence That Ethan Was Exposed to a Level of Heavy Metals Through Hain's Baby Foods That Was Sufficient to Cause His Condition.**

Even ignoring that the Palmquists failed to present legally sufficient evidence of general causation, the Court should also affirm the district court's grant of judgment because the Palmquists failed to present legally sufficient evidence of specific causation.

To create a triable issue on specific causation, the Palmquists were required to present legally sufficient evidence that the particular substance caused Ethan's

particular injury. *Havner*, 953 S.W.2d at 714; *Knight*, 482 F.3d at 352. Texas law is clear that to do so in a toxic torts case such as this, a plaintiff must show that he was actually exposed to a sufficient level of the substance that could cause his injuries— *i.e.*, the plaintiff must quantify his exposure dose. *Helena Chem.*, 664 S.W.3d at 76. "Knowledge of the extent of exposure to a potentially harmful substance is *essential to* any reliable expert opinion that the particular substance caused a disease." *Abraham*, 233 S.W.3d at 21 (emphasis added); *see Borg-Warner*, 232 S.W.3d at 770 ("Dose refers to the amount of chemical that enters the body, and, according to one commentator, is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." (quotations omitted)).[12] Moreover, the "plaintiff must prove the level of exposure using techniques subject to objective, independent validation in the scientific community." *Abraham*, 233 S.W.3d at 22. And the Palmquists must also show that "***the defendant's act***" "was a

---

[12] *See also, e.g., Johnson*, 685 F.3d at 472; *Curtis*, 174 F.3d at 671 ("[I]f Dr. Stevens's causation opinion was not based on sufficient information of the level of benzene to which Plaintiffs were exposed, his methodology would not be reliable."); *Moore*, 151 F.3d at 278 ("Because he had no accurate information on the level of Moore's exposure to the fumes, Dr. Jenkins necessarily had no support for the theory that the level of chemicals to which Moore was exposed caused RADS."); *Allen*, 102 F.3d at 199; Federal Judicial Center, *Reference Manual on Scientific Evidence*, 637, 2011 WL 7724262, at *4 (3d ed. 2011) ("[I]n most specific causation issues involving exposure to a chemical known to be able to cause the observed effect, the primary issue will be whether there has been exposure to a sufficient dose to be a likely cause of this effect.").

substantial factor in bringing about the injury," absent which the injury "would not otherwise have occurred." *Union Pump Co.*, 898 S.W.2d at 775 (emphasis added). But the Palmquists presented no evidence (1) of Ethan's purported level of exposure to lead, arsenic, or mercury, *or* (2) that he was exposed to those levels (or any level of heavy metals) ***through Hain's products***. Thus, the district court correctly entered judgment as a matter of law.[13]

***First***, the Palmquists do not even attempt to argue that they introduced evidence of what, if any, level of heavy metals Ethan was actually exposed to. *See* Br. at 50-52. Nor could they, as the Palmquists chose to forgo presenting any expert toxicologist, and the two causation experts they did present disavowed all knowledge regarding the purported levels of heavy metals in Hain's baby foods and Ethan's purported exposure from those foods:

- Dr. Settles testified that she left it up to "other experts" "as far as tallying up how much Ethan ate of the baby food, the parts per billion levels, things like that," that she is "obviously not an expert on heavy metals, the amounts of heavy metals, interpreting the tests, anything like that," and that she does not "know one way or the other whether there were heavy metals in any of the specific foods that Ethan ate." ROA.20681, 20683-84, 20733.

---

[13] The Palmquists are incorrect that the district court "implicitly rejected" Hain's argument that they failed to present legally sufficient evidence of specific causation. Br. at 50. The district court order granted Hain's Rule 50(a) motion "in its entirety." ROA.18417. What's more, as noted above, *see* p. 18, this Court may affirm on any grounds presented to the district court, whether ruled on or not. *See, e.g.*, *TOTAL Gas*, 859 F.3d at 332.

- Dr. Nelson testified that he did not "form any independent opinions about what Ethan actually ate," that he did not "do any kind of testing, analysis, mathematical calculations … to determine whether there were, in fact, heavy metals in what Ethan ate," that "[h]e does not know what "level of metals … might actually present a risk of heavy metal toxicity for a child." ROA.20842-43, 20851, 20852-53.

To be sure, Hain does not argue that the Palmquists were required to present expert testimony showing a mathematically "precise" level of Ethan's exposure. "[T]he law does not require Plaintiffs to show the precise level of [the substance] to which they were exposed," *Curtis*, 174 F.3d at 671—but it ***does*** require them to present evidence showing an approximate level of their exposure, *see, e.g., Helena Chem.*, 664 S.W.3d at 76; *Mullins v. Atlantic Richfield Co.*, No. 01-20-00013-CV, 2021 WL 2931355, at *7 (Tex. App.—Houston [1st Dist.] July 13, 2021, pet. denied); *Johnson*, 685 F.3d at 472. The Palmquists introduced no evidence on any level, range, or estimate of Ethan's exposure. That evidentiary gap is fatal.

Faced again with a fundamental lack of evidence on another element of their claims, the Palmquists argue that a differential diagnosis is sufficient here, despite the fact that no expert attempted to estimate Ethan's exposure dose. Br. at 50-52. That position misstates Texas law. *See, e.g.*, *Abraham*, 233 S.W.3d at 21; *Moore*, 151 F.3d at 278 ("Because he had no accurate information on the level of Moore's exposure to the fumes, Dr. Jenkins necessarily had no support for the theory that the level of chemicals to which Moore was exposed caused RADS."). And the cases the Palmquists cite to support their contrary standard, *Clark v. Kellogg Brown & Root*

*L.L.C.*, 414 F. App'x 623 (5th Cir. 2011) and *O'Neill v. Seariver Mar., Inc.*, 246 F. App'x 278 (5th Cir. 2007), are inapposite. Both are *Jones Act* cases applying a different, lower standard for causation. *See Clark*, 414 F. App'x at 625 (finding the district court correctly "applied the 'featherweight' causation standard to Clark's Jones Act claim rather than a 'proximate' causation standard"); *O'Neill*, 246 F. App'x at 280 ("The standard for causation in Jones Act cases is 'very light.'").

Moreover, in both of those cases, the plaintiffs ***did*** present experts who testified to an estimated range of the plaintiffs' exposures. In *Clark*, multiple experts testified to the plaintiff's "total benzene exposure level" from working on the defendant's barges, and because the evidence showed that even the lower end of the plaintiff's estimated exposure range would be sufficient to cause the plaintiff's acute myelogenous leukemia, the court concluded there was sufficient evidence "that Clark was exposed to *some* level of benzene high enough to cause AML." *Id.* at 628, 629. *See also O'Neill*, 246 F. App'x at 280 (explaining that "O'Neill was exposed to hydrogen sulfide at 200 ppm or at greater levels," because "[i]n Oman, O'Neill saw a plum of vapor," and "[a]n expert witness provided an opinion that a vapor at that location would have been greater than 200 ppm"). The Palmquists have presented no such evidence. Their argument that a differential diagnosis is sufficient again assumes what they need to prove—that Ethan was exposed to sufficient levels of heavy metals.

Regardless, even if that were the standard, it cannot address the fact that no expert testified (indeed, the Palmquists do not even attempt to suggest one did) that Ethan's purported exposure or heavy metal toxicity was caused by *Hain*'s food specifically. The Palmquists argue only that their experts' differential diagnoses established that "heavy metals specifically caused Ethan's injuries," they do not contend that those diagnoses established that heavy metals in *Hain's foods* caused Ethan's injuries. Simply, there is no expert testimony to show that, even if Ethan somehow had heavy metal toxicity, that toxicity was caused by *Hain*'s conduct—no expert ruled out other sources of exposure, or testified that the same level of exposure would not have occurred had Ethan eaten other foods. *See Cano v. Everest Mins. Corp.*, 362 F. Supp. 2d 814, 819 (W.D. Tex. 2005) ("Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." (citing *Union Pump*, 898 S.W.2d at 775)).

This latter point is particularly fatal where, as here, heavy metals are ubiquitous in the environment, *see* ROA.20839—meaning there are multiple potential routes of exposure—Ethan had to eat *some* form of food, and there is no evidence to suggest that Ethan's levels of heavy metal exposure would have been lower had he eaten different foods. To the contrary, the only record evidence suggests the opposite: That levels of heavy metals in Earth's Best baby foods were

comparable to those in other brands and often *lower* than those in whole, fresh

produce purchased at the grocery store. *See* ROA.18815-24 (listing arsenic, mercury,

cadmium, and lead results for various commercial baby foods products, fresh

produce, and grains). Indeed, Dr. Nelson conceded that Ethan would have been

exposed to lead, mercury, and arsenic in food no matter what he ate and that Dr.

Nelson could not say whether Ethan's exposure to heavy metals would have been

lower had Ethan eaten homemade baby foods:

> [Q.] Do you know whether -- if the Palmquists had decided to make homemade baby food, whether there would have been heavy metals in that food?
>
> [A.] *Oh, there would have been heavy metals in any -- any food*. I guess *the difference between what they made and what was in the Hain's baby food is a difficult question to answer*.
>
> . . .
>
> [Q.] And you couldn't say for this jury whether Ethan's situation would have been different, whether better or worse, if his parents had fed him homemade baby food. You don't know that, right?
>
> [A.] For the same reason, yes.

ROA.20842-43 (emphases added). Dr. Settles similarly offered no opinion on this

topic.  Thus, the Palmquists put forth no evidence on which any jury could find that

Hain's "act or omission was a substantial factor in bringing about the injury," *absent*

*which* Ethan's condition "*would not otherwise have occurred*." *Union Pump Co.*,

898 S.W.2d at 775.

## 2. The Palmquists Did Not Present Legally Sufficient Evidence That Ethan Had Heavy Metal Toxicity.

The Palmquists seem to be arguing that they can be relieved of proving causation because, in their view, Ethan was diagnosed with heavy metal toxicity. Setting aside that such a diagnosis would not excuse the lack of proof of causation in this case, the Palmquists have not offered reliable or sufficient evidence even to prove that point.

The Palmquists rest their claim of heavy metal toxicity entirely on the testimony of three witnesses: experts Drs. Nelson and Settles, and Ethan's treating physician, Dr. Rao. But Drs. Nelson and Settles, by their admission, did nothing to reach this conclusion; they just relied on the conclusions of Drs. Nikogosian, Megson, and Rao, none of whom testified as experts. *See* ROA.20680-81, 20740-41, 20822-23. Absent the conclusions of those three, Drs. Nelson and Settles have no basis to conclude that Ethan had heavy-metal toxicity. As Dr. Settles conceded, she did not "independently interpret Ethan's metals testing," nor did she "check the validity of that testing for [her]self." ROA.20741. She further admitted that she is "obviously not an expert on heavy metals, the amounts of heavy metals, interpreting the tests, anything like that." ROA.20681. Dr. Nelson, for his part, provided no explanation of what the tests showed, or how he independently interpreted them, testifying instead that he was "relying on those doctors" for the "diagnosis of heavy metal toxicity." ROA.20823.

Accordingly, Drs. Nelson's and Settles's opinions rise and fall on the underlying validity of Drs. Megson's, Nikogosian's, and Rao's determinations. But their views were not even offered as expert opinions and cannot provide a basis for the opinions of Drs. Nelson and Settles. Dr. Rao's testimony at trial made that clear. While he purported to rest his heavy metals conclusions on porphyrin tests, ROA.20976-77, 21024, he conceded that the porphyrin tests showed only a "suspicion that requires further testing," and that further testing was not done, ROA.20981, 20985-86.

But more fundamentally, no expert (or any other witness) has testified about what porphyrin tests are, whether they are reliable or generally accepted to measure heavy metals, or how those tests specifically support the conclusion that Ethan had elevated heavy metals. Dr. Settles disclaimed any knowledge about porphyrins beyond her blind reliance on Drs. Megson's, Nikogosian's, and Rao's determinations. *See* ROA.20739 (agreeing that she "wouldn't have any role in actually interpreting what porphyrin testing might show for a particular child" and does not "have any idea what porphyrins have to do with heavy metals and the levels of heavy metals in a person"). And Dr. Nelson likewise made no effort to explain porphyrins or how the testing supports a reliable conclusion of heavy metal toxicity. Accordingly, even if a "diagnosis" of heavy metal toxicity could suffice for showing

the level of exposure, there is not sufficient evidence to support such a diagnosis here.

## III. The Palmquists Failed To Present Sufficient Evidence That Hain's Baby Foods Contained Harmful Levels of Heavy Metals.

In addition to the requirement to prove causation, each of the Palmquists' substantive claims also required them to prove that Hain's baby food was unreasonably dangerous because it contained harmful levels of heavy metals. The Palmquists simply failed to present such evidence.[14]

On appeal, the Palmquists contend that "the evidence established that Hain's products contained harmful levels of heavy metals," because "Hain's internal specifications for its rice cereal were 200 [parts per billion] inorganic arsenic and 100 [parts per billion] lead," which the Palmquists assert on appeal are "unacceptably high levels of heavy metals." Br. at 53-54. As an initial matter, product "specifications" represent the maximum allowed levels for a given product category, not the actual amount in the final product as manufactured, which is often many magnitudes lower. *See* ROA.20183, 20340, 20341. Regardless, establishing that Hain's products contained harmful levels of toxic metals requires expert testimony because it falls outside "the common knowledge and experience of

_____

[14] The Palmquists addressed this issue in a subsection of the part of their brief addressing causation. *See* Br. at 53-54. But the issue is not specifically one of causation and relates to other elements of the Palmquists' causes of action.

jurors." *Guevara*, 247 S.W.3d at 665. The Palmquists designated multiple expert toxicologists who claimed that they could make this connection. *See* ROA.19867 (describing Dr. Parran's role as an expert witness in Plaintiffs' case). Such testimony is especially crucial here because heavy metals are ubiquitous and unavoidable in the food supply. Absent expert testimony contextualizing those levels, a jury is left to pure speculation as to what level of heavy metals would render a food "harmful."

Despite recognizing the need for expert toxicologists on this topic, the Palmquists chose not to call those witnesses at trial, and not a single one of the experts they did call offered the opinion that Hain's baby foods contained unsafe levels of heavy metals. Indeed, the testifying experts did not offer any expert testimony as to **what level** of heavy metals Hain's products even allegedly contained. To the contrary, the Palmquists' experts disavowed any such opinion. Dr. Nelson conceded that he "didn't do any of [his] own assessment or testing or analysis of [the] metals," ROA.20851, and not surprisingly given his acknowledged lack of expertise, he did not know what "level of metals … might actually present a risk of heavy metal toxicity for a child," ROA.20852-53. And Dr. Settles testified that she left it up to "other experts" "as far as tallying up … the parts per billion levels, things like that," ROA.20683-84. But no other expert who testified at trial **did** the "tallying up" of the levels of heavy metals in Hain's food or determined whether they "might actually present a risk." This failure alone is separately fatal to all of the Palmquists'

claims.

Furthermore, not one expert or non-expert witness testified that Hain's products were unsafe or unreasonably dangerous at any time, including the periods in which Ethan ate Hain's baby food. To the contrary, Hain's employees Raul Fajardo, Allison Milewski, and Matthew Bletsch repeatedly testified that Hain's baby foods are safe, monitored, and approved by the FDA. ROA.19976, 19999, 20480. The Palmquists contend that "Hain now recognizes that 200 [parts per billion] is a dangerously high level of arsenic," Br. at 53, but that description is inaccurate. None of Hain's witnesses at trial testified that Hain's products were unsafe when its internal specifications were 200 parts per billion for arsenic consistent with international standards, and all agreed that more recent lower internal specifications did not render the prior levels unsafe. *See, e.g.*, ROA.19991, 20480-81, 21047-48, 21147-48.

The Palmquists' reference to internal Hain documents also does not show that the levels of heavy metals in Hain's baby foods made the products unreasonably dangerous, as these mischaracterized snippets from documents cannot establish that point without an expert offering that conclusion. *See* ROA.22127, 22131, 22452. At best, the Palmquists can pluck out a demonstrative graphic from a toxicology textbook in an internal Hain educational presentation stating that "inorganic arsenic" is, as a general matter and at very high levels, "very toxic to biological systems" and

that "arsenic poisoning" can cause severe adverse effects—which of course says nothing on the issue here that products with over 100 parts per billion arsenic (or arsenic levels anywhere near that amount) can have these effects. *Contra* Br. at 54; *see* ROA.20403-04 (Hain's expert toxicologist Dr. Keil explaining that parts per billion are minutely tiny, and "one drop from an eye dropper in that huge Olympic-size pool would be the equivalent of a part per billion" or "[o]ne second in about 32 years is the equivalent of a part per billion"). Likewise, the Palmquists' assertion that "[i]n drinking water, … the FDA limits arsenic to 10 ppb and lead to 5 ppb," Br. at 54, is inapposite where there is no evidence that heavy metal limits set for drinking water must correspond to limits in baby food, particularly given that the FDA has put in place different, higher limits for some baby foods. *See, e.g.*, ROA.22284 (2016 FDA draft guidance setting guidelines of 100 ppb arsenic for infant rice cereal).

The evidence at trial showed that other brands of baby food, and fresh produce in general, contained amounts of heavy metals comparable to or higher than those in Hain's baby food. ROA.18782-857, 19987, 21164-66, 21170. As Hain's witness Raul Fajardo testified, "[h]eavy metals at the levels in our products, the same as levels in everybody else's product, and the same levels that you see in raw produce, agriculture are safe." ROA.19987. This evidence, uncontested by any qualified expert or otherwise, precludes a finding of unreasonable dangerousness.

## IV. The Palmquists Failed to Present Substantial Evidence to Establish Other Elements of Their Substantive Causes of Action.

Put simply, the Palmquists' failure to present legally sufficient evidence of general or specific causation is fatal to each of their substantive causes of action against Hain. As laid out below, their substantive causes of action fail for other reasons as well.

### A. The Palmquists Presented Legally Insufficient Evidence That Hain's Baby Food Contained a Marketing Defect.

To recover on a product liability claim based on a marketing defect under Texas law,

> the plaintiff must prove each of the following elements: (1) a risk of harm was inherent in the product or might arise from the intended or reasonably anticipated use of the product, (2) the supplier of the product knew or reasonably could foresee the risk of harm at the time the product was marketed, (3) the product had a marketing defect, (4) the lack of instructions or warnings rendered the product unreasonably dangerous to the ultimate user or consumer of the product, and (5) the failure to warn or instruct caused the user's injuries.

*Garrick v. Autoliv ASP, Inc.*, No. 14-17-00818-CV, 2018 WL 3385159, at *5 (Tex. App.—Houston [14th Dist.] July 12, 2018, pet. denied).

Here, the lack of evidence of causation—both toxic torts causation and but-for causation given that the levels of heavy metals in Hain's baby food was not higher than that in other brands of baby food or in produce in general—knocks out elements (1) and (5). As to elements (2), (3), and (4), the Palmquists failed to present

legally sufficient evidence that its products were unreasonably dangerous and therefore that Hain's labeling was inadequate.

### B. The Palmquists Presented Legally Insufficient Evidence That Hain's Baby Food Contained a Manufacturing Defect.

"Under Texas law, [a] manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous." *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 326 (5th Cir. 2014). To prove a manufacturing defect, "plaintiffs must allege a specific deviation from the product's intended design that allegedly caused the injury." *Norman v. Bodum USA, Inc.*, 44 F.4th 270, 272 (5th Cir. 2022). The "touchstone of a manufacturing defect claim is proof that the allegedly defective product differs from other products in the same product line." *Casey*, 770 F.3d at 329.

Setting aside the other deficiencies set forth above, the manufacturing defect claim fails for the simple reason that the Palmquists offered no expert testimony or otherwise that the baby food Ethan consumed deviated from the baby food's intended design, *Norman*, 44 F.4th at 272, or "differ[ed] from other products in the same product line," *Casey*, 770 F.3d at 329. The Palmquists' references to Hain's internal guidelines for heavy metals are irrelevant: under Texas law, a company's internal standards or procedures cannot establish a standard of care. *FFE Transp. Servs. Inc. v. Fulgham*, 154 S.W.3d 84, 92-93 (Tex. 2004). Without an expert to

reliably opine that Hain's manufacturing deviated in some fashion from the intended process, their manufacturing defect claim must fail.

### C. The Palmquists Failed to Present Legally Sufficient Evidence to Support a Negligent Testing Claim.

To establish a negligence claim under Texas law, "a party must establish a duty, a breach of that duty, and damages proximately caused by the breach." *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006).

Again, the Palmquists presented no evidence—by expert testimony or otherwise—establishing the standard for reasonable care for product testing in the baby food industry, nor did they show that Hain's failure to test was outside the standard of care for the industry. *See Blackmon v. Am. Home Prods. Corp.*, 346 F. Supp. 2d 907, 917 (S.D. Tex. 2004) (rejecting failure to test claim where "Plaintiffs have neither alleged nor brought forth evidence describing the standard of care for pharmaceutical research"). Nor did the Palmquists prove a breach of any duty: the evidence demonstrated that Hain "tested the components that make up the finished product," ROA.19973, which tracked the industry standard, ROA.20896-97. Likewise, because the standard of care for testing here was outside "the experience of a layman," *Fulgham*, 154 S.W.3d at 90 (quotation omitted), the Palmquists needed to present evidence about this standard of care. They did not.

### D. The District Court Correctly Granted Hain Summary Judgment on the Palmquists' Design Defect Claim.

To establish a product liability claim based on an alleged design defect, "a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009). Courts have repeatedly held that expert testimony is necessary to prove the existence and feasibility of a safer alternative design and to survive summary judgment. *See, e.g.*, *Norman v. Grove Cranes U.S., L.L.C.*, 750 F. App'x 269, 273 (5th Cir. 2018) (collecting cases).

Because the Palmquists did not offer this expert testimony, the district court's grant of summary judgment to Hain on their design defect claim was correct. ROA.17012-15. And as with the Palmquists' other claims, the Palmquists did not present legally sufficient evidence to show that the alleged design defect caused Ethan's condition or that the alleged defect made the product unreasonably dangerous.

### CONCLUSION

For all the reasons explained above, the Court should affirm the judgment.

Respectfully submitted,

/s/Thomas C. Wright

| | |
|---|---|
| Paul W. Schmidt | Thomas C. Wright |
| Michael X. Imbroscio | Raffi Melkonian |
| Phyllis A. Jones | Eric B. Boettcher |
| Nicole M. Antoine | Cristina De La Cruz |
| COVINGTON & BURLING LLP | WRIGHT CLOSE & BARGER, LLP |
| One CityCenter | One Riverway, Suite 2200 |
| 850 Tenth Street NW | Houston, Texas  77056 |
| Washington, DC 20001 | (713) 572-4321 |
| 202-662-6000 | (713) 572-4320 (Fax) |
| 202-778-5868 [Fax] | wright@wrightclosebarger.com |
| mimbroscio@cov.com | melkonian@wrightclosebarger.com |
| pajones@cov.com | boettcher@wrightclosebarger.com |
| nantoine@cov.com | delacruz@wrightclosebarger.com |

**Attorneys for Defendant-Appellee The Hain Celestial Group, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2023, I electronically transmitted the attached Appellee's Brief to the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the Court's ECF System, which sent a Notice of Electronic Filing to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

*/s/ Thomas C. Wright*
Thomas C. Wright

**CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 15,608 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, and on September 25, 2023, the Court granted a motion for leave to file a brief not to exceed 17,000 words. See 5th Cir. R. 32.4.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font for text and Times New Roman 14-point font for footnotes.

*/s/ Thomas C. Wright*
Thomas C. Wright